IN THE UNITED STATES DISTRICT COURT
FOR THE NOTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| TYRONE CADE, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | Civil Action No. 3:17-cv-3396-G-BT |
| | § | |
| LORIE DAVIS, Director, | § | |
| | § | |
| Respondent. | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION**
**OF THE UNITED STATES MAGISTRATE JUDGE**

Petitioner Tyrone Cade has filed a motion for stay and abeyance (ECF no. 100). For the following reasons, the Court should GRANT the motion.

Background

On March 27, 2011, Cade fatally stabbed his girlfriend and her teenage daughter. He later turned himself into law enforcement authorities and gave a videotaped confession. *Cade v. State*, AP-76,883, 2015 WL 822421, *1-*2 (Tex. Crim. App. Feb. 25, 2015). At the guilt-innocence phase of his trial, Cade's trial counsel asserted an insanity defense under Section 8.01 of the Texas Penal Code, which the jury rejected. The jury convicted Cade of capital murder; it also subsequently answered the Texas capital sentencing scheme's future dangerousness special issue affirmatively and the mitigation special issue negatively. The Texas Court of Criminal Appeals (TCCA) affirmed Cade's conviction and sentence. *Cade v. State*, AP-76,883, 2015 WL 822421, *41. Cade

filed an application for state habeas corpus relief which the TCCA denied. *Ex parte Cade*, WR-83,274-01, 2017 WL 4803802 (Tex. Crim. App. Oct. 25, 2017).

Thereafter, on March 28, 2019, Cade filed his first amended federal habeas corpus petition in this court (ECF no. 79), asserting twenty claims for relief. Respondent filed her answer on July 26, 2019 (ECF no. 82). Cade filed his reply brief November 12, 2019 (ECF no. 98). Respondent was granted leave to file a sur-reply on January 23, 2020 (ECF no. 110). Cade filed his final reply brief on the merits on March 23, 2020 (ECF no. 114).

Now, Cade requests a stay and abeyance to permit him to return to state court and exhaust state habeas corpus remedies on five of his claims in his first amended petition: claim 4 (in which he argues that his trial counsel rendered ineffective assistance by failing to raise a mental health defense at the guilt-innocence phase of trial other than that of insanity); claim 9 (in which he is exempt from execution because he is intellectually disabled, i.e., his *Atkins* claim); claim 11 (ineffective assistance based upon his trial counsel's failure to investigate and present available mitigating evidence showing his lack of propensity for future dangerousness); claim 15 (cumulative error); and claim 18 (ineffective assistance arising from his trial counsel's failure to investigate and present available mitigating evidence).

<u>Legal Standards</u>

The Supreme Court has made it clear that a federal habeas court should defer action on a mixed petition such as Cade's first amended petition until the

appropriate state court has had the first opportunity to rule on the merits of an unexhausted claim. *Rhines v. Weber*, 544 U.S. 269, 273-74 (2005). A stay is the appropriate means of fulfilling the principles of comity underlying the exhaustion doctrine. *Rhines*, 544 U.S. at 276. A stay and abeyance is only appropriate when the federal habeas court determines there was good cause for the petitioner's failure to exhaust his claims first in state court. *Id.*, at 277. Even if good cause exists for the failure to exhaust, a stay is inappropriate when the unexhausted claim is plainly meritless. *Id.*

Exhausted Claims

Cade seeks leave to return to state court to re-litigate two claims, i.e., claim 4 and claim 18, which he fully litigated and on which he obtained rulings on the merits from the Texas Court of Criminal Appeals during his first state habeas corpus proceeding. Insofar as he argues that the Supreme Court's holdings in *Martinez v. Ryan,* 566 U.S. 1 (2012), and *Trevino v. Thaler*, 569 U.S. 413 (2013), allow him to re-litigate with new evidence these two claims, he misconstrues the holdings in those two Supreme Court opinions. The Supreme Court's holding in *Martinez v. Ryan* furnishes a narrow avenue for circumventing a procedural default. It requires a showing that the performance of state habeas counsel was so deficient as to *completely preclude* state court merits review of a meritorious claim of ineffective assistance by trial counsel, thus permitting a federal habeas court to undertake a merits review of the otherwise procedurally defaulted complaint of ineffective assistance by state trial counsel. *See In re Edwards*, 865 F.3d 197, 207-

08 (5th Cir. 2017) (To show cause for procedural default under *Martinez* and *Trevino*, "the petitioner must show (1) that his claim of ineffective assistance of counsel at trial is 'substantial' (i.e., 'has some merit'); and (2) that his habeas counsel was ineffective for failing to present those claims in his first state habeas application." (quoting *Beatty v. Stephens*, 759 F.3d 455, 465-66 (5th Cir. 2014)); *Prystash v. Davis*, 854 F.3d 830, 836 (5th Cir. 2017) (holding the Supreme Court's rulings in *Martinez* and *Trevino* created a narrow exception to the general rules of procedural default that applies only to a claim of ineffective assistance by state trial counsel).

Cade was not precluded by his state habeas counsel's allegedly ineffective assistance from fairly presenting and obtaining a ruling on the merits from the TCCA of either of these ineffective assistance claims during his state habeas corpus proceeding. On the contrary, the TCCA rejected both claims on the merits. Thus, Cade may not rely on *Martinez* or *Trevino* to justify a stay in this cause to allow Cade to return to state court and attempt to re-litigate those two claims using new factual allegations and new evidence. Likewise, Cade may not re-litigate those claims in this court using new factual allegations and new evidence. *Cullen v. Pinholster*, 563 U.S. 170, 181-82 (2011) ("[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits. Section 2254(d)(1) refers, in the past tense, to a state-court adjudication that 'resulted in' a decision that was contrary to, or 'involved' an unreasonable application of, established law. This backward-looking language requires an

examination of the state-court decision at the time it was made. It follows that the record under review is limited to the record in existence at that same time *i.e.,* the record before the state court.”).

Thus, Cade is not entitled to a federal evidentiary hearing on any of his claims which were rejected on the merits by the state courts, either on direct appeal or during his state habeas corpus proceeding. *See Halprin v. Davis*, 911 F.3d 247, 255 (5th Cir. 2018) (“If a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court.” (quoting *Pinholster*, 563 U.S. at 185)), *cert. denied*, 140 S. Ct. 167 (2019). He is not entitled to a stay of this proceeding so that he can return to state court and seek to re-litigate the same claims with new evidence.

Likewise, Cade’s complaints of ineffective assistance by his state habeas counsel during his first state habeas corpus proceeding do not furnish an independent basis for federal habeas corpus relief. Infirmities in state habeas corpus proceedings do not give rise to a basis for federal habeas relief. *See, e.g., Stevens v. Epps*, 618 F.3d 489, 502 (5th Cir. 2010) (allegedly inadequate funding and staffing of the Mississippi Office of Capital Post-Conviction Counsel); *Haynes v. Quarterman*, 526 F.3d 189, 195 (5th Cir. 2008) (alleged ineffective assistance by initial state habeas counsel); 28 U.S.C. § 2254(i). Cade is not entitled to a stay and abeyance of this cause so that he can return to state court and seek to re-litigate claims on which he has already obtained a ruling on the merits.

Intellectual Disability Claim[1]

Cade also seeks leave to return to state court to litigate a new *Atkins* claim (claim 9). During his capital murder trial, Cade presented testimony from several different mental health experts. None suggested Cade was intellectually disabled. In his first amended petition, Cade admits that he is a high school graduate who briefly attended community college but insists his academic deficits qualify him as intellectually disabled. First. Am. Pet. (ECF no. 79) at 82-88. At no point in his first amended petition, however, does Cade allege any specific facts showing that any of the mental health professionals who have evaluated him has ever diagnosed Cade as intellectually disabled.

The Supreme Court's case law addressing intellectual disability does not provide a uniform definition for the condition. In *Atkins v. Virginia*, 536 U.S. 304 (2002), the United States Supreme Court concluded the execution of "mentally retarded" persons failed to fulfill either of the two justifications for capital punishment, *i.e.*, retribution and deterrence, and held the Eighth Amendment

[1] While the parties' pleadings in both the state habeas court and this court occasionally employ the terms "mental retardation" and "mentally retarded," the undersigned uses the terms "intellectual disability" and "intellectually disabled." *See In re Cathey*, 857 F.3d 221, 223 n.1 (5th Cir. 2017) ("The term 'intellectual disability' has replaced 'mental retardation.'" (citing *Brumfield v. Cain*, 576 U.S. 305, ___ n.1, 135 S. Ct. 2269, 2274 n.1 (2015)); *see also Hall v. Florida*, 572 U.S. 701, 704-05 (2014) ("This change in terminology is approved and used in the latest edition of the Diagnostic and Statistical Manual of Mental Disorders, one of the basic texts used by psychiatrists and other experts, the manual is often referred to by its initials 'DSM,' followed by its edition numbers, *e.g.*, 'DSM-5.'").

forbids the execution of mentally retarded persons. *Atkins*, 536 U.S. at 318-21. The Supreme Court cited two clinical definitions of "mental retardation" with approval:

> The American Association on Mental retardation (AAMR) defines mental retardation as follows: "*Mental retardation* refers to substantial limitations in present functioning. It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure and work. Mental retardation manifests before age 18." Mental Retardation, definition, Classification, and Systems of Supports 5 (9th ed. 1992).

[and]

> The American Psychiatric Association's definition is similar. "The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health and safety (Criterion B). The onset must occur before age 18 years (Criterion C). Mental Retardation has many different etiologies and may be seen as a final common pathway of various pathological processes that affect the functioning of the central nervous system." Diagnostic and Statistical Manual of Mental Disorders 41 (4th ed. 2000). "Mild mental retardation is typically used to describe people with an IQ of 50-55 to approximately 70. *Id*., at 42-43.

*Id*., at 309 n.3. But, ultimately, the Court left to the States "the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences." *Id*., at 317; *see also Bobby v. Bies*, 556 U.S. 825, 831 (2009) (noting *Atkins* did not provide definitive procedural or substantive guides for determining when a person who claims intellectual disability will be so impaired as to fall within *Atkins'* limits).

Nonetheless, the Supreme Court recognizes that "an IQ between 70 and 75 or lower" is "typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition." *Brumfield v. Cain,* 576 U.S. 305, 315, (2015) (quoting *Atkins*, 536 U.S. at 309 n.5). Thus, an IQ score of 75 is "squarely in the range of potential intellectual disability." *Brumfield*, 576 U.S. at 315.

Regarding the first prong of the *Atkins* analysis, *i.e.*, establishing significantly subaverage intellectual functioning, the Supreme Court has held that, because of the imprecision inherent in IQ testing,[2] a court must consider the standard error of measurement (SEM) when assessing intellectual disability:

---

[2] In *Hall v. Florida*, 572 U.S. 701 (2014), the Supreme Court explained in some detail the nature of the imprecision inherent in IQ testing as follows:

> The professionals who design, administer, and interpret IQ tests have agreed, for years now, that IQ test scores should be read not as a single fixed number but as a range. Each IQ test has a "standard error of measurement," often referred to by the abbreviation "SEM." A test's SEM is a statistical fact, a reflection of the inherent imprecision of the test itself. An individual's IQ test score on any given exam may fluctuate for a variety of reasons. These include the test taker's health; practice from earlier tests; the environment or location of the test; the examiner's demeanor; the subjective judgment involved in scoring certain questions on the exam; and simple lucky guessing. . . . The SEM reflects the reality that an individual's intellectual functioning cannot be reduced to a single numerical score. For the purposes of most IQ tests, the SEM means that an individual's score is best understood as a range of scores on either side of the recorded score. The SEM allows clinicians to calculate a range within which one may say an individual's true IQ score lies. . . . Even when a person has taken multiple tests, each separate score must be assessed using the SEM, and the analysis of multiple IQ scores jointly is a complicated endeavor. In addition, because the test itself may be flawed, or administered in a consistently flawed manner, multiple examinations

> The legal determination of intellectual disability is distinct from a medical diagnosis, but it is informed by the medical community's diagnostic framework. *Atkins* itself points to the diagnostic criteria employed by psychiatric professionals. And the professional community's teachings are of particular help in this case, where no alternative definition of intellectual disability is presented and where this Court and the States have placed substantial reliance on the expertise of the medical profession.
>
> By failing to take into account the SEM and setting a strict cutoff at 70, Florida "goes against the unanimous professional consensus." APA Brief 15. Neither Florida nor its *amici* point to a single medical professional who supports this cutoff. The DSM–5 repudiates it: "IQ test scores are approximations of conceptual functioning but may be insufficient to assess reasoning in real-life situations and mastery of practical tasks." DSM–5, at 37. This statement well captures the Court's independent assessment that an individual with an IQ test score "between 70 and 75 or lower," *Atkins, supra,* at 309, n. 5, 122 S.Ct. 2242, may show intellectual disability by presenting additional evidence regarding difficulties in adaptive functioning.

*Hall v. Florida*, 572 U.S. 701, 721-22 (2014).

In *Moore v. Texas*, 581 U.S. ___, ___, 137 S. Ct. 1039, 1048-53 (2017) (*Moore I*), the Supreme Court further restricted States' ability to circumscribe the legal definition of "intellectual disability," holding (1) a State's determination under *Atkins* must be guided by current medical standards[3] and (2) States are not

---

> may result in repeated similar scores, so that even a consistent score is not conclusive evidence of intellectual functioning.

*Hall*, 572 U.S. at 712-14 (internal citations and quotations omitted).

[3] *Moore I*, 137 S. Ct. at 1048-49 ("Although *Atkins* and *Hall* left to the States "the task of developing appropriate ways to enforce" the restriction on executing the intellectually disabled, States' discretion, . . ., is not "unfettered." Even if "the views of medical experts" do not "dictate" a court's intellectual-disability determination, . . ., the determination must be "informed by the medical community's diagnostic

free to adopt criteria unsupported by medical science to evaluate a defendant's alleged subaverage intellectual functioning or deficits in adaptive skills.[4] More specifically, the Supreme Court held the TCCA erred in applying a set of non-clinical criteria known as the *Briseno* factors in evaluating a defendant's claim of intellectual disability because (1) some of the *Briseno* factors had implicitly been rejected by the medical community (in part because they were based on outdated stereotypes) and (2) all the *Briseno* factors were little more than lay perceptions of intellectual disability untethered to any clinical medical standard. *Moore I*, 137 S. Ct. at 1050-53. Two years later, in *Moore v. Texas*, 139 S. Ct. 666, 668-72 (2019) (*Moore II*), the Supreme Court again struck down as a violation of the Eighth

---

framework." . . . Florida, . . ., had violated the Eighth Amendment by "disregarding established medical practice" [and] . . . parted ways with practice and trends in other States. *Hall* indicated that being informed by the medical community does not demand adherence to everything stated in the latest medical guide. But neither does our precedent license disregard of current medical standards.") (citations omitted).

[4] For example, the Supreme Court pointed out the Texas appellate court focused on Moore's perceived adaptive strengths in certain areas when the current clinical approach called for identification of deficits in adaptive skills. *Moore I*, 137 S. Ct. at 1050. The Texas appellate court also pointed out Moore's improved behavior in prison; whereas the Supreme Court noted clinicians caution against reliance on adaptive strengths developed in a controlled setting. *Id*. The Texas appellate court attempted to explain away Moore's poor academic performance by pointing to traumatic childhood abuse and suffering; the Supreme Court pointed out the medical community employed such traumatic experiences as "risk factors" sufficient to explore the prospect of intellectual disability. *Id*., at 1051. The Texas appellate court required Moore to show that his adaptive deficits were unrelated to his "personality disorder"; the Supreme Court pointed out mental health professionals have long recognized that intellectual disability may be co-morbid with a wide variety of personality disorders, attention-deficit disorder, depression, and even bi-polar disorder. *Id*.

Amendment a new TCCA determination that Moore was intellectually disabled, finding the TCCA had committed many of the same analytical errors identified in *Moore I*.

Thus, the Supreme Court's case law addressing intellectual disability does not employ a uniform definition of the condition. Instead, the Supreme Court recognizes the distinction between the medical and legal definitions of intellectual disability and directs the States to craft their own approaches to the issue. And the Supreme Court has reversed state courts for straying too far from current, best medical practices. The result is a fluid legal landscape in which state courts and legal practitioners have operated since *Atkins*.

What is clear at this juncture is that whether Cade is intellectually disabled is a question of fact. *Matamoros v. Stephens*, 783 F.3d 212, 216 (5th Cir. 2015); *Maldonado v. Thaler*, 625 F.3d 229, 236 (5th Cir. 2010). The Supreme Court and Fifth Circuit have both made clear that, under the AEDPA, the proper place for development of the factual bases for federal habeas claims is the state courts. *See Harrington v. Richter*, 562 U.S. 86, 103 (2011) ("Section 2254(d) thus complements the exhaustion requirement and the doctrine of procedural bar to ensure that state proceedings are the central process, not just a preliminary step for a later federal habeas proceeding."); *Hernandez v. Johnson*, 108 F.3d 554, 558 n.4 (5th Cir. 1997) (holding AEDPA clearly places the burden on a federal habeas petitioner to raise and litigate as fully as possible his federal claims in state court).

Cade alleges that he has tested in the 76-80 range on standardized IQ tests and his background demonstrates multiple deficits in adaptive behavior. Considering the SEM of plus or minus five points for most IQ tests, and the possible application of the "Flynn effect," which neither party has yet addressed in a meaningful manner, Cade's allegations put him at least within the range of a possible diagnosis of intellectual disability. Cade argues persuasively that he should be permitted to return to state court to argue and present evidence showing that he is intellectually disabled - a contention which if proven, would render moot many of the other claims Cade has presented to this federal habeas court in his first amended petition. Cade also correctly points out that the TCCA's persistent reliance upon the *Briseno* factors, *see Ex parte Briseno*, 135 S.W.3d 1, 8 (Tex. Crim. App. 2004), created analytical confusion within the Texas appellate courts which lasted beyond the Supreme Court's opinion in *Moore I*.

Before this court appoints mental health experts to explore whether Cade is intellectually disabled and expends scarce judicial resources to hold an evidentiary hearing and determine whether *in fact* Cade is intellectually disabled, the state courts should be permitted an opportunity to address that critical factual issue. To do otherwise would run counter to the principles of federalism and comity that form the basis of the exhaustion doctrine and that underlie the expressions of congressional intent found within the AEDPA.

The legislative history of the AEDPA indicates that it was intended as a limitation upon the scope of federal habeas review. One of the principal purposes

of the AEDPA was to reduce delays in the execution of state and federal criminal sentences, especially capital sentences. *Ryan v. Gonzales*, 568 U.S. 57, 76 (2013); *Schriro v. Landrigan*, 550 U.S. 465, 475 (2007); *Rhines*, 544 U.S. at 276. Another purpose of the AEDPA was to encourage litigants to pursue claims in state court prior to seeking federal collateral review. *Duncan v. Walker*, 533 U.S. 167, 181 (2001); *see also Hernandez*, 108 F.3d at 558 n.4 (the AEDPA imposes the burden on a petitioner to litigate to the maximum extent possible, including fairly presenting all available evidence supporting, his claims in state court). The AEDPA was also intended to prevent piecemeal litigation and gamesmanship. *Magwood v. Patterson*, 561 U.S. 320, 334 (2010). Thus, under the AEDPA, federal habeas review of claims is limited to the record that was before the state court that adjudicated the prisoner's claims on the merits. *Pinholster*, 563 U.S. at 182. "The AEDPA statute of limitation promotes judicial efficiency and conservation of judicial resources, safeguards the accuracy of state court judgments by requiring resolution of constitutional questions while the record is fresh, and lends finality to state court judgments within a reasonable time." *Day v. McDonough*, 547 U.S. 198, 205-06 (2006). Collectively, the provisions of the AEDPA further the principals of comity, finality, and federalism. *Panetti v. Quarterman*, 551 U.S. 930, 945 (2007); *Miller-El v. Cockrell*, 537 U.S. 322, 337 (2003).

Cade's request for a stay and abeyance to permit him to return to state court and to exhaust available state habeas corpus remedies on his currently unexhausted intellectual disability claim in a post-*Moore* context should be

granted. The inconsistency found within the Texas appellate courts and among Texas legal practitioners by the TCCA's reliance upon the *Briseno* factors justifies permitting Cade an opportunity to fully and fairly litigate his intellectual disability claim in the state courts. Cade's state trial counsel, state appellate counsel, and state habeas counsel confronted a State legal landscape influenced by evolving Supreme Court precedent that attempted to define the term intellectual disability and the TCCA's *Briseno* factors. Counsels' decision to forego an attempt to assert an *Atkins* claim may have been based upon their understanding of the manner in which the TCCA applied the *Briseno* factors to deny intellectual disability claims. Under such circumstances, Cade should be permitted to return to state court and litigate his intellectual disability claim, which if successful, will render moot many of his claims for federal habeas corpus relief, especially those challenging the legitimacy of his death sentence.

Because Cade is entitled to a stay and abeyance to permit state court consideration of his intellectual disability claim, he should be permitted to seek state court review on any and all of the claims he has included in his first amended petition for federal habeas corpus relief. A stay should be issued consistent with the holding in *Rhines*. Cade will have an opportunity in his second or subsequent state habeas corpus proceeding to fairly present the state courts with all of the claims that he has included in his first amended federal habeas corpus petition, all the factual allegations supporting those claims, and (through properly

authenticated documents, affidavits, and sworn declarations) all of the evidence he wishes to present in support of those claims.

Avoiding Unnecessary Delay

To avoid unnecessary delay in the disposition of the forthcoming state habeas corpus proceeding, Cade should be directed to file his application for leave to file a second or subsequent state habeas corpus application in the appropriate state court in an expeditious manner.

Recommendation

Cade's motion for stay and abeyance (ECF No. 100) should be **GRANTED**; and Cade should be directed within 30 days to (1) file in the appropriate state court his application for leave to file a second or subsequent state habeas corpus application, (2) include in his second or subsequent state habeas corpus application (a) all of the claims that he wishes this federal court to consider in ruling on his petition for federal habeas corpus relief and (b) all of the factual allegations supporting those same claims that he wishes to raise in this court, and (3) present the state court with all of the evidence supporting his claims for federal habeas corpus relief that he wishes this court to consider in ruling on his claims for federal habeas corpus relief.

SIGNED July 2, 2020.

REBECCA RUTHERFORD
UNITED STATES MAGISTRATE JUDGE

**INSTRUCTIONS FOR SERVICE AND NOTICE OF RIGHT TO OBJECT**

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of this report and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Services Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).