IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| TYRONE CADE, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| VS. | ) | CIVIL ACTION NO. |
| | ) | |
| ERIC GUERRERO, Director, Texas | ) | 3:17-CV-3396-G-BT |
| Correctional Institutions Division, | ) | |
| Department of Criminal Justice, | ) | |
| | ) | |
| Respondent. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Petitioner Tyrone Cade ("Cade") filed this federal habeas corpus action under

28 U.S.C. § 2254 challenging his August 2012, Dallas County, Texas, capital murder

conviction and death sentence.  Cade's recent wave of motions challenging the

constitutionality of the Antiterrorism and Effective Death Penalty Act ("AEDPA")

(ECF nos. 150, 151, 152, 158) are untimely and lacking in arguable merit.  For the

reasons set forth below, the court determines that Cade is not entitled to federal

habeas corpus relief or a Certificate of Appealability ("COA").

## I.  BACKGROUND

In the early morning hours of March 27, 2011, Cade stabbed to death his romantic partner, Mischell Fuller ("Fuller"), and Fuller's teenage daughter, Desaree Hoskins ("Desaree").[1]  Cade also raped Fuller after he repeatedly stabbed her in the neck and chest.  Although mortally wounded, Desaree was alive and close enough to Fuller to witness her rape.  Later the same day, Cade turned himself in by calling 911 from a pay phone in a police station lobby.  After receiving *Miranda* warnings, Cade gave officers two video-recorded statements in which he confessed to the killings in detail.  On April 19, 2011, a Dallas County grand jury indicted Cade in cause no. F-11-33962-R on a charge of capital murder.[2]

The guilt-innocence phase of Cade's capital murder trial began on August 20, 2012.  In addition to Cade's recorded confessions, which were played for the jury, the evidence included handwritten notes recovered from a notebook found in a bathroom near the bodies of the victims with a bloody knife.  The notes explained that Cade killed Fuller because she "kicked [him] to the curb" and because he could not live without Fuller, he took Fuller from himself and "from . . . anyone else."  The medical examiner ("ME") also testified that Fuller died from being stabbed twenty-eight

---

[1]     The opinion of the Texas Court of Criminal Appeals ("TCCA") on direct appeal contains a detailed and accurate summary of the evidence introduced during Cade's trial.  *Cade v. State*, No. AP-76,883, 2015 WL 832421, *1-*2 (Tex. Crim. App. Feb. 25, 2015), *cert. denied*, 577 U.S. 1105 (2016).

[2]     ECF no. 68-5, 16.

times, and that several of Fuller's wounds were between four and five inches deep. Desaree's death resulted from thirty-nine stab wounds, many of which were also between four and five inches deep. The ME testified that the perpetrator used a great deal of force in inflicting Desaree's injuries, noting the wounds penetrated her bones.

The defense presented numerous witnesses to support Cade's argument that he was insane at the time he murdered Fuller and Desaree. The jury watched portions of a videotaped deposition of Cade's father who was then suffering from ill-health, including symptoms of schizophrenia, and heard an excerpt from that same deposition in which Cade's father testified that Cade's mother sexually abused Cade when he was about two years old and, around the same time period, Cade witnessed an incident in which his father struck his mother in the head with a hammer.[3]

Cade's older half-brother Gregory Scott also testified that (1) Cade's father was abusive toward Cade and frequently beat Cade's mother; (2) both of Cade's parents abused drugs and alcohol; (3) both of Cade's parents beat Cade as a child; (4) Cade has a brother, Jerry Scott, who has mental problems; (5) their family likes to say they have a "crazy" bloodline; (6) in a pair of incidents Cade witnessed when he was age two to two-and-a-half, Cade saw (a) his mother pin his father against a

---

[3]     Statement of Facts from Trial (henceforth "R.R. Trial"), Volume 47 [ECF no. 69-47], at 82-85.

wall by stabbing him with a knife, and (b) his father strike his mother in the head with a hammer; (7) after the latter incident, Cade's mother took her children and left the family's home; (8) Fuller took care of Cade's daughter Tyra while Cade was in prison for a prior offense; (9) when Cade left prison, he moved in with Fuller; (10) Cade was worse emotionally – more standoffish – when he came out of prison; (11) Cade used experimental pain patches for his back pain; and (12) he did not believe Cade understood what he was doing was wrong when he stabbed Fuller and Desaree.[4]

Dr. David Altman, a psychologist who had not evaluated Cade and offered no diagnosis of Cade's condition, testified regarding the heritability of schizophrenia and schizoaffective disorder.[5]  Dr. Michael Gottlieb, another psychologist who did not interview or evaluate Cade and offered no opinion regarding Cade's sanity, testified that children who are sexually abused often develop serious emotional disturbances, bipolar disorder, some psychoses, mental illness, long term depression, difficulties maintaining intimate relationships, and chronic post-traumatic stress disorder ("PTSD").[6]

---

[4]     46 R.R. Trial [ECF no. 69-46] at 77-109.

[5]     *Id*. at 134-43.

[6]     47 R.R. Trial [ECF no. 69-47] at 48-81.

The defense also called psychologist Dr. Gilda Kessner, who like Cade's other mental health experts, had neither interviewed nor evaluated Cade.  Dr. Kessner testified based upon information privately conveyed to her by Cade's defense team, her review of Cade's journal writings after the offense, and her review of a report prepared by prosecution expert Dr. Timothy James Proctor, that (1) Cade was likely traumatized as a child; (2) Cade thereafter likely developed symptoms of PTSD; (3) at the time of his offense Cade also suffered from depression and a variety of stressors; (4) as a result, at the time of his offense, Cade likely experienced a mental disease or defect – specifically abandonment rage; (5) Cade's abandonment rage consisted of an uncontrollable emotional state originating in childhood which became incorporated into his personality as he matured into adulthood and rendered him vulnerable to feelings of insecurity in his intimate personal relationships, depression, and an inability to control his emotions when stressed; (6) while suffering from abandonment rage, Cade experienced an inability to volitionally control his emotions, *i.e.*, Cade experienced a state of "autonomic arousal" in which he engaged in uncontrollable "fight or flight" behavior divorced from any rational thought processes; (7) Cade's abandonment rage began when Fuller saw the knife he was holding and screamed, and this condition lasted until all the violence ceased; (8) during Cade's episode of abandonment rage, he was unable to understand that his conduct was wrong; and (9) Cade's later writings in his journal and comments to

- 5 -

Dr. Proctor that he understood that his conduct was wrong were *ex post facto* rationalizations by Cade, were based entirely on hindsight, and did not accurately reflect Cade's actual thought processes at the time of his offense.[7]

In rebuttal, the prosecution called Dr. Proctor, a forensic psychologist who had interviewed and evaluated Cade. Dr. Proctor testified that (1) Cade was not suffering from a severe mental disease or defect at the time of the capital offense; (2) Cade understood at that time that his actions were wrong; and (3) he was confident of both of his conclusions based upon his clinical interview and psychological testing of Cade, his interviews of Cade's family members, and his review of Cade's audiotaped 911 call, Cade's recorded post-arrest police interviews, Cade's handwritten journals, and Cade's voluminous school, medical, jail, probation, prison, and employment records.[8]

On August 24, 2012, the jury returned its verdict, unanimously finding Cade guilty of capital murder and implicitly rejecting Cade's claim of insanity.[9] The punishment phase of Cade's trial began three days later.

---

[7]    48 R.R. Trial [ECF no. 69-48] at 36-105.

[8]    *Id*. at 109-79.

[9]    *Id*. at 231-32. The guilt-innocence phase jury charge and verdict form appear at ECF no. 68-5 at 404-10.

During the punishment phase, the jury heard the prosecution's punishment phase evidence, as well as the evidence of Cade's future dangerousness.[10]  This evidence showed that Cade stabbed Fuller twenty-eight times and Desaree thirty-nine times, using great force to inflict deep, painful wounds.  Fuller and Desaree both lived between thirty and forty minutes before they died.  For Fuller, this interval included a sexual assault while she was dying but still conscious and able to experience pain and fear.  While sexually assaulting Fuller, Cade was aware that Desaree was alive, within close proximity of her mother's ongoing sexual assault, and sufficiently conscious to speak.

The jury heard evidence concerning Cade's prior criminal history, which included a 1987 juvenile adjudication of delinquent conduct for burglary of a habitation, evidence that Cade committed aggravated assault with a deadly weapon when he shot a man with a shotgun in 1993, and a 1999 conviction for aggravated sexual assault.

The jury also heard evidence of Cade's behavior and attitude following his 1999 aggravated-sexual-assault conviction.  Cade's community supervision officer for that offense asserted that, while Cade was incarcerated, he was critical of his past decisions and expressed willingness to adhere to his community-supervision

---

[10]     The TCCA analyzed this evidence on direct appeal.  See *Cade v. State*, 2015 WL 832421, at *6-*8.

conditions.  However, following Cade's release from jail, he "had an about face," told the officer he would not adhere to the conditions, and denied his guilt.  Another counselor who led the sex-offender treatment program that Cade was required to attend, testified that he found Cade to be extremely manipulative.  At his first session, Cade attempted to cry in front of the group, a behavior that the counselor surmised was not a genuine emotional response; and thereafter, Cade was evasive, argumentative, disruptive, and manipulative.  Cade was terminated from the program after only three scheduled sessions, one of which he failed to attend.  In the discharge summary, the counselor wrote that Cade's recidivism risk was extremely high. Following Cade's termination from the treatment program, the court revoked his community supervision and sentenced him to three years in prison.  Cade's disciplinary records while incarcerated showed that Cade was found in possession of contraband and had an altercation with another inmate, during which Cade suffered a black eye, and the other inmate suffered a fractured thumb.

The defense played another excerpt from the videotaped deposition of Cade's father for the jury before calling an acquaintance and former coworker of Cade who testified Cade was able to learn the skills necessary to do his job and follow instructions and, from what he could tell from talking with Cade frequently and

attending one birthday party for Cade's daughter Tyra, Cade was a good father to his daughter.[11]

The defense also called a former prison inmate who had been exonerated based on DNA evidence who testified about the daily living conditions within TDCJ, the security conditions applicable to inmate movement within a unit, and, on cross-examination, the fact that inmates have access to many items they can turn into weapons, and some inmates have escaped from TDCJ facilities.[12]

A Dallas County Jail supervisor testified Cade had not caused any problems during the year and a half he had supervised him (under 23-hour a day lockdown conditions).[13]  A retired TDCJ official testified regarding the inmate classification system used to control inmates, and he reported there was nothing remarkable about Cade's disciplinary records during his previous term of incarceration in the TDCJ, including the absence of any disciplinary citation arising from the fight with another inmate in which Cade was involved.[14]

Cade's childhood friend and high school teammate testified that Cade was a phenomenal athlete in high school until Cade was injured playing football his junior

---

[11]     50 R.R. Trial [ECF no. 69-50] at 56-67.

[12]     *Id*. at 79-109.

[13]     *Id*. at 119-25.

[14]     *Id*. at 126-53, 176-78, 181-82.

year and forced to give up football due to partial paralysis and dizziness that was later attributed to a genetic condition.  Prior to his injury Cade had been extremely popular, but afterward Cade had a difficult time adjusting.[15]  Cade's cousin Rhea Scott testified she had been raised with Cade and knew him her entire life; she knew Cade to be a good and loving father to his daughter who still loved Cade very much; many members of their family had visited Cade in jail during his pretrial detention; and their family would have supported Cade had he asked them for help prior to the murders because they had supported Cade during his childhood when his mother was in and out of his life.[16]

In rebuttal, the prosecution called Fuller's son Michael Hoskins, who testified regarding the impact of the murders of his mother and sister on his family and him.[17]

On August 29, 2012, Cade's jury found (1) unanimously and beyond a reasonable doubt there was a probability Cade would commit future acts of violence that would constitute a continuing threat to society, and (2) unanimously there was no mitigating circumstance which warranted the imposition of a term of life imprisonment for Cade.[18]

---

[15]    51 R.R. Trial [ECF no. 69-51] at 22-31.

[16]    *Id*. at 31-42.

[17]    *Id*. at 48-57.

[18]    *Id*. at 125-27.  The jury charge and verdict form from the punishment
(continued...)

Cade appealed his conviction and sentence.[19]  The TCCA affirmed,[20] and the United States Supreme Court denied Cade's petition for writ of certiorari on January 19, 2016.[21]

The Texas Office of Capital and Forensic Writs filed Cade's initial state habeas corpus application on September 9, 2014, asserting sixteen claims for relief.[22]  The state habeas trial court held an evidentiary hearing on some of Cade's claims on June 22-28, 2016, and November 17, 2016, during which it heard testimony from Cade's three trial counsel, Cade's mitigation specialist (psychologist Dr. Kristi L. Compton), Cade's expert attorney, a clinical and forensic psychiatrist who evaluated Cade (Dr. Seth Silverman), Cade's older half-brother (Jerry Scott), a licensed social worker who interviewed Cade (Laura Sovine), a forensic psychologist who evaluated Cade (Dr. Proctor), and a neuropsychologist who evaluated Cade (Dr. J. Randall Price).  On April 10, 2017, the state trial court issued its findings of fact, conclusions of law, and

---

[18](...continued)
phase of Cade's capital murder trial appear at ECF no. 68-5 at 415-30.

[19]    On December 19, 2013, attorney Catherine Bernhard filed Cade's appellate brief in the TCCA, asserting forty-four points of error.  A copy of the brief appears at ECF no. 68-17.

[20]    *Cade v. State*, 2015 WL 832421, at *41.

[21]    *Cade v. Texas*, 577 U.S. 1105 (2016).

[22]    A copy of Cade's initial state habeas application appears at ECF no. 71-4.

a recommendation that Cade's state habeas application be denied.[23]  The TCCA

adopted most but not all of the trial court's findings and conclusions and denied

Cade state habeas relief.[24]

Cade filed his first amended federal habeas corpus petition in this court on

March 28, 2019 (ECF no. 79), asserting twenty claims for relief.  Respondent filed an

answer (ECF no. 82); Cade filed his reply (ECF no. 98).  The court granted

Respondent leave to file a sur-reply (ECF no. 110).  Thereafter, Cade filed his final

reply brief on the merits (ECF no. 114).

While his first amended petition was pending, Cade filed a motion requesting

a stay and abeyance to permit him to return to state court and exhaust state habeas

corpus remedies on five of his claims in his first amended petition (ECF no. 100).

The court stayed this proceeding to permit Cade to exhaust state remedies on several

unexhausted claims (ECF no. 119).

On November 19, 2020, Cade filed his first subsequent state habeas corpus

application, in which he asserted twenty-two claims for relief.  Four and a half

months later, the TCCA summarily dismissed Cade's first subsequent state habeas

---

[23]    The state trial court's order containing its findings, conclusions, and recommendation in Cade's initial state habeas corpus proceeding ("FFCL") appears at ECF no. 71-9 and at ECF no. 134-2 at 113-216.

[24]    *Ex parte Cade*, No. WR-83,274-02, 2017 WL 4803802 (Tex. Crim. App. Oct. 25, 2017) (per curiam).  A copy of the TCCA's unpublished order accepting most of the trial court's findings appears at ECF no. 134-2 at 217-23.

application pursuant to the Texas abuse-of-the-writ statute, *i.e.*, Article 11.071, § 5(a) of the Texas Code of Criminal Procedure.[25]  The United States Supreme Court denied Cade's petition for writ of certiorari.[26]

Cade filed his second amended federal habeas petition in this court on August 10, 2021 (ECF no. 127), asserting seventeen grounds for relief.  Respondent filed its original answer (ECF no. 132) and a supplemental answer (ECF no. 141).  Cade filed his reply brief (ECF no. 146).

Cade filed a pair of motions on July 23, 2025, seeking to have this court declare AEDPA unconstitutional and void (ECF nos. 150, 151), along with a motion for leave to file same (ECF no. 152).  Cade later renewed his motion for leave to file his challenges to the constitutionality of AEDPA (ECF no. 158).  Respondent opposes Cade's motions for leave to challenge AEDPA constitutionality as untimely and lacking in merit (ECF no. 159).

## II.  LEGAL STANDARDS

For the reasons discussed in Section IV below, this court's review of Cade's federal habeas corpus claims is governed by AEDPA.[27]

---

[25]     *Ex parte Cade*, No. WR-83,274-03, 2021 WL 1202479, at *2 (Tex. Crim. App. Mar. 31, 2021) (per curiam).

[26]     *Cade v. Texas*, __ U.S.__, 142 S. Ct. 783 (2022).

[27]     *Penry v. Johnson*, 532 U.S. 782, 792 (2001) ("*Penry II*").  For the reasons discussed at length below, Cade's requests that this court declare AEDPA

(continued...)

The legislative history of AEDPA indicates it was intended as a limitation upon the scope of federal habeas review, not as an enactment intended to broaden the scope of federal habeas review or to reconfigure federal habeas courts as super state appellate courts. One of the principal purposes of AEDPA is to reduce delays in the execution of state and federal criminal sentences, especially capital sentences.[28] Another purpose of AEDPA is to encourage litigants to pursue claims in state court prior to seeking federal collateral review.[29] AEDPA is also intended to prevent "piecemeal litigation and gamesmanship."[30] Thus, under AEDPA, federal habeas review of claims is limited to the record that was before the state court which adjudicated the prisoner's claims on the merits.[31] "The AEDPA statute of limitations promotes judicial efficiency and conservation of judicial resources, safeguards the accuracy of state court judgments by requiring resolution of constitutional questions while the record is fresh, and lends finality to state court judgments within a

---

[27](...continued)
unconstitutional and null and void lack any arguable merit.

[28]     *Ryan v. Gonzales*, 568 U.S. 57, 76 (2013); *Schriro v. Landrigan*, 550 U.S. 465, 475 (2007); *Rhines v. Weber*, 544 U.S. 269, 276 (2005).

[29]     *Duncan v. Walker*, 533 U.S. 167, 181 (2001); see also *Hernandez v. Johnson*, 108 F.3d 554, 558 n.4 (5th Cir.), *cert. denied*, 522 U.S. 984 (1997).

[30]     *Magwood v. Patterson*, 561 U.S. 320, 334 (2010).

[31]     *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011).

reasonable time."[32] Collectively, the provisions of AEDPA "'further the principles of comity, finality, and federalism.'"[33]

Under AEDPA's standard of review, this court cannot grant Cade federal habeas corpus relief in connection with any claim that was adjudicated on the merits in state court proceedings (either on direct appeal or during a state habeas corpus proceeding), unless the adjudication of that claim either: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.[34]

The Supreme Court has concluded the "contrary to" and "unreasonable application" clauses of Title 28 U.S.C. § 2254(d)(1) have independent meanings.[35] Under the "contrary to" clause, a federal habeas court may grant relief if (1) the state

---

[32] *Wood v. Milyard*, 566 U.S. 463, 472 (2012) (quoting *Day v. McDonough*, 547 U.S. 198, 205-06 (2006) (quoting *Acosta v. Artuz*, 221 F.3d 117, 123 (2nd Cir. 2000))).

[33] *Panetti v. Quarterman*, 551 U.S. 930, 945 (2007) (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 337 (2003) ("*Miller-El I*") (internal quotation marks omitted)).

[34] *Brown v. Davenport*, 596 U.S. 118, 135-36 (2022); *Brown v. Payton*, 544 U.S. 133, 141 (2005); *Williams v. Taylor*, 529 U.S. 362, 404-05 (2000); 28 U.S.C. § 2254(d).

[35] *Bell v. Cone*, 535 U.S. 685, 694 (2002).

court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or (2) the state court decides a case differently than the Supreme Court on a set of materially indistinguishable facts.[36]  A state court's failure to cite Supreme Court authority does not, *per se*, establish the state court's decision is "contrary to" clearly established federal law:  "a state court need not even be aware of our precedents, 'so long as neither the reasoning nor the result of the state-court decisions contradicts them.'"[37]

Under the "unreasonable application" clause, a federal habeas court may grant relief if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the petitioner's case.[38]  A federal court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable."[39]  The focus of this inquiry is on whether the state court's

---

[36]    *Brown*, 544 U.S. at 141; *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) ("A state court's decision is 'contrary to' our clearly established law if it 'applies a rule that contradicts the governing law set forth in our cases' or it 'confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent.'") (quoting *Williams*, 529 U.S. at 405-06).

[37]    *Mitchell*, 540 U.S. at 16 (quoting *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam)).

[38]    *Brown*, 544 U.S. at 141; *Wiggins v. Smith*, 539 U.S. 510, 520 (2003).

[39]    *McDaniel v. Brown*, 558 U.S. 120, 132-33 (2010) ("A federal habeas

(continued...)

application of clearly established federal law was objectively unreasonable; an "unreasonable" application is different from a merely "incorrect" one.[40]  "Under the Antiterrorism and Effective Death Penalty Act of 1996, a state prisoner seeking a writ of habeas corpus from a federal court 'must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'"[41]

Legal principles are "clearly established" for purposes of AEDPA review when the holdings, as opposed to the *dicta*, of Supreme Court decisions existing at the time of the relevant state court decision establish those principles.[42]

---

[39](...continued)
court can only set aside a state-court decision as 'an unreasonable application of . . . clearly established Federal law,' § 2254(d)(1), if the state court's application of that law is 'objectively unreasonable[.]'") (quoting *Williams*, 529 U.S. at 409); *Wiggins*, 539 U.S. at 520-21.

[40]    *Schriro*, 550 U.S. at 473 ("The question under the AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher threshold."); *Wiggins*, 539 U.S. at 520; *Price v. Vincent*, 538 U.S. 634, 641 (2003) ("[I]t is the habeas applicant's burden to show that the state court applied [that case] to the facts of his case in an objectively unreasonable manner.") (citation omitted).

[41]    *Bobby v. Dixon*, 565 U.S. 23, 24 (2011) (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).

[42]    *Brown*, 596 U.S. at 136 ("It is not enough that the state-court decision offends lower federal court precedents.  This Court's dicta cannot supply a ground for relief.") (citation omitted); *Yarborough v. Alvarado*, 541 U.S. 652, 660-61 (2004)

(continued...)

AEDPA also significantly restricts the scope of federal habeas review of state court fact findings.  Subsection 2254(d)(2) of Title 28, United States Code, provides federal habeas relief may not be granted on any claim that was adjudicated on the merits in the state courts unless the state court's adjudication of the claim resulted in a decision based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.[43]  Even if reasonable minds reviewing the record might disagree about the factual finding in question (or the implicit credibility determination underlying the factual finding), on habeas review, this does not suffice to supersede the trial court's factual determination.[44]

In addition, § 2254(e)(1) provides that a federal habeas petitioner challenging state court factual findings must establish by clear and convincing evidence that the state court's findings were erroneous.[45]  It remains unclear at this juncture whether

---

[42](...continued)
("We look for 'the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.'") (quoting *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003)).

[43]     *Wood v. Allen*, 558 U.S. 290, 301 (2010) ("[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance."); *Williams*, 529 U.S. at 410 ("[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law.") (emphasis in the original).

[44]     *Wood*, 558 U.S. at 301; *Rice v. Collins*, 546 U.S. 333, 341-42 (2006).

[45]     *Schriro*, 550 U.S. at 473-74 ("AEDPA also requires federal habeas courts to presume the correctness of state courts' factual findings unless applicants rebut

(continued...)

§ 2254(e)(1) applies in every case presenting a challenge to a state court's factual findings under § 2254(d)(2).[46]

The deference to which state court factual findings are entitled under AEDPA "does not imply an abandonment or abdication of federal judicial review."[47]

Before a federal court may grant a state prisoner habeas corpus relief on a claim that was adjudicated on the merits in state court, the petitioner must not only satisfy the requirements of AEDPA but must also convince the court that the error committed by the state court during its adjudication of the petitioner's criminal case was not "harmless" within the meaning of *Brecht v. Abrahamson*.[48]  In *Shinn v.*

---

[45](...continued)
this presumption with 'clear and convincing evidence.'") (quoting 28 U.S.C. § 2254(e)(1)); *Rice*, 546 U.S. at 338-39 ("State-court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'") (quoting 28 U.S.C. § 2254(e)(1)); *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) ("*Miller-El II*") ("[W]e presume the Texas court's factual findings to be sound unless Miller-El rebuts the 'presumption of correctness by clear and convincing evidence.'") (quoting 28 U.S.C. § 2254(e)(1)); 28 U.S.C. § 2254(e)(1).

[46]    See *Wood*, 558 U.S. at 300-01 (choosing not to resolve the issue of § 2254(e)(1)'s possible application to all challenges to a state court's factual findings); *Rice*, 546 U.S. at 339 (likewise refusing to resolve the Circuit split regarding the application of § 2254(e)(1)).

[47]    *Miller-El I*, 537 U.S. at 340 ("Even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review.  Deference does not by definition preclude relief."); see also *Miller-El II*, 545 U.S. at 240 ("The standard is demanding but not insatiable[.]").

[48]    *Brown*, 596 U.S. at 122 (discussing the persistent relevance of the
(continued...)

*Ramirez*,[49] the Supreme Court held that when a federal habeas petitioner has properly exhausted state court remedies on a federal constitutional claim through direct appeal or a state habeas corpus proceeding, federal habeas review of that claim is "highly circumscribed" in that the federal court is limited to reviewing the record before the state court which resolved the claim on the merits, and the petitioner must establish that, under Supreme Court precedent, no fair-minded jurist could have reached the same result as the state court.[50]

Absent a showing that there is an absence of available state corrective process or that circumstances exist that render such process ineffective to protect the rights of a petitioner, this court is statutorily precluded from granting federal habeas corpus relief on any claim that has not been fairly presented to the state courts.[51]

---

[48](...continued)
harmless error standard announced in *Brecht v. Abrahamson*, 507 U.S. 619 (1993), within the context of AEDPA review).

[49]    596 U.S. 366 (2022).

[50]    *Id.* at 378; see also *id*. at 371 (where a petitioner failed to develop the factual bases for his claims in state court, he is entitled to present new evidence in support of his claims before the federal habeas court only two limited circumstances outlined in 28 U.S.C. § 2254(e)(2)(A)); *Shoop v. Twyford*, 596 U.S. 811, 819-20 (2022).

[51]    *Davila v. Davis*, 582 U.S. 521, 527 (2017) ("The exhaustion requirement is designed to avoid the 'unseemly' result of a federal court 'upset[ting] a state court conviction without' first affording the state courts an 'opportunity to . . . correct a constitutional violation[.]") (quoting *Rose v. Lundy*, 455 U.S. 509, 518 (1982)); 28 U.S.C. § 2254(b)(1).

Nonetheless, this court is authorized to deny federal habeas relief on the merits notwithstanding a petitioner's failure to exhaust available state court remedies.[52]

If the state courts failed to adjudicate a claim on the merits that Cade now presents to this court (such as claims (1) the state courts summarily dismissed under the Texas writ-abuse statute or Texas rules of procedural default or (2) which Cade failed to fairly present to the state courts), then this court's review of the unadjudicated claim is *de novo*.[53]

### III.  ANALYSIS

### A.  *Batson* Claims

In his first claim in his second amended federal habeas petition, Cade argues the state courts erred in overruling his objections to the prosecution's exercise of peremptory challenges against two black members of the jury venire:  V_ B_ and

---

[52]    See *Rhines*, 544 U.S. at 277 (a federal habeas court abuses its discretion if it grants a petitioner a stay when his unexhausted claims are plainly meritless); 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").

[53]    See *Porter v. McCollum*, 558 U.S. 30, 39 (2009) (*de novo* review of the allegedly deficient performance of petitioner's trial counsel was necessary because the state court failed to address the prejudice prong of *Strickland v. Washington*, 466 U.S. 668 (1984)); *Rompilla v. Beard*, 545 U.S. 374, 390 (2005) (*de novo* review of the prejudice prong of *Strickland* was required where the state court rested its rejection of an ineffective assistance claim on the deficient performance prong and never addressed the issue of prejudice); *Wiggins*, 539 U.S. at 534 (holding same).

L_ P_.[54]  Cade presented a pair of *Batson* claims involving the same two venire

members, V_ B_ and L_ P_, as his sixteenth and seventh points of error on direct

appeal.[55]  The TCCA denied both of Cade's *Batson* claims on the merits in an opinion

which detailed the exchange between the parties throughout voir dire and during the

multiple *Batson* hearings held in Cade's case.[56]  Cade's first claim in his first

subsequent (second) state habeas corpus application re-urged his *Batson* claims with

regard to venire members V_ B_ and L_ P_.[57]  The TCCA summarily dismissed this

claim pursuant to the Texas writ-abuse statute.[58]

In *Batson v. Kentucky*,[59] the United States Supreme Court extended the equal

protection principle barring the purposeful exclusion of racial minorities from

criminal jury service to the prosecution's use of peremptory challenges during petit

jury selection.[60]  *Batson* provides a three-step process for a trial court to use in

---

[54]    ECF no. 127, 29-49.

[55]    Appellant's Brief [ECF no. 68-17], 83-104.

[56]    *Cade v. State*, 2015 WL 832421, at *19-*24.

[57]    Second State Habeas Application [ECF no. 134-17], 18-39.

[58]    *Ex parte Cade*, 2021 WL 1202479, at *2.

[59]    476 U.S. 79 (1986).

[60]    See *id*. at 89 ("[T]he Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant.").

adjudicating a claim that a peremptory challenge was based on race:  first, the defendant must make out a *prima facie* case of discriminatory jury selection by the totality of the relevant facts concerning a prosecutor's conduct during the defendant's own trial; second, once the defendant makes the *prima facie* showing, the burden shifts to the State to come forward with a race-neutral explanation for challenging jurors within the arguably targeted class; finally, the trial court must determine if the defendant established purposeful discrimination by the prosecution.[61]

A trial judge's findings in connection with a *Batson* challenge turn primarily upon an evaluation of the prosecutor's credibility and are entitled to deference.[62] Under AEDPA, even more deference must be shown.[63]

This court has independently reviewed the voir dire testimony of V_ B_ in its entirety and finds the prosecution's proffered race-neutral reasons for peremptorily striking V_ B_ are fully supported by V_ B_'s voir dire testimony.[64]  V_ B_ repeatedly

---

[61]    See *Foster v. Chatman*, 578 U.S. 488, 499 (2016); *Snyder v. Louisiana*, 552 U.S. 472, 476-77 (2008); *Miller-El II*, 545 U.S. at 239; *Batson*, 476 U.S. at 94-98.

[62]    *Davis v. Ayala*, 576 U.S. 257, 271 (2015) ("The opponent of the strike bears the burden of persuasion regarding racial motivation and a trial court finding regarding the credibility of an attorney's explanation of the ground for a peremptory challenge is entitled to 'great deference.'") (citation omitted, quoting *Felker v. Jackson*, 562 U.S. 594, 598 (2011)); *Batson*, 476 U.S. at 98 n.21.

[63]    *Id.* at 271-72.

[64]    The voir dire testimony of V_ B_ (*i.e.*, juror no. 33) appears at 7 R.R.
(continued...)

indicated that, while she could perform the duties of a juror in Cade's trial, she was personally against the imposition of the death penalty.  V_ B_ also volunteered during voir dire (and acknowledged that she had written in her questionnaire responses) that she believed African Americans had been "railroaded" into the death penalty.  The prosecution's other race-neutral reasons for striking V_ B_ were also supported by V_ B_'s voir dire testimony, including her admissions that she had worked for several law firms, had served as a mediator, and was trained as a paralegal.  The prosecution's explanation that V_ B_ often attempted to rephrase the prosecutor's question is also confirmed by review of V_ B_'s voir dire exchanges.

This court has also independently reviewed the voir dire testimony of L_ P_ and finds the prosecution team's proffered race-neutral reasons for peremptorily striking L_ P_ were also fully supported by L_ P_'s voir dire testimony.[65]  L_ P_ repeatedly used words during his voir dire examination by the State suggesting he would be "trouble[d]," "bother[ed]," and "distract[ed]" by the prospect of voting to impose a death sentence.  L_ P_ repeatedly stated that he believed the Bible teaches

---

[64](...continued)
Trial [ECF no. 69-7] 47-124.  The record of the State's announcement of its exercise of a peremptory strike against V_ B_, the prosecution's explanation of its reasons for using that strike, and the trial court's subsequent discussions with counsel for both parties appear at 7 R.R. Trial [ECF no. 69-7] 125-37.

[65]      The voir dire testimony of L_ P_ (*i.e.*, juror no. 198) appears at 11 R.R. Trial [ECF no. 69-11] 14-81.  The State's two challenges for cause to L_ P_ and the trial judge's and defense counsel's discussions regarding same appear at 11 R.R. Trial [ECF no. 69-11] 81-88.

us not to judge others.  L_ P_ testified repeatedly that he had a difficult time imagining a scenario in which he could vote to convict based solely on circumstantial evidence.  L_ P_ testified that he believed black men receive the death penalty disproportionately to "white guys" and found this unfair.

Thus, both V_ B_ and L_ P_ testified during their voir dire examination that while they could perform their civic duty and serve as jurors, they were reluctant to participate as jurors in a capital sentencing proceeding.  The TCCA's factual findings on that point were reasonable in view of the evidence before that court on direct appeal.[66]

The state court was entitled to "take into account, among other things, any observations of the juror that the judge was able to make during voir dire."[67]  The state trial court's rejections of Cade's *Batson* challenges were fully supported by the evidence before that court.  The same is true for the record before the TCCA on direct appeal.  Cade has failed to present this court with clear and convincing evidence showing the state trial court's implicit credibility findings (regarding the prosecution's race-neutral reasons for its peremptory strikes of venire members V_ B_ and L_ P_) were erroneous.  In sum, the state trial and appellate courts reasonably

---

[66]  *Cade v. State*, 2015 WL 832421, at *19-*24.

[67]  *Thaler v. Haynes*, 559 U.S. 43, 48 (2010).

- 25 -

could have believed the prosecution's concerns that V_ B_ and L_ P_ were at best reluctant jurors with a potentially negative view of the death penalty.

On direct appeal, Cade called the TCCA's attention to juror J_ N_ and argued that his voir dire answers were similar to those of venire members V_ B_ and L_ P_.[68] Insofar as Cade points out that all three of these jurors expressed reservations about their willingness to rely upon purely circumstantial evidence, Cade is correct. All three did express at least some confusion about, if not antagonism toward, circumstantial evidence. With regard to their respective views on the efficacy of the death penalty and their willingness to participate in a capital sentencing proceeding, however, Cade is mistaken. Juror J_ N_ did not express any views during his voir dire examination as (1) hostile toward the imposition of the death penalty, as did both V_ B_ and L_ P_ during their voir dire examinations or (2) reflecting a desire to avoid being part of a capital sentencing jury, as did both V_ B_ and L_ P_. On the contrary, J_ N_ not only expressed full support for the death penalty, he expressed a desire to see the scope of that form of punishment expanded to include rape and child abuse. In contrast to both V_ B_ and L_ P_, both of whom expressed reluctance to serve as jurors in a capital sentencing proceeding, when asked by defense counsel whether he wanted to serve as a juror in this case, J_ N_ answered, "I think it would

---

[68] J_ N_'s voir dire testimony appears at 20 R.R. Trial [ECF no. 69-20] 301-68.

be interesting."[69]  At its core, a *Batson* claim is an equal protection challenge to the prosecutor's actions.  With regard to their views on the efficacy of the death penalty and their willingness to serve on a capital sentencing jury, J_ N_ was not similarly situated for equal protection purposes with venire members V_ B_ and L_ P_.

The same is true for juror K_ T_, identified by Cade in his pleadings in this court.[70]  During his voir dire examination K_ T_ expressed no reservations about serving as a juror in a capital sentencing proceeding and expressed no personal qualms with the Texas definition of capital murder or the Texas capital sentencing special issues.  Nor has Cade identified anything in juror K_ T_'s questionnaire responses similar to the comments adverse to the death penalty contained in the questionnaire answers of venire members V_ B_ and L_ P_ discussed during their voir dire testimony.

It is particularly important that a federal habeas court pay deference to the state trial court's evaluation of the prosecution's credibility.[71]

---

[69]    *Id*. at 367.

[70]    K_ T_'s voir dire examination appears at 14 R.R. Trial [ECF no. 69-14] 8-84.

[71]    See, *e.g.*, *Miller-El I*, 537 U.S. at 340 ("'[T]he trial court's decision on the ultimate question of discriminatory intent represents a finding of fact of the sort accorded great deference on appeal[.]'") (quoting *Hernandez v. New York*, 500 U.S. 352, 364 (1991)); *Blanton v. Quarterman*, 543 F.3d 230, 246-47 (5th Cir. 2008) (recognizing that the state trial court's acceptance of the prosecution's race-neutral reasons for striking a venire member involve, at least in part, a credibility

(continued...)

The pattern of the prosecution's peremptory challenges likewise supports the state courts' conclusion that the prosecution's peremptory strikes of V_ B_ and L_ P_ were not based on racial animus.  The prosecution used less than half of its allotted peremptory strikes, and only two of its strikes were directed against any of the six black venire members who reached the individual voir dire stage of jury selection.  Thus, the prosecution accepted four black venire members as jurors while striking only two.  Furthermore, one of the five white venire members peremptorily stricken by the prosecution, venire member L_ S_, was a special education teacher, which lends credibility to the prosecution's contention that one of its race-neutral reasons for striking venire member V_ B_ was that her occupation and training (as a mediator and paralegal) appeared problematic.[72]

Cade argues that the prosecution questioned some black venire members more aggressively on the subject of their views of circumstantial evidence than white venire members.  Cade asserts this demonstrates racial animus, citing *Miller-El I* and

[71](...continued)
determination) (citing *Goodwin v. Johnson*, 224 F.3d 450, 457 (5th Cir. 2000) (recognizing the high burden that a habeas petitioner faces in order to reverse an initial fact-finder's credibility determination), *cert. denied*, 531 U.S. 1120 (2001)), *cert. denied*, 556 U.S. 1240 (2009); *Ortiz v. Quarterman*, 504 F.3d 492, 502 (5th Cir. 2007) (noting that Texas appellate courts pay particular deference when a prospective juror's answers are vacillating, unclear, or contradictory and holding that a federal habeas court's respect for such a finding "certainly should be no less"), *cert. denied*, 553 U.S. 1035 (2008).

[72]    The voir dire testimony of L_ S_ appears at 19 R.R. Trial [ECF no. 69-19] 7-69.

*Miller-El II.*  Those two opinions addressed jury selection during Miller-El's 1986 capital murder trial in Dallas County.  The Supreme Court concluded the lower courts had erred in denying federal habeas relief on a *Batson* claim involving the striking of ten of eleven black venire members.  The evidence relied upon by the Supreme Court to find the prosecution's proffered reasons for the strikes of such a high percentage of black venire panelists were pretextual was compelling:  (1) the prosecution requested and obtained a jury shuffle which moved at least four black venire members significantly back in the order in which they were to appear for individual voir dire; (2) a side-by-side comparison showed a contrasting pattern of voir dire questions for black and non-black venire members (*i.e.*, 6% of white panelists received a graphic script describing the methods of execution available under Texas law while 53% of black panelists were read the graphic script describing the execution process; 27% of white panelists received trick questions while 100% of black panelists received trick questions); (3) side-by-side comparisons of the answers given by black venire members who were stricken with the questionnaire answers of non-black venire members allowed to sit on the jury showed similarities on the very questions identified by the prosecution as justifying its strikes (*i.e.*, three of the prosecution's proffered race-neutral rationales for striking black jurors applied just as well to some white panelists who were not challenged and who did serve as jurors); and (4) numerous former employees of the Dallas County District Attorney's Office,

including a pair of former Dallas County judges, testified (a) an official policy of excluding blacks from Dallas County juries existed in the late 1950s to the early 1960s; (b) a systemic policy of excluding blacks from Dallas County juries still existed in 1976-78; and (c) a training manual created in 1968 which explained the reasons the Office excluded minorities from criminal juries was still circulating within that Office until at least 1976 and was available to at least one prosecutor at the time of Miller-El's 1986 trial.[73]

Cade has not identified any specific facts or evidence showing that a systematic pattern or policy of excluding black venire members from capital jury service still existed in Dallas County at the time of his own 2012 capital murder trial. Nor does Cade offer any evidence of purposeful racial discrimination by his prosecution team's attorneys which approaches the conduct of Dallas County prosecutors in 1986.

On the contrary, Cade's allegation of disparate questioning of some (but not all) black venire members regarding circumstantial evidence does little to address the fact that the prosecution, which had the majority of its peremptory strikes still available by the conclusion of individual voir dire, elected not to strike four of the six black venire members who reached that stage of jury selection. Nor does Cade identify any white venire member whom the prosecution failed to strike who offered

---

[73]     See *Miller-El II*, 545 U.S. at 240-66; *Miller-El I*, 537 U.S. at 331-35.

negative views during voir dire on capital punishment or who demonstrated clear reluctance to serve on a capital sentencing jury which were similar to the testimony offered by venire members V_ B_ and L_ P_.

The TCCA's denial on the merits of Cade's *Batson* claims regarding venire members V_ B_ and L_ P_ on direct appeal was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in Cade's trial and state direct appeal proceedings.  Under AEDPA, Cade's multifaceted *Batson* claim does not warrant federal habeas corpus relief.  Cade's first claim in his second amended petition lacks arguable merit and is denied.

### B.  Fair Cross-Section Claim

In his second claim in his second amended federal habeas petition, Cade argues that his right to a jury selected from a fair cross-section of the community was violated when his trial counsel jointly stipulated with the prosecution to allow the trial court to excuse peremptorily any venire members whose questionnaire answers placed them at the extremes in terms of their support for, or opposition to, the death penalty.[74]  Cade asserted a similar ineffective assistance claim as his second claim in

---

[74]    ECF no. 127, 49-56.  Respondent construed this claim as sounding primarily in ineffective assistance attributed by Cade to his trial counsel (ECF no.
(continued...)

- 31 -

his first subsequent (second) state habeas application.[75]  The TCCA summarily dismissed this claim when it dismissed Cade's first subsequent (second) state habeas application based on state writ-abuse principles.[76]  Here, Cade complains that his trial counsel stipulated to the summary dismissal of 57 venire members (out of more than 540) based upon the attitudes toward the death penalty reflected in their answers to the juror questionnaire.[77]

The Supreme Court has declared that the Sixth Amendment guarantees a criminal defendant the right to have his or her jury chosen from a venire or panel representing a "fair cross-section" of the community.[78]  The Supreme Court reached this conclusion by recognizing:  (1) "the Sixth Amendment's provision for jury trial is

---

[74](...continued)
132, 48-54).  This court construes Cade's claim as a blend of both ineffective assistance and fair cross-section principles.  Out of an abundance of caution, this court will liberally construe Cade's second claim as asserting claims under both fair cross-section and ineffective assistance theories.  As explained hereinafter, neither claim possesses any arguable merit.

[75]      First Subsequent (Second) State Habeas Application 39-46 [ECF no. 134-17, 139-53 of 794].  While the briefing in support of this state habeas claim includes a citation to the Supreme Court's opinion in *Strickland*, the thrust of Cade's arguments in both state and federal court is on the fair cross-section component of the Sixth Amendment.

[76]      *Ex parte Cade*, 2021 WL 1202479, at *1-*2.

[77]      ECF no. 127, 53.

[78]      *Taylor v. Louisiana*, 419 U.S. 522, 527-30 (1975).

made binding on the States by virtue of the Fourteenth Amendment[;]"[79] (2) "the American concept of the jury trial contemplates a jury drawn from a fair cross section of the community[;]"[80] and (3) the selection of a petit jury from a representative cross-section of the community is an essential component of the Sixth Amendment right to a jury trial.[81]  The Supreme Court cited its long line of equal protection cases outlawing the purposeful exclusion of racial and ethnic groups from service on grand and petit juries in support of its interpretation of the Sixth Amendment's fair cross-section requirements.  The Supreme Court has acknowledged its holding in *Taylor* announced a new rule of constitutional criminal procedure.[82]

The fair cross-section requirement exists separate and apart from the equal protection rights recognized in *Batson*.  Likewise, the fair cross-section requirement exists separate and apart from the equal protection principles forbidding systematic exclusion of identifiable racial or ethnic groups from grand jury service.[83]

---

[79]     *Id*. at 526.

[80]     *Id*. at 527.

[81]     *Id*. at 528.

[82]     *Id.* at 535-36 ("[U]ntil today no case had squarely held that the exclusion of women from jury venires deprives a criminal defendant of his Sixth Amendment right to trial by an impartial jury drawn from a fair cross section of the community.").

[83]     See *Holland v. Illinois*, 493 U.S. 474, 478-83 (1990) (distinguishing the principles governing the Supreme Court's equal protection case law forbidding the
(continued...)

The Supreme Court has repeatedly refused to extend the Sixth Amendment's fair cross-section requirement to the selection of a petit jury once a jury panel or venire has been constituted that satisfies this requirement.[84]

A criminal defendant has standing to challenge an exclusion resulting in a violation of the fair cross-section requirement, whether or not he or she is a member of the excluded class.[85]  The Supreme Court has emphasized its construction of the Sixth Amendment does not deprive the states of the opportunity to grant exemptions from jury service in cases of special hardship or incapacity or to persons engaged in

---

[83](...continued) systematic discriminatory exclusion of identifiable groups from grand juries and petit jury venires from the Sixth Amendment's fair cross-section of the community requirement and holding that the latter did not prohibit the use of peremptory challenges in an allegedly racially discriminatory manner akin to the Equal Protection Clause's prohibition recognized in *Batson*).

[84]    See *id*. at 486-87 (holding the Sixth Amendment's fair cross-section requirement does not mirror the Equal Protection Clause's proscription against racial discrimination in the exercise of peremptory challenges); *Teague v. Lane*, 489 U.S. 288, 314-15 (1989) (recognizing the denial of the right to a fair cross-section of the community in a jury venire does not undermine the fundamental fairness that must underlie a criminal conviction); *Lockhart v. McCree*, 476 U.S. 162, 173 (1986) ("We have never invoked the fair cross-section principle to invalidate the use of either for-cause or peremptory challenges to prospective jurors, or to require petit juries, as opposed to jury panels or venires, to reflect the composition of the community at large.").

[85]    *Duren v. Missouri*, 439 U.S. 357, 359 n.1 (1979); *Taylor*, 419 U.S. at 526.

particular occupations whose uninterrupted performance of their duties is critical to the community's welfare.[86]

To establish a *prima facie* violation of the fair cross-section requirement, a defendant must demonstrate "(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process."[87]

Rule 2(c)(2) of the Rules Governing Section 2254 Cases in the United States District Courts requires that the petition "state the facts supporting each ground."[88]

---

[86] See *Taylor*, 419 U.S. at 534 ("The States are free to grant exemptions from jury service to individuals in case of special hardship or incapacity and to those engaged in particular occupations the uninterrupted performance of which is critical to the community's welfare.") (citation omitted); see also *id*. at 538 ("The States remain free to prescribe relevant qualifications for their jurors and to provide reasonable exemptions so long as it may be fairly said that the jury lists or panels are representative of the community.").

[87] *Duren*, 439 U.S. at 364; see also *United States v. Alix*, 86 F.3d 429, 434 n.3 (5th Cir. 1996) ("We note that a defendant cannot establish a prima facie violation of the fair-cross-section requirement by relying solely on the composition of the jury panel at his own trial.") (citation omitted).

[88] *Mayle*, 545 U.S. 644, 655 (2005); *Harper v. Lumpkin*, 64 F.4th 684, 691 (5th Cir.) (per curiam), *cert. denied*, __ U.S.__, 144 S. Ct. 429 (2023).

This is very different from the "notice pleading" requirement of Rule 8, FED. R. CIV. P.[89]  The Fifth Circuit has reaffirmed this rule in a wide variety of contexts.[90]

Here, Cade fails to allege specific facts, or present evidence, showing that his trial counsel were *required* or felt coerced by any rule of procedure, statute, ordinance, or other governmental edict to consent to the summary excusal of those members of the venire panel who filled out juror questionnaires in ways indicating they were either extremely in support of, or extremely opposed to, the death penalty.  Instead, Cade speculates that financial pressures might have motivated his trial counsel: "Appointed capital defense counsel in Dallas County exercising his client's right to a selection process allowing for rehabilitation, conducted entirely on the record, and

---

[89]    See, *e.g.*, *Murphy v. Dretke*, 416 F.3d 427, 436-38 (5th Cir. 2005) (holding generic reference to individual voir dire of entire jury venire insufficient to support a *Batson* claim) (citing *Koch v. Puckett*, 907 F.2d 524, 530 (5th Cir. 1990) (conclusory allegations fail to establish a valid claim of ineffective assistance of counsel) and *Ross v. Estelle*, 694 F.2d 1008, 1012 (5th Cir. 1983) (per curiam) (conclusory allegations do not raise a constitutional issue in a habeas proceeding)), *cert. denied*, 546 U.S. 1098 (2006).

[90]    See, *e.g.*, *Fahle v. Cornyn*, 231 F.3d 193, 196-97 (5th Cir. 2000) (conclusory due process allegations that petitioner was denied the presumption of innocence insufficient to support claims for federal habeas relief), *cert. denied*, 532 U.S. 1043 (2001); *Little v. Johnson*, 162 F.3d 855, 862 (5th Cir. 1998) (conclusory assertions regarding alleged destruction of exculpatory evidence failed to show State destroyed the evidence in bad faith, *i.e.*, with knowledge of its exculpatory value), *cert. denied*, 526 U.S. 1118 (1999); *Perillo v. Johnson*, 79 F.3d 441, 444 (5th Cir. 1996) ("A habeas petitioner must make specific allegations; 'conclusory allegations unsupported by specifics,' or 'contentions that in the face of the record are wholly incredible' will not entitle one to discovery or a hearing.") (quoting *Blackledge v. Allison*, 431 U.S. 63, 74 (1977)).

overseen by an impartial judge, faces the practical consideration that he may be passed over for future capital appointments and thereby undermine his livelihood."[91] Cade alleges no facts, and presents no evidence, showing how or when the purported "long-held practice in Dallas County capital cases" about which he complains originated.[92]  More significantly, Cade alleges no specific facts showing that the stipulation which his trial counsel made jointly with the prosecution has ever occurred in any other capital murder trial held in Dallas County, before or after his own.

Nor does Cade allege anything more than conjecture to support his assertion that his trial defense team felt compelled by any third party or outside force to stipulate in the manner they did.  For instance, Cade offers no affidavit from any of his trial counsel or anyone else claiming to possess personal knowledge regarding the circumstances under which Cade's trial counsel chose to stipulate to the summary excusal of any individuals from Cade's jury venire.

Likewise, Cade alleges no specific facts, and presents no evidence, showing that any attorney who refused to agree to the stipulation at issue has ever been sanctioned or otherwise harmed in any manner by any judge as a result of their refusal to so stipulate.  Mere speculation and conjecture about "practical considerations" are not

---

[91]    ECF no. 127, 55.

[92]    *Id*. at 50.

substitutes for specific facts and evidence.  Nor does such speculation satisfy Rule 2(c)'s requirement of factual specificity in federal habeas pleadings.  Thus, Cade fails to allege specific facts showing that there has been any systematic or systemic exclusion of an identifiable group from participation in Dallas County jury venires in capital murder cases.

Even more significantly, Cade fails to allege specific facts identifying a "distinctive" group in the community subjected to systematic or systematic exclusion.[93]  The Supreme Court has never extended the Sixth Amendment's fair cross-section jurisprudence to address the exclusion of groups composed of individuals with particular political views or party affiliation (as opposed to groups distinguished by their race or ethnicity).  *Duren* and *Taylor* addressed the exclusion of women from jury service.  *Holland* addressed a defendant's challenge to a prosecutor's use of peremptory strikes to exclude black venire members from the jury.

In *Lockhart v. McCree*,[94] the Supreme Court addressed an issue much more analogous to Cade's claim:  "Does the Constitution prohibit the removal for cause, prior to the guilt phase of a bifurcated capital trial, of prospective jurors whose opposition to the death penalty is so strong that it would prevent or substantially impair the performance of their duties as jurors at the sentencing phase of the

---

[93]     *Duren*, 439 U.S. at 364.

[94]     476 U.S. 162 (1986).

trial?"[95]  The Supreme Court concluded that exclusion of such individuals did not violate the fair cross-section requirement.[96]  Because Cade fails to identify a "distinctive" group whom he claims has been excluded from jury service, he fails to allege specific facts which show a violation of his Sixth Amendment rights under the *prima facie* test set forth in *Duren*.

As the Supreme Court's analysis in *Lockhart* makes evident, a citizen vehemently opposed to capital punishment at one point in his or her life may change their opinion on that subject on a weekly, daily, or hourly basis; the same holds for individuals who pronounce their equally unfaltering support for the death penalty. Neither group constitutes a "distinctive" group within the meaning of term as used in *Duren*.[97]  The Supreme Court's fair cross-section jurisprudence deals almost exclusively with exclusions premised on race or ethnicity.  The Supreme Court has not extended the fair cross-section requirement to guarantee a criminal defendant that the political views of his jury venire will accurately reflect the overall political

---

[95]    *Id.* at 165.

[96]    See *id*. at 174-77; see also *id*. at 174 (explaining that "groups defined solely in terms of shared attitudes that would prevent or substantially impair members of the group from performing one of their duties as jurors . . . are not 'distinctive groups' for fair-cross-section purposes").

[97]    *Id.* at 175-76; see also *United States v. Sanders*, 133 F.4th 341, 376 (5th Cir. 2025), *petition for cert. docketed* (Dec. 30, 2025) (No. 25-6451).

views of the local community.[98]  Cade's fair cross-section claim is foreclosed by the

Supreme Court's holding in *Lockhart*.

Furthermore, extending the Supreme Court's Sixth Amendment fair

cross-section jurisprudence to amorphous groups distinguished not by objective

criteria but, instead, by their answers to questionnaires designed to measure their

views on the efficacy and desirability of the death penalty would violate the

nonretroactivity doctrine in *Teague*.  Finally, Cade's complaint that his trial counsel's

stipulation removed 57 individuals with extreme views on the death penalty from his

jury venire does not rise above the level of harmless error.[99]  Insofar as it is premised

upon his conclusory and speculative Sixth Amendment's fair cross-section

requirement, Cade's second claim does not warrant federal habeas corpus relief.

### C.  Rulings on Challenges for Cause/Biased Juror Claim

In his third claim in his second amended federal habeas petition Cade argues

the trial court erred in denying his challenges for cause to seventeen members of the

jury venire and, as a result of the exhaustion of his peremptory challenges, he was

forced to proceed to trial with a biased juror who will be identified herein as juror

---

[98]      *Lockhart*, 476 U.S. at 175-77.

[99]      *Brecht*, 507 U.S. at 623 (The test for harmless error in federal court is
"whether the . . . error 'had substantial and injurious effect or influence in
determining the jury's verdict.'") (quoting *Kotteakos v. United States*, 328 U.S. 750,
776 (1946)).

K_ A_.[100]  Cade presented a similar set of arguments in his eighteenth through thirty-fourth points of error on direct appeal.[101]  The TCCA rejected these points of error on the merits when it affirmed Cade's conviction and sentence on direct appeal, making detailed factual findings after reviewing the voir dire testimony of each venire member in question.[102]

A potential juror's personal viewpoints on a wide variety of subjects, including the propriety of the death penalty, do not justify exclusion of that potential juror as biased unless he or she is unable to set aside their viewpoint and render a verdict based on the law and evidence:  "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court."[103]

In *Adams v. Texas*,[104] the Supreme Court emphasized the limitations its previous holding in *Witherspoon v. Illinois*,[105] imposed on the ability of the State to exclude members of a jury venire from service on a capital sentencing jury:

---

[100]    ECF no. 127, 56-65.

[101]    Appellant's Brief 103-22 [ECF no. 68-17] 127-45.

[102]    See *Cade v. State*, 2015 WL 832421, at *24-*39.

[103]    *Irvin v. Dowd*, 366 U.S. 717, 722 (1961) (citations omitted).

[104]    448 U.S. 38 (1980).

[105]    391 U.S. 510 (1968).

> [A] juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath. The State may insist, however, that jurors will consider and decide the facts impartially and conscientiously apply the law as charged by the court.[106]

The Supreme Court emphasized in *Adams* that the State could, consistent with *Witherspoon*, exclude prospective jurors whose views on capital punishment are such as to make them unable to follow the law or obey their oaths; but excluding jurors on broader grounds based on their opinions concerning the death penalty is impermissible.[107]

In *Wainwright v. Witt*,[108] the Supreme Court further clarified its holdings in *Witherspoon* and *Adams*, holding the proper inquiry when faced with a venire member who expresses personal, conscientious, or religious views on capital punishment is "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'"[109] The Supreme Court also emphasized that considerable deference is to be given the trial court's firsthand evaluation of the potential juror's demeanor, and that no particular

---

[106]    *Adams*, 448 U.S. at 45.

[107]    *Id*. at 44-48.

[108]    469 U.S. 412 (1985).

[109]    *Id*. at 424 (footnote omitted).

- 42 -

phrasing or word choice need necessarily be followed in interrogating the potential

juror in this regard.[110]

More recently, the Supreme Court has identified the following "principles of

relevance" from its *Witherspoon-Witt* line of opinions:

> First, a criminal defendant has the right to an impartial
> jury drawn from a venire that has not been tilted in favor
> of capital punishment by selective prosecutorial challenges
> for cause.  Second, the State has a strong interest in having
> jurors who are able to apply capital punishment within the
> framework state law prescribes.  Third, to balance these
> interests, a juror who is substantially impaired in his or her
> ability to impose the death penalty under the state-law
> framework can be excused for cause; but if the juror is not
> substantially impaired, removal for cause is impermissible.
> Fourth, in determining whether the removal of a potential
> juror would vindicate the State's interest without violating
> the defendant's right, the trial court makes a judgment
> based in part on the demeanor of the juror, a judgment
> owed deference by reviewing courts.[111]

In *Uttecht v. Brown*, the Supreme Court admonished reviewing courts to defer to the

trial court's resolution of questions of bias arising from a potential juror's conflicting

voir dire answers because the trial court had the opportunity to observe the demeanor

of the potential juror.[112]  "Courts reviewing claims of *Witherspoon-Witt* error, however,

---

[110]    *Id*. at 430-35.

[111]    *Uttecht v. Brown*, 551 U.S. 1, 9 (2007) (citations omitted).

[112]    *Id*. at 20 ("[W]here, as here there is a lengthy questioning of a
prospective juror and the trial court has supervised a diligent and thoughtful *voir dire*,
the trial court has broad discretion.").

- 43 -

especially federal courts considering habeas petitions, owe deference to the trial court, which is in a superior position to determine the demeanor and qualifications of a potential juror."[113]  Moreover, judicial determinations of whether a potential juror possesses disqualifying bias is a question of fact to which a federal habeas court is required to give deference.[114]

Insofar as Cade complains about the state trial court's failure to grant defense challenges for cause made against venire members against whom Cade later exercised peremptory challenges, Cade's complaints must fail.[115]  If a criminal defendant exercises a peremptory challenge to exclude an allegedly biased venire member from service on the jury, no constitutional violation occurs.[116]  Thus, this court's focus is limited to examining the propriety of the state trial court's ruling on Cade's challenge for cause to the only member of the jury venire Cade identifies in his federal habeas petition as biased who ultimately served on his petit jury, *i.e.*, qualified juror K_ A_.

---

[113]   *Id*. at 22.

[114]   *Skilling v. United States*, 561 U.S. 358, 396 (2010); *Witt*, 469 U.S. at 423-24; *Patton v. Yount*, 467 U.S. 1025, 1036-38 (1984).

[115]   See *Ross v. Oklahoma*, 487 U.S. 81, 88 (1988) ("So long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated.").

[116]   *United States v. Martinez-Salazar*, 528 U.S. 304, 307 (2000) ("[I]f the defendant elects to cure such error by exercising a peremptory challenge, and is subsequently convicted by a jury on which no biased juror sat, he has not been deprived of any rule-based or constitutional right.").

The TCCA made thorough findings regarding the voir dire examination and alleged disqualifying bias of juror K_ A.[117]  This court has undertaken a careful review

---

[117]     The TCCA thoroughly analyzed Cade's challenge to K_ A_ and concluded the trial court did not abuse its discretion is denying defense counsel's three challenges for cause:

> First, defense counsel argued that [K_ A_] would automatically vote for the death penalty.  Defense counsel acknowledged that, during the State's voir dire, [K_ A_] had indicated that he could and would follow all the law applicable to sentencing, but defense counsel asserted that, during the defense's voir dire, [K_ A_] "differentiated and went back and forth and vacillated on his true feelings," such that counsel believed [K_ A_]'s "true opinion [was] that if somebody kills somebody, that they deserve to die."
>
> After reviewing [K_ A_]'s entire voir dire, we disagree that he took positions during defense questioning that were materially different than the answers he gave during the State's questioning.  But even if we were to accept [Cade]'s argument, we give particular deference to the trial court's ruling when a prospective juror vacillates or gives equivocal or contradictory answers concerning his ability to follow the law.
>
> Second, defense counsel argued that [K_ A_] would hold [Cade] to a higher burden of proof than the law required regarding insanity.  Defense counsel based his assertion on [K_ A_]'s response when the prosecutor questioned him about his answer to Question 38 of the juror questionnaire.  Question 38 informed potential jurors that a person with mental illness can receive life without parole or the death penalty for committing capital murder, then asked for the juror's thoughts.  [K_ A_] wrote, "Life without parole no death penalty on a person with mental illness."  The prosecutor questioned [K_ A_] as follows:

(continued...)

- 45 -

----

[117](...continued)

> [PROSECUTOR]:  First of all, would you agree with me that anyone can just claim they have a mental illness?
>
> [K_ A_]:  Yes.
>
> [PROSECUTOR]:  Okay.  Would you agree with me that mental illness exists on a range of very mild, like a person with mild depression, all the way up to severe where a person just doesn't even understand the difference between right and wrong?
>
> [K_ A_]:  Right.
>
> [STATE]:  Okay.  Now, are you saying to me that, no matter what the extent of the mental illness is, that you'll never consider the death penalty, or are you saying if they are on a far end of that scale that you wouldn't consider it?
>
> [K_ A_]:  No, on a far end.

This line of questioning and [K_ A_]'s "far end" response concerned a punishment issue rather than the affirmative defense of insanity.  [Cade] identifies nothing else in [K_ A_]'s voir dire suggesting that he would elevate the burden of proof regarding the insanity determination, and we find nothing in our independent review.

Third, defense counsel asserted that [K_ A_]'s testimony when questioned about his written response to Question 17 of the questionnaire showed that he would require any evidence of remorse to come through [Cade]'s testimony. Question 17 asked jurors what would be important to

(continued...)

[117](...continued)
them in deciding whether a person received a death sentence rather than a life sentence in a capital-murder case. In pertinent part, [K_ A_] indicated that a lack of remorse would be significant to him.

The prosecutor informed [K_ A_] that a defendant has a constitutional right not to testify and that if the defendant elects not to testify, a juror may not hold that choice against him. [K_ A_] stated that he could and would follow the law. When defense counsel questioned [K_ A_], counsel noted his mention of remorse in response to Question 17. Defense counsel asked whether [K_ A_] would require a defendant "to actually testify and say, look, I'm sorry I did that, or something like that, in the punishment stage?" [K_ A_] said that he would not, but he struggled to explain:

> [K_ A_]: No, I think the remorse would – I don't know if that's a state of mind or it goes along with like their moral [culpability]. I think it's, you know, like they have no feeling when they do it, you know, like they are not remorse[ful] about killing another human being.

Defense counsel then suggested that a defendant's testimony might be the only way for him to provide evidence of remorse:

> [DEFENSE]: Okay. Do you see where I'm coming from? To actually – I mean the way we give information to each other is either through, you know, some kind of gesture, words, or writings.
>
> [K_ A_]: Right, right, right. I guess –

(continued...)

[117](...continued)

> [DEFENSE]:  And, so, I guess my question is, you know, how would you receive the information about if a person was remorseful, you know, if you didn't require him to testify or give you some information about remorse, like I'm sorry or something?
>
> [K_ A_]:  I guess explaining through the act of violence, I guess that would be –
>
> [DEFENSE]:  Are you saying that, during the act of violence, they would have to say, I'm sorry, or something like [that]?
>
> [K_ A_]:  No, just, or their mental, trying to say their state of mind at the time of doing the crime.
>
> [DEFENSE]:  Okay.  I guess I'm confused.  I am totally confused in that sense.
>
> [K_ A_]:  I'm a little confused myself.

When defense counsel again asked [K_ A_] to explain how one would know whether someone was remorseful or not, [K_ A_] responded, "I guess through their actions, maybe you could tell.  I don't know, if they were crying or I guess however you could tell whether they are remorse[ful] or not."

It was within the trial court's discretion to deny [Cade]'s challenge for cause.  The proponent of a cause-based challenge must show that the challenge is proper and does not meet this burden until, among other things, he demonstrates that the law was explained to and understood by the venire member.  When the prosecutor

(continued...)

- 48 -

of the entire record from K_ A_'s voir dire testimony.[118]  At no point during his voir

dire examination did K_ A_ suggest that he was unable to set aside his personal views

and decide Cade's case based solely on the applicable law and the evidence presented

in court.  On the contrary, as accurately reflected in the portion of the TCCA's

opinion,[119]  K_ A_ indicated in his questionnaire responses and voir dire testimony

that he supported use of the death penalty but also recognized that in certain cases,

---

[117](...continued)

> explained a defendant's constitutional right not to testify,
> [K_ A_] stated that he could and would follow the law.
> When defense counsel discussed the topic, it was in the
> context of how jurors could ascertain whether a defendant
> felt remorse.  Defense counsel did not explain to [K_ A_]
> that jurors could determine whether a defendant felt
> remorse at the time of the offense by drawing reasonable
> inferences from circumstantial evidence presented at trial.
> Rather, it seems that counsel inaccurately implied through
> his questions that only the defendant, by testifying, could
> supply such evidence.  Despite the apparent misdirection,
> [K_ A_] evinced an understanding that circumstantial
> evidence may provide a basis for inferring remorse.  [Cade]
> points to nothing in the record to show that [K_ A_] could
> not or would not consider such circumstantial evidence, if
> it were offered, or that he would require evidence of
> remorse to come from [Cade] himself.  Point of error
> thirty-four is overruled.

*Cade v. State*, 2015 WL 832421, at *37-*39 (citations omitted).

[118]    The voir dire testimony of juror K_ A_ appears at 39 R.R. Trial [ECF no. 69-39] 35-109.

[119]    See *supra*.

- 49 -

life without parole "is the right result."[120]  After the prosecution explained the Texas

capital sentencing process, he testified that he believed that process was fair.[121]  He

also promised to answer the capital sentencing issues based on the evidence and not

to give any "automatic" answers.[122]  After the prosecution explained that a defendant

has the right to choose not to testify, he testified that he would not hold the

defendant's decision to not testify against the defendant.[123]  After the prosecution

explained the presumption of innocence and burden of proof was on the State to

prove all the elements of capital murder, he testified he understood same and would

take his oath seriously.[124]  He also testified during voir dire in response to questions

from the defense that, while he had answered his questionnaire by indicating that he

believed in "an eye for an eye," after being informed of the nature of the Texas capital

sentencing scheme he no longer believed that was the case.[125]

---

[120]    39 R.R. Trial [ECF no. 69-39] 44-46.

[121]    *Id.* at 47-48.

[122]    *Id*. at 48-49, 67-70, 100.  K_ A_ also promised to keep an open mind and consider the entire range of potential punishment for the offense of ordinary murder in the event the jury convicted Cade of a lesser-included offense.  *Id*. at 49-53.

[123]    *Id*. at 53-54.

[124]    *Id*. at 55-58.

[125]    *Id*. at 89-91, 94-98.

The TCCA assumed for the purpose of argument that Cade's appellate counsel's characterization of K_ A_ as a "vacillating juror" was accurate, but held that, in such instances, deference to the trial judge's implicit credibility finding was appropriate.  For two, equally compelling reasons, the TCCA's determination regarding K_ A_'s lack of disqualifying bias is beyond reproach:  first, unlike the TCCA, this court's independent review of the entire record from K_ A_'s voir dire examination compels a finding that K_ A_ never vacillated in any legitimate regard about his ability to follow applicable law and decide Cade's case based upon the evidence; second, the deference the TCCA applied to the state trial court's implicit credibility finding was reasonable.[126]

The deference the TCCA paid to the state trial court's implicit factual finding that K_ A_ possessed no disqualifying bias was both reasonable and fully supported by the evidence before the TCCA during Cade's direct appeal.  Even under pre-AEDPA case law, a state trial court's ruling on the credibility of a potential juror was entitled to special deference in a federal habeas corpus proceeding.[127]  Under

---

[126]    *O'Bryan v. Estelle*, 714 F.2d 365, 406 (5th Cir. 1983) (explaining that specific fact findings and credibility determinations must be given deference under § 2254(d) because "the typed transcript cannot accurately reflect the all-too-typical vacillating juror's true feelings about the death penalty"), *cert. denied sub nom*. 465 U.S. 1013 (1984).

[127]    See, *e.g.*, *Patton*, 467 U.S. at 1038 (recognizing a presumption of correctness applies to a trial court's factual findings (which are essentially credibility determinations) regarding whether a venire member possessed disqualifying bias).

AEDPA, specifically § 2254(e)(1), these implicit factual findings are presumed correct.[128]

At no point during his voir dire examination did K_ A_ categorically or unequivocally assert that he was unable to set aside his personal views and decide Cade's case based solely on the applicable law and the evidence presented in court. Nor did K_ A_ testify in any manner implicitly suggesting that he would be unable to set aside his personal views and decide Cade's case, including answering the capital sentencing special issues, based solely on the law and evidence. The record from K_ A_'s voir dire examination fully supports the TCCA's rejection on the merits of all three arguments Cade's trial counsel made in support of the challenge for cause to venire member and future juror K_ A_. With regard to Cade's arguments about K_ A_'s views on the burden of proof on the insanity defense and the nature of evidence sufficient to demonstrate remorse, the TCCA's opinion on direct appeal accurately described K_ A_'s voir dire testimony and reasonably concluded the state trial court implicitly found no disqualifying bias. At best, K_ A_'s voir dire testimony

---

[128]    *Wood*, 558 U.S. at 293 (a determination of a factual issue made by a state court is presumed correct and the petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence); *Chester v. Thaler*, 666 F.3d 340, 348 (5th Cir.), *pet. for rehearing and pet. for rehearing en banc denied*, 671 F.3d 494 (5th Cir. 2011) (per curiam), *cert. denied*, 568 U.S. 978 (2012); *Richards v. Quarterman*, 566 F.3d 553, 563 (5th Cir. 2009) (holding a state court's factual findings, including credibility determinations, are entitled to the presumption of correctness under § 2254(e)(1)); *Coleman v. Quarterman*, 456 F.3d 537, 541 (5th Cir. 2006), *cert. denied*, 549 U.S. 1343 (2007).

with regard to the burden of proof on the insanity defense and the type of evidence needed to establish remorse shows he was vacillating on those two issues.  Cade has failed to present any clear and convincing evidence showing that either of the state trial court's implicit factual findings on those two topics (rejecting Cade's assertion of bias) were erroneous.

Cade's reliance upon the Supreme Court's holding in *Morgan v. Illinois*[129] is unpersuasive because that decision is inapposite to the facts in Cade's case.  *Morgan* held merely that it was constitutional error for a state trial court to deny a defendant the opportunity to conduct voir dire into whether a potential juror would automatically vote to impose the death penalty in every case of capital murder.[130] *Morgan* did not establish a new standard for evaluating the propriety of a challenge for cause to a venire member in a capital case.  Instead, the Supreme Court reaffirmed its prior holdings that (1) the proper standard for determining when a potential juror may be excused for cause is "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and oath[;]"[131] (2) "a juror who in no case would vote for capital punishment, regardless of his or her instructions, is not an impartial juror and must

---

[129]    504 U.S. 719 (1992).

[130]    See *id*. at 729-34.

[131]    *Id.* at 728 (quoting *Witt*, 469 U.S. at 424) (quoting *Adams*, 448 U.S. at 45)).

be removed for cause[;]"[132] and (3) a juror who would automatically vote for the death penalty in every capital murder case will fail in good faith to consider the aggravating and mitigating circumstances as the instructions require and must also be excused for cause.[133]

The TCCA's rejection on the merits during Cade's direct appeal of Cade's complaints about the state trial court's denial of his challenges for cause and the alleged bias of juror K_ A_ was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in Cade's trial and state direct appeal proceedings.  Under AEDPA, Cade's third claim does not warrant federal habeas corpus relief.

### D.  Intellectual Disability Claim

In his ninth claim in his second amended federal habeas petition, Cade argues the Eighth Amendment forbids his execution because he is intellectually disabled.[134] Cade did not assert that he is intellectually disabled in any state court until he included that argument as his ninth claim in his first subsequent (second) state

---

[132] *Id.* (noting the standard made "clear from *Witt* and *Adams*, [and] the progeny of *Witherspoon*").

[133] *Id.* at 728-29 (citing *Ross*, 487 U.S. at 85).

[134] ECF no. 127, 112-19.

habeas application.[135]  The TCCA summarily dismissed Cade's first subsequent state

habeas application pursuant to the Texas writ-abuse statute.[136]

Where the state courts failed to adjudicate a claim on the merits, possibly

because it was not fairly presented to the state courts or it was otherwise procedurally

defaulted, this court's review of the unadjudicated claim is *de novo*.[137]

---

[135]    First Subsequent (Second) State Habeas Application, 111-19 [ECF no.
134-17, 283-99 of 794].

[136]    See *Ex parte Cade*, 2021 WL 1202479, at *2.

[137]    See *Porter*, 558 U.S. at 39 (*de novo* review of the allegedly deficient
performance of petitioner's trial counsel was necessary because the state courts had
failed to address this prong of *Strickland* analysis); *Rompilla*, 545 U.S. at 390 (*de novo*
review of the prejudice prong of *Strickland* was required where the state courts rested
their rejection of an ineffective assistance claim on the deficient performance prong
and never addressed the issue of prejudice).

Although the parties dispute in their pleadings in this court whether Cade
procedurally defaulted on his intellectual disability claim, it is unnecessary for this
court to resolve that issue because Cade's intellectual disability claim lacks arguable
merit.  The Supreme Court has made clear that federal habeas courts may deny writs
of habeas corpus by engaging in *de novo* review when it is unclear whether AEDPA
deference applies because a federal habeas petitioner will not be entitled to a writ of
habeas corpus if his claim is rejected on *de novo* review.  *Berghuis v. Thompkins*, 560
U.S. 370, 390 (2010).  The Supreme Court has declined to address an issue of
procedural default and chosen, instead, to resolve a claim on the merits, holding that
an application for a writ of habeas corpus may be denied on the merits
notwithstanding a petitioner's failure to exhaust in state court.  See *Bell*, 543 U.S. at
451 n.3 (citing § 2254(b)(2)); *Rhines*, 544 U.S. at 277.  This court has followed the
same procedure in disposing of multiple meritless claims which were also arguably
procedurally defaulted.  See, *e.g.*, *Brewer v. Director*, No. 2:15-CV-0050-Z-BR, 2021
WL 6845600, at *11 n.39 (N.D. Tex. Sept. 30, 2021) (Reno, M.J.), *report and
recommendation accepted*, 2022 WL 398414 (N.D. Tex. Feb. 8, 2022) (Kacsmaryk, J.),
*COA denied*, 66 F.4th 558 (5th Cir. 2023), *cert. denied*, __ U.S. __, 144 S. Ct. 354

(continued...)

During his capital murder trial, Cade presented testimony from several different mental health experts.  None suggested Cade is intellectually disabled.[138] Instead, all of the mental health experts who testified during Cade's trial or initial state habeas corpus proceeding stated that, based upon their evaluations of Cade (at least by those who did evaluate him) and testing performed during Cade's pretrial detention by neuropsychologist Dr. Antoinette McGarrahan, Cade's intellectual functioning fell within the low average to borderline range.  The record currently before this court likewise includes no diagnosis or opinion from any mental health expert expressing the view that Cade falls within the range of intellectual functioning identifying him as intellectually disabled.

Here, Cade fails to present any records, affidavits, or other evidence showing that he was ever referred for special education screening or special education services during his years as a student.  Cade's academic records from his trial and state habeas proceedings reveal that he earned a GPA of 1.93 in high school (which Cade now

---

[137](...continued)
(2023); *Broadnax v. Davis*, 2019 WL 3302840, at \*29 n.41 (N.D. Tex. July 23, 2019) (Godbey, J.), *COA granted*, 813 Fed. Appx. 166 (5th Cir. 2020), *aff'd sub nom.* 987 F.3d 400 (5th Cir. 2021), *cert. denied*, __ U.S. __, 142 S. Ct. 859 (2022).

[138]    While the parties' pleadings in both the state habeas court and this court occasionally employ the terms "mental retardation" and "mentally retarded[,]" this opinion uses the terms "intellectual disability" and "intellectually disabled" to describe the identical phenomenon.  See *In re Cathey*, 857 F.3d 221, 223 n.1 (5th Cir. 2017) (per curiam) ("The term 'intellectual disability' has replaced 'mental retardation.'") (citing *Brumfield v. Cain*, 576 U.S. 305, 308 n.1 (2015)).

insists was inflated) and ranked only 309 in his high school graduating class of 342. But these statistics, standing alone, reveal little about Cade's intellectual ability. The same is true for Cade's insistence that he earned a GPA of 1.64 while attending a junior college after his high school graduation.

The record currently before this court reveals that Cade obtained a Texas driver's license and was carrying a forklift operator's certificate at the time of his arrest. Cade's friend and former supervisor at one of Cade's job sites testified at trial that Cade was fully capable of learning the skills he needed to perform his work duties and following instructions.[139] Cade's childhood friend and former high school teammate testified Cade was well-liked by students and teachers alike on their high school campus, and was decidedly popular and socially active in high school prior to Cade being diagnosed with a spinal condition which prematurely ended Cade's once-promising football career.[140]

In *Atkins v. Virginia*,[141] the United States Supreme Court concluded that the execution of intellectually disabled persons failed to fulfill either of the two justifications for capital punishment, *i.e.*, retribution and deterrence, and held the

---

[139]   Testimony of James Kemp, 50 R.R. Trial [ECF no. 69-50] 56-67.

[140]   Testimony of Jason Shanks, 51 R.R. Trial [ECF no. 69-51] 12-31.

[141]   536 U.S. 304 (2002).

Eighth Amendment forbids the execution of intellectually disabled persons.[142]  The

Supreme Court cited two clinical definitions of "mental retardation" with approval[143]

---

[142]    *Id*. at 318-21.

[143]    In *Atkins*, the Court identified two clinical definitions of "mentally retarded" as follows:

> The American Association on Mental Retardation (AAMR)
> defines mental retardation as follows:  "*Mental retardation*
> refers to substantial limitations in present functioning.  It
> is characterized by significantly subaverage intellectual
> functioning, existing concurrently with related limitations
> in two or more of the following applicable adaptive skill
> areas:  communication, self-care, home living, social skills,
> community use, self-direction, health and safety,
> functional academics, leisure and work.  Mental
> retardation manifests before age 18."  Mental Retardation,
> Definition, Classification, and Systems of Supports 5 (9th
> ed. 1992).
>
> The American Psychiatric Association's definition is
> similar.  "The essential feature of Mental Retardation is
> significantly subaverage general intellectual functioning
> (Criterion A) that is accompanied by significant limitations
> in adaptive functioning in at least two of the following skill
> areas:  communication, self-care, home living,
> social/interpersonal skills, use of community resources,
> self-direction, functional academic skills, work, leisure,
> health and safety (Criterion B).  The onset must occur
> before age 18 years (Criterion C).  Mental Retardation has
> many different etiologies and may be seen as a final
> common pathway of various pathological processes that
> affect the functioning of the central nervous system."
> Diagnostic and Statistical Manual of Mental Disorders 41
> (4th ed. 2000).  "Mild mental retardation" is typically
> used to describe people with an IQ of 50-55 to
> approximately 70.  *Id*., at 42-43.

(continued...)

but, ultimately, left "'to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon their execution of sentences.'"[144]

Nonetheless, the Supreme Court recognizes that "an IQ between 70 and 75 or lower" is "typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition."[145]  Thus, an IQ score of 75 is "squarely in the range of potential intellectual disability."[146]

With regard to the first prong of the *Atkins* analysis, *i.e.,* establishing significantly subaverage intellectual functioning, the Supreme Court has held that, because of the imprecision inherent in IQ testing, a court must consider the standard error of measurement ("SEM") when assessing intellectual disability.[147]  In *Moore v. Texas* ("*Moore I*"),[148] the Supreme Court further restricted states' ability to

---

[143](...continued)
*Id*. at 308 n.3.

[144]    *Id*. at 317 (quoting *Ford v. Wainwright*, 477 U.S. 399, 405 (1986)).  In *Bobby v. Bies*, 556 U.S. 825, 831 (2009), the Supreme Court pointed out that *Atkins* did not provide definitive procedural or substantive guides for determining "when a person who claims intellectual disability will be so impaired as to "fall within *Atkins*' compass."

[145]    *Brumfield*, 576 U.S. at 315 (quoting *Atkins*, 536 U.S. at 309 n.5).

[146]    *Id*.; see also *id*. at 316.

[147]    See *Hall v. Florida*, 572 U.S. 701, 721-22 (2014).

[148]    581 U.S. 1 (2017) ("*Moore I*").

circumscribe the legal definition of "intellectual disability" holding that (1) a state's

determination under *Atkins* must be guided by current medical standards, and

(2) states are not free to adopt criteria unsupported by medical science to evaluate a

defendant's alleged subaverage intellectual functioning or deficits in adaptive skills.[149]

More specifically, the Supreme Court held the TCCA erred in applying a set of

non-clinical criteria known as the *Briseno* factors in evaluating a defendant's claim of

intellectual disability because (1) some of the *Briseno* factors had implicitly been

rejected by the medical community (in part because they were based on outdated

stereotypes), and (2) all of the *Briseno* factors were little more than lay perceptions of

intellectual disability untethered to any clinical medical standard.[150]  Two years later,

in *Moore v. Texas* ("*Moore II*"),[151] the Supreme Court again struck down as a violation

of the Eighth Amendment a new TCCA determination that Moore was intellectually

disabled, finding the TCCA had committed many of the same analytical errors

identified in *Moore I*.[152]

The only IQ test score identified by Cade as supporting his intellectual

disability claim was a full-scale score of 80 obtained by Dr. McGarrahan during

---

[149]     *Id*. at 11-20.

[150]     *Id*. at 15-20.

[151]     586 U.S. 133 (2019) ("*Moore II*").

[152]     See *id.* at 135-42.

Cade's pretrial detention, when Cade was in his mid-thirties.  Dr. McGarrahan testified without contradiction at trial that there was a ninety-five percent probability Cade's actual IQ fell within the range of 76 to 84.[153]  Thus, Cade accurately alleges that he has tested in the 76-80 range on a standardized IQ test.  Other than his low GPAs in high school and community college, however, Cade offers no firm factual allegations showing that he demonstrated any deficits in adaptive behavior during his developmental period.

The record demonstrates that Cade graduated from high school; obtained admission to, and earned academic credits from, a community college; obtained a Texas driver's license; obtained gainful employment, including work as a forklift operator after earning the necessary certification; and expressed in written journal entries (from the notebook found at the crime scene) his unwillingness to accept responsibility for his criminal conduct and his disdain for Fuller's ex-husband.  The affidavits of Cade's high school football coaches suggesting that Cade had difficulty learning football plays are unpersuasive to show Cade's alleged intellectual ability fell significantly below the average.  *When directly asked, Dr. McGarrahan, Dr. Kessner, Dr. Silverman, and all of Cade's other mental health professionals who testified at trial or during*

---

[153]    Testimony of Dr. Antoinette McGarrahan, 47 R.R. Trial [ECF no. 69-47] 18-20, 92-95, 102.  Dr. McGarrahan also testified that Cade's academic records showed that he earned fourteen hours of college credit at Ranger College, albeit with a GPA of 1.64.  *Id*. at 123.

*Cade's initial state habeas proceeding, consistently denied that Cade is intellectually disabled.* The only full-scale IQ test score obtained by a neuropsychologist and purporting to definitively measure Cade's level of intellectual functioning identified in the voluminous evidence now before this court is a score of 80, which is within a second SEM of the top-level cut-off for a diagnosis of intellectual disability. Cade offers no evidence or analysis of the possible impact of the so-called Flynn factor on his test score of 80. Under such circumstances, Cade has failed to allege specific facts which satisfy the first prong of *Atkins, i.e.,* he has failed to establish that he displays significantly subaverage intellectual functioning. Nor has Cade alleged specific facts establishing that he has ever convinced a qualified mental health expert that he has demonstrated significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety.

Cade's intellectual disability claim lacks arguable merit. His IQ test score of 80 does not reach into the upper range of intellectual disability, even when considering the SEM. He offers no support for his claim from any qualified mental

health expert.[154]  Under a *de novo* standard of review, Cade's ninth claim in his second amended federal habeas petition does not warrant federal habeas corpus relief.

### E.  Insufficient Evidence of Future Dangerousness

In his thirteenth claim in his second amended federal habeas petition, Cade argues there was legally insufficient evidence to support the jury's affirmative answer to the future dangerousness special issue.[155]  Cade asserted an insufficient evidence claim as his fifteenth point of error on direct appeal, challenging the sufficiency of the evidence supporting the jury's affirmative answer to the future dangerousness special issue.[156]  The TCCA rejected this argument on the merits when it affirmed Cade's conviction and sentence.[157]

In *Jackson v. Virginia*,[158] the Supreme Court declared the proper standard for evaluating the sufficiency of the evidence to support a criminal conviction is "'whether, after viewing the evidence in the light most favorable to the prosecution,

---

[154]    See *Green v. Davis*, 414 F. Supp. 3d 892, 912-13 (N.D. Tex. 2019) (Lynn, C.J.) (state court reasonably rejected *Atkins* claim on the merits where petitioner presented an IQ test score of 78 but no expert opinion diagnosing petitioner with intellectual disability), *aff'd sub nom*. 860 Fed. Appx. 930 (5th Cir. 2021) (per curiam), *cert. denied*, __ U.S. __, 142 S. Ct. 1234 (2022).

[155]    ECF no. 127, 146-48.

[156]    Appellant's Brief [ECF no. 68-17] 80-82.

[157]    *Cade v. State*, 2015 WL 832421, at *6-*8.

[158]    443 U.S. 307 (1979).

*any* rational trier of fact could have found the essential elements of the crime beyond

a reasonable doubt.'"[159]  "Under *Jackson*, federal courts must look to state law for 'the

substantive elements of the criminal offense,' but the minimum amount of evidence

that the Due Process Clause requires to prove the offense is purely a matter of federal

law."[160]

On direct appeal, the TCCA carefully reviewed the entire record from Cade's

capital murder trial and found the evidence, when viewed in the light most favorable

to the jury's verdict, showed (1) the undisputed details of Cade's capital offense were

"brutal[ ] and deprav[ed];" (2) the prosecution's punishment phase evidence

established that Cade had engaged in an escalating pattern of violence starting when

he was a juvenile and culminating in his murders of Fuller and Desaree; and (3) Cade

admitted that he sexually assaulted Fuller after stabbing her and while both Fuller

and Desaree were conscious.[161]  This court has undertaken a careful review of the

---

[159]    *Lewis v. Jeffers*, 497 U.S. 764, 781 (1990) (quoting *Jackson*, 443 U.S. at 319) (emphasis in the original, citation omitted)).

[160]    *Coleman v. Johnson*, 566 U.S. 650, 655 (2012) (quoting *Jackson*, 443 U.S. at 324 n.16).

[161]    See *Cade v. State*, 2015 WL 832421, at *6 ("Here, the evidence showed that [Cade] stabbed Fuller twenty-eight times and Desaree thirty-nine times, using great force to inflict deep, painful wounds.  By [Cade]'s own estimate, Fuller and Desaree both had between thirty and forty minutes to experience the pain and terror of his attack before they died.  For Fuller, this interval included a vaginal and anal sexual assault while she was dying but still conscious and able to experience pain and fear.  While sexually assaulting Fuller, [Cade] was aware that Desaree was still alive,
(continued...)

entire record from Cade's trial. Each of the TCCA's foregoing factual determinations is fully supported by the trial record.

Furthermore, this court has also carefully reviewed the recordings from Cade's post-arrest interviews by police and Cade's notebooks left at the crime scene in which he described his emotional state before, during, and after his capital offense. While Cade's trial counsel and federal habeas counsel characterize the contents of Cade's post-arrest interviews and post-murder writings as some evidence that Cade was remorseful for his actions, no rational juror could construe Cade's statements as anything other than an attempt to cast blame on Fuller and her ex-husband for Cade's assaults on Fuller and Desaree.

The extreme level of violence involved in Cade's knife attacks on Fuller and Desaree were also sufficient to support the jury's affirmative answer to the future dangerousness special issue. Cade stabbed his victims dozens of times with great force. Then he sexually assaulted Fuller as she bled to death but while she was still conscious and while Desaree also was conscious.

The TCCA's on-the-merits rejection on direct appeal of Cade's attack on the sufficiency the evidence supporting the jury's affirmative answer to the future dangerousness special issue was neither contrary to, nor involved an unreasonable

_____

[161](...continued)
within close proximity of her mother's ongoing sexual assault, and sufficiently conscious to speak.").

application of, clearly established federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in Cade's trial and state direct appeal proceedings.  Under AEDPA, Cade's thirteenth claim does not warrant federal habeas corpus relief.

### F.  Mitigating Evidence Instruction

In his seventeenth claim in his second amended federal habeas petition, Cade argues that the Texas statutory definition of mitigating circumstance or mitigating evidence is unconstitutionally narrow because it limits the jury's consideration to evidence which reduces the defendant's moral blameworthiness.[162]  Cade presented a substantially similar argument as point of error thirty-seven in his appellant's brief.[163] The TCCA rejected this argument on the merits in its opinion affirming Cade's conviction and sentence on direct appeal.[164]  Cade re-urged essentially the same argument as his thirteenth claim in his initial state habeas application.[165]  The state habeas trial court concluded the claim was without merit and recommended it be

---

[162]    ECF no. 127, 247-50.

[163]    Appellant's Brief 128-30 [ECF no. 68-17] 151-53.

[164]    See *Cade v. State*, 2015 WL 832421, at \*41.

[165]    Initial State Habeas Application 121-26 [ECF no. 71-4, 124-29].

denied.[166]  The TCCA expressly adopted the trial court's findings and conclusions and denied this claim on the merits when it denied Cade's initial state habeas application.

The standard for evaluating the constitutionality of a capital sentencing jury charge is whether "there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence."[167]

Article 37.071, § 2(f)(4), of the Texas Code of Criminal Procedure directs a trial court to instruct a capital sentencing jury that it "shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness."  At the punishment phase of his capital murder trial, Cade's trial court instructed his capital sentencing jury in precisely this manner.[168]  Furthermore, the state trial court also instructed Cade's jury at the punishment phase of trial as follows:  "In determining your answers to the special issues, you shall consider all the evidence admitted in this whole trial, which includes that phase of the trial wherein you were called upon to determine the guilt or innocence of the defendant, and this

---

[166]    FFCL, pp. 94-96, ¶¶ 520-28 [ECF no. 71-2, 733-35].

[167]    *Boyde v. California*, 494 U.S. 370, 380 (1990); see also *Sprouse v. Stephens*, 748 F.3d 609, 618-19 (5th Cir.), *cert. denied*, 574 U.S. 993 (2014).

[168]    ECF no. 68-5, 417:  "In arriving at your answer [to Special Issue no. 2], you shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness."

punishment phase of the trial wherein you are now called upon to determine the answers to the special issues submitted to you by the Court."[169]

Cade does not identify with any reasonable degree of specificity any evidence actually before his capital sentencing jury which his capital sentencing jury was unable to consider adequately or unable to give mitigating effect based upon the foregoing "allegedly narrow" definition of mitigating evidence contained in his punishment phase jury charge.  On the contrary, the state trial court expressly instructed his jury, in answering both the special issues, to consider "all of the evidence," including evidence from both phases of trial.  The punishment phase verdict form instructed Cade's jury that, when answering the mitigation special issue to consider "all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant . . . ."[170]

The court is to presume that juries follow their instructions.[171]  There is no reasonable likelihood Cade's capital sentencing jury considered itself unable to consider or give mitigating effect to any of the evidence properly before it at the punishment phase of his capital murder trial.

---

[169]    *Id*. at 418.

[170]    *Id*. at 429.

[171]    *Zafiro v. United States*, 506 U.S. 534, 540 (1993) (citation omitted).

Cade argues that the term mitigating evidence employed in the Texas capital sentencing scheme's mitigation special issue is unconstitutionally narrow in that it requires a nexus to the capital offense.[172]  Cade relies primarily upon the Supreme Court's holding in *Tennard v. Dretke*,[173] a decision which applied the Supreme Court's holding in *Penry II,*[174] to a capital murder defendant with a low IQ.  Tennard was tried before the Texas Legislature enacted amendments to the capital sentencing statute mandating submission of the current mitigation special issue at the punishment phase of capital murder trials.  Thus, the Supreme Court's opinion in *Tennard* was a straightforward application of its prior holding in *Penry II.  Tennard* does not purport to address the definition of "mitigating evidence" or "mitigating circumstance" as those terms are employed in the Texas capital sentencing statute's mitigation special issue.

In the years since the Supreme Court decided *Tennard*, the Fifth Circuit has expressly and repeatedly rejected the same argument raised by Cade in this portion of his seventeenth claim for federal habeas relief, *i.e.*, that the definition of mitigating evidence or mitigating circumstance furnished by Texas law is unconstitutionally narrow because it focuses the jury's attention on evidence reducing the defendant's

---

[172]   ECF no. 127, 248-49.

[173]   542 U.S. 274 (2004).

[174]   532 U.S. 782 (2001).

moral blameworthiness.[175]  The Fifth Circuit has also repeatedly rejected numerous

related arguments suggesting the Texas capital sentencing scheme's definition of

"mitigation" is too narrow.[176]

---

[175]  See, *e.g.*, *Rhoades v. Davis*, 914 F.3d 357, 367 (5th Cir.) ("This court has never accepted that it is unconstitutional to define mitigating evidence as evidence that reduces moral blameworthiness.") (citation omitted), *cert. denied*, 589 U.S. 956 (2019); *Hummel v. Davis*, 908 F.3d 987, 994 (5th Cir. 2018) (rejecting the argument that the Texas capital sentencing special issue unconstitutionally limits a jury's ability to consider mitigating evidence that goes beyond the defendant's moral blameworthiness), *cert. denied*, 589 U.S. 930 (2019); *Rockwell v. Davis*, 853 F.3d 758, 763 (5th Cir.), *cert. denied*, 583 U.S. 882 (2017); *Sprouse*, 748 F.3d at 622 (noting the Fifth Circuit has repeatedly rejected this same constitutional challenge to the allegedly narrow construction of the mitigation special issue when viewed in conjunction with the future dangerousness special issue); *Blue v. Thaler*, 665 F.3d 647, 667 (5th Cir. 2011) (rejecting the argument that Supreme Court precedent requires a definition of mitigating evidence that includes something more than evidence which reduces a defendant's moral blameworthiness), *cert. denied*, 568 U.S. 828 (2012).

[176]  See, *e.g.*, *Sprouse*, 748 F.3d at 622-23 (denying a COA on the same issue); *Blue*, 665 F.3d at 665-66 ("[A]rticle 37.071 'does *not* unconstitutionally 'preclude the jury from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis'" for a life sentence.) (emphasis in the original) (quoting *Beazley v. Johnson*, 242 F.3d 248, 260 (5th Cir.), *cert. denied sub nom*. 534 U.S. 945 (2001) (quoting *Lockett v. Ohio*, 438 U.S. 586, 604 (1978))); *Beazley*, 242 F.3d at 260 ("The definition of mitigating evidence does *not* limit the evidence considered under the third special issue (whether mitigating circumstances warrant a life, rather than a death, sentence).  '[V]irtually *any* mitigating evidence is capable of being viewed as having some bearing on the defendant's 'moral culpability' apart from its relevance to the particular concerns embodied in the Texas special issues'.") (emphasis in the original) (quoting *Graham v. Collins*, 506 U.S. 461 (1993)).  Cade fails to distinguish this line of Fifth Circuit authority rejecting his argument that the Texas definition of mitigating evidence is unconstitutionally narrow.  For that reason, his seventeenth claim for federal habeas relief violates Rule 11.  *Williams v. Lumpkin*, 339 F.R.D. 383, 389-90 (N.D. Tex. 2021) (Godbey, J.) (legal arguments which ignore the existence of

(continued...)

- 70 -

Furthermore, the Supreme Court has consistently used the term "relevant mitigating evidence" to describe evidence which, by its very nature, tends to diminish a convicted capital murder defendant's moral blameworthiness or lessen the reprehensible nature of the offense – *i.e.*, evidence which relates to the defendant's character or background or to the circumstances of the offense.[177]  Cade does not identify any Supreme Court opinion to date which purports to require that a capital sentencing jury give "mitigating" consideration to any evidence or circumstance wholly unrelated to a defendant's moral blameworthiness or personal moral culpability.

Finally, Respondent correctly points out that insofar as Cade argues in favor of a definition of "mitigating evidence" or "mitigating circumstances" that goes beyond evidence which reduces a defendant's moral blameworthiness, Cade's claim runs afoul of the nonretroactivity doctrine announced in *Teague v. Lane*,[178] which forecloses

---

[176](...continued)
long-standing Circuit precedent fail to (1) present a good faith effort to distinguish adverse existing case law or (2) furnish a rational argument for "extending, modifying, or reversing existing law or for establishing new law.").

[177]     See, *e.g.*, *Brewer v. Quarterman*, 550 U.S. 286, 293-96 (2007) (depression, troubled childhood, substance abuse); *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 259 (2007) (childhood deprivation and lack of self-control); *Tennard*, 542 at 283-88 (low intellectual functioning); *Penry II*, 532 U.S. at 796-804 ("mental retardation" and history of childhood abuse); *Lockett*, 438 U.S. at 604-05, 608 (lack of intent to kill, relatively minor role in the offense, and age).

[178]     489 U.S. 288 (1989).

adoption of the new principles of federal constitutional criminal procedure in federal habeas corpus proceedings. Under the holding in *Teague*, federal courts are generally barred from applying new constitutional rules of criminal procedure retroactively on collateral review.[179] A "new rule" for *Teague* purposes is one not dictated by precedent existing at the time the defendant's conviction became final.[180] Under this doctrine, unless reasonable jurists hearing the defendant's claim at the time his conviction became final would have felt compelled by existing precedent to rule in his favor, a federal habeas court is barred from doing so on collateral review.[181] A conviction becomes final for *Teague* purposes when either the United States Supreme

---

[179]    *Caspari v. Bohlen*, 510 U.S. 383, 389-90 (1994).

[180]    Before a state prisoner may upset his state conviction or sentence on federal collateral review, he must demonstrate as a threshold matter that the court-made rule of which he seeks the benefit is not "new." We have stated variously the formula for determining when a rule is new. See, *e.g.*, *Graham v. Collins*, 506 U.S. 461, 467 [] (1993) ("A holding constitutes a 'new rule' within the meaning of *Teague* if it 'breaks new ground,' 'imposes a new obligation on the States or the Federal Government,' or was not '*dictated* by precedent existing at the time the defendant's conviction became final' ") (quoting *Teague*, 489 U.S. at 301[]) (emphasis in original).

*O'Dell v. Netherland*, 521 U.S. 151, 156 (1997).

[181]    *Id.*

- 72 -

Court denies a certiorari petition on the defendant's direct appeal or the time period for filing a certiorari petition expires.[182]  Cade's conviction became final for *Teague* purposes no later than January 19, 2016, *i.e.*, the date the United States Supreme Court denied Cade's certiorari petition on direct appeal.[183]

*Teague* remains applicable after the passage of AEDPA.[184]  As of the date Cade's conviction and sentence became final for *Teague* purposes, no federal court had ever held a Texas capital sentencing jury was constitutionally required to consider as "mitigating" any evidence or circumstance which did not bear on the defendant's personal moral culpability or moral blameworthiness.  Likewise, as of the same date, no federal court had ever held that a Texas trial court was required to instruct a capital sentencing jury to consider as "mitigating" any evidence or circumstances that were unrelated to the defendant's character, background, or personal moral culpability, *i.e.*, the defendant's personal moral blameworthiness.  Thus, in addition

---

[182]     *Caspari*, 510 U.S. at 390.

[183]     See *Beard v. Banks*, 542 U.S. 406, 411-12 (2004); *Caspari*, 510 U.S. at 390 ("A state conviction and sentence become final for purposes of retroactivity analysis when the availability of direct appeal to the state courts has been exhausted and the time for filing a petition for a writ of certiorari has elapsed or a timely filed petition has been finally denied.").

[184]     See *Horn v. Banks*, 536 U.S. 266, 268-72 (2002) (applying *Teague* in an AEDPA context); *Robertson v. Cockrell*, 325 F.3d 243, 255 (5th Cir.) (recognizing the continued vitality of the *Teague* nonretroactivity doctrine under AEDPA), *cert. denied*, 539 U.S. 979 (2003).

to being without arguable merit, the new rule advocated by Cade in his seventeenth claim is also foreclosed by the holding in *Teague*.

The TCCA's denials, both on direct appeal and in Cade's initial state habeas proceeding, of Cade's challenges to the statutory definition of mitigating evidence in the Texas capital sentencing statute were neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in Cade's trial, state direct appeal, and initial state habeas proceedings.  Under AEDPA, Cade's seventeenth claim does not warrant federal habeas corpus relief.  Alternatively, Cade's seventeenth claim is foreclosed by *Teague*.

## G.  Future Dangerousness Special Issue

In his sixteenth claim in his second amended federal habeas petition, Cade argues that the Texas capital sentencing statute's future dangerousness special issue is unconstitutionally vague (1) under the Eighth Amendment because of the lack of definitions of multiple key terms and (2) because of the Supreme Court's holdings in *Johnson v. United States*,[185] *Sessions v. Dimaya*,[186] and *United States v. Davis*.[187]  Cade

---

[185]    576 U.S. 591 (2015).

[186]    584 U.S. 148 (2018).

[187]    588 U.S. 445 (2019).

- 74 -

raised the first portion of this constitutional challenge to the future dangerousness special issue as his forty-third point of error in his appellant's brief.[188]  The TCCA denied this point of error on the merits when it affirmed Cade's conviction and sentence on direct appeal.[189]  Cade re-urged the same basic argument in his fifteenth claim in his initial state habeas application.[190]  The state habeas trial court noted that the claim had been rejected on the merits on direct appeal before rejecting it on the merits and recommending denial.[191]  The TCCA expressly adopted the trial court's findings and conclusions when it denied Cade's initial state habeas application.[192] Cade presented the state courts with his vagueness arguments premised on the Supreme Court's holdings in *Johnson*, *Dimaya*, and *Davis* as his twenty-first claim in his first subsequent (second) state habeas application.[193]  The TCCA summarily dismissed this claim when it dismissed Cade's first subsequent (second) state habeas application.[194]

---

[188]    Appellant's Brief 137-40 [ECF no. 68-17, 160-63].

[189]    *Cade v. State*, 2015 WL 832421, at *41.

[190]    Initial State Habeas Application 136-40 [ECF no. 71-4, 139-43].

[191]    FFCL, pp. 97-98, ¶¶ 539-43 [ECF no. 71-9, 736-37].

[192]    *Ex parte Cade*, 2017 WL 4803802, at *3.

[193]    First Subsequent (Second) State Habeas Application 294-311 [ECF no. 134-17, 649-83].

[194]    *Ex parte Cade*, 2021 WL 1202479, at *2.

"The Constitution allows capital punishment."[195]  The manner in which the Supreme Court has analyzed the constitutionality of the Texas capital sentencing scheme under the Eighth Amendment has evolved over time.  In *Furman v. Georgia*,[196] the Supreme Court struck down capital sentencing schemes in several southern states, including Texas, but failed to reach any degree of consensus in terms of an analytical approach to the Eighth Amendment.  Four years later, the Supreme Court upheld the capital scheme adopted by the Texas Legislature in response to *Furman*.[197]  More specifically, the Supreme Court held the Texas statutory scheme "'limits the circumstances under which the State could seek the death penalty to a small group of narrowly defined and particularly brutal offenses.'"[198]  In answering the Texas capital sentencing special issues, a jury was permitted to consider any mitigating evidence the defendant wished to present.[199]  In sum, the new Texas system constitutionally narrowed the circumstances under which the defendant could be found guilty of capital murder and focused the jury's objective consideration on the particularized

---

[195]   *Bucklew v. Precythe*, 587 U.S. 119, 129 (2019).

[196]   408 U.S. 238 (1972).

[197]   See *Jurek v. Texas*, 428 U.S. 262, 268 (1976) (holding imposition of the death penalty does not *per se* violate the Eighth Amendment's proscription on "cruel and unusual punishment").

[198]   *Id.* at 270 (quoting *Jurek v. State*, 522 S.W.2d 934, 939 (Tex. Crim. App. 1975).

[199]   *Id*. at 271-74.

circumstances of the individualized offense and individualized offender before imposing a sentence of death.[200]

In *Boyde v. California*,[201] the Supreme Court settled on a single standard for reviewing the adequacy of jury instructions in a capital sentencing proceeding:

> We think the proper inquiry in such a case is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence. Although a defendant need not establish that the jury was more likely than not to have been impermissibly inhibited by the instruction, a capital sentencing proceeding is not inconsistent with the Eighth Amendment if there is only a possibility of such an inhibition. This "reasonable likelihood" standard, we think, better accommodates the concerns of finality and accuracy than does a standard which makes the inquiry dependent on how a single hypothetical "reasonable" juror could or might have interpreted the instruction. There is, of course, a strong policy in favor of accurate determination of the appropriate sentence in a capital case, but there is an equally strong policy against retrials years after the first trial where the claimed error amounts to no more than speculation. Jurors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might. Differences among them in interpretation of instructions may be thrashed out in the deliberative process, with commonsense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting.[202]

---

[200]   *Id*. at 273-74.

[201]   494 U.S. 370 (1990).

[202]   *Id*. at 380-381 (footnote omitted).

And in *Tuilaepa v. California*,[203] the Supreme Court clarified that the Eighth

Amendment addresses two different, but related, aspects of capital sentencing:  the

eligibility decision and the selection decision:

> To be eligible for the death penalty, the defendant must be convicted of a crime for which the death penalty is a proportionate punishment.  To render a defendant eligible for the death penalty in a homicide case, we have indicated that the trier of fact must convict the defendant of murder and find one "aggravating circumstance" (or its equivalent) at either the guilt or penalty phase.  The aggravating circumstance may be contained in the definition of the crime or in a separate sentencing factor (or in both).  As we have explained, the aggravating circumstance must meet two requirements.  First, the circumstance may not apply to every defendant convicted of a murder; it must apply only to a subclass of defendants convicted of murder.  Second, the aggravating circumstance may not be unconstitutionally vague.
>
> * * *
>
> We have imposed a separate requirement for the selection decision, where the sentencer determines whether a defendant eligible for the death penalty should in fact receive that sentence.  "What is important at the selection stage is an *individualized* determination on the basis of the character of the individual and the circumstances of the crime."  That requirement is met when the jury can consider relevant mitigating evidence of the character and record of the defendant and the circumstances of the crime.[204]

---

[203]    512 U.S. 967 (1994).

[204]    *Id*. at 971-73 (emphasis in the original, citations omitted).

Thus, the Supreme Court declared its view that "the States may adopt capital

sentencing procedures which rely upon the jury, in its sound judgment, to exercise

wide discretion."[205]  The Supreme Court also concluded, at the *selection* stage, "the

States are not confined to submitting to the jury specific propositional questions"

but, rather, may direct the jury to consider a wide range of broadly-defined factors,

"such as 'the circumstances of the crime' or 'the background of the defendant[,]'" and

"'all facts and circumstances presented in extenuation, mitigation, and aggravation of

punishment[.]'"[206]

In *Loving v. United States*,[207] the Supreme Court described the first part of the

*Tuilaepa* analysis, *i.e.*, the eligibility decision, as follows:

> The Eighth Amendment requires, among other things, that
> "a capital sentencing scheme must 'genuinely narrow the
> class of persons eligible for the death penalty and must
> reasonably justify the imposition of a more severe sentence
> on the defendant compared to others found guilty of
> murder.'"  Some schemes accomplish that narrowing by
> requiring that the sentencer find at least one aggravating
> circumstance.  The narrowing may also be achieved,
> however, in the definition of the capital offense, in which
> circumstance the requirement that the sentencer "find the

---

[205]    *Id*. at 974.

[206]    *Id.* at 978 (citations omitted).

[207]    517 U.S. 748 (1996).

existence of an aggravating circumstance in addition is no part of the constitutionally required narrowing process."[208]

The Supreme Court subsequently elaborated on the distinction between the narrowing function or "eligibility decision" and the "selection phase" of a capital sentencing proceeding in *Buchanan v. Angelone*:[209]

> In the eligibility phase, the jury narrows the class of defendants eligible for the death penalty, often through consideration of aggravating circumstances. In the selection phase, the jury determines whether to impose a death sentence on an eligible defendant. Petitioner concedes that it is only the selection phase that is at stake in his case. He argues, however, that our decisions indicate that the jury at the selection phase must both have discretion to make an individualized determination and have that discretion limited and channeled. He further argues that the Eighth Amendment therefore requires the court to instruct the jury on its obligation and authority to consider mitigating evidence, and on particular mitigating factors deemed relevant by the State.
>
> No such rule has ever been adopted by this Court. While petitioner appropriately recognizes the distinction between the eligibility and selection phases, he fails to distinguish the differing constitutional treatment we have accorded those two aspects of capital sentencing. It is in regard to the eligibility phase that we have stressed the need for channeling and limiting the jury's discretion to ensure that the death penalty is a proportionate punishment and therefore not arbitrary or capricious in its imposition. In contrast, in the selection phase, we have emphasized the need for a broad inquiry into all relevant mitigating evidence to allow an individualized determination.

---

[208]    *Id.* at 755 (citations omitted).

[209]    522 U.S. 269 (1998).

> In the selection phase, our cases have established that the
> sentencer may not be precluded from considering, and may
> not refuse to consider, any constitutionally relevant
> mitigating evidence.  However, the state may shape and
> structure the jury's consideration of mitigation so long as it
> does not preclude the jury from giving effect to any
> relevant mitigating evidence.  Our consistent concern has
> been that restrictions on the jury's sentencing
> determination not preclude the jury from being able to give
> effect to mitigating evidence.
>
> * * *
>
> But we have never gone further and held that the state
> must affirmatively structure in a particular way the manner
> in which juries consider mitigating evidence.  And indeed,
> our decisions suggest that complete jury discretion is
> constitutionally permissible.[210]

The Fifth Circuit has repeatedly rejected challenges to the key terms in the

Texas capital sentencing statute's future dangerousness special issue identified by

Cade as allegedly unconstitutionally vague.[211]  All of the key terms in Cade's

---

[210]    *Id*. at 275-77 (citations omitted).

[211]    See, *e.g.*, *Sprouse*, 748 F.3d at 622-23 (denying a COA on complaints
about the lack of definitions of "'probability,' 'criminal acts of violence,' and
'continuing threat to society'" in a Texas capital sentencing jury charge); *Paredes v.
Quarterman*, 574 F.3d 281, 294 (5th Cir. 2009) (per curiam) (holding the terms
"probability," "criminal acts of violence," and "continuing threat to society" "'have a
plain meaning of sufficient content that the discretion left to the jury is no more than
that inherent in the jury system itself'") (quoting *Milton v. Procunier*, 744 F.2d 1091,
1095-96 (5th Cir. 1984), *cert. denied*, 471 U.S. 1030 (1985)), *aff'd sub nom*. 617 F.3d
315 (5th Cir. 2010), *cert. denied*, 562 U.S. 1203 (2011); *Turner v. Quarterman*, 481
F.3d 292, 299-300 (5th Cir.) (rejecting claims that the terms "probability," "criminal
acts of violence," and "continuing threat to society" were so vague as to preclude a
capital sentencing jury's consideration of mitigating evidence), *cert. denied*, 551 U.S.
(continued...)

punishment phase jury charge about which he complains in his sixteenth claim have a common understanding in the sense that they ultimately mean what the jury says by their final verdict they mean and do not require further definition.[212]  Thus, Cade's constitutional complaints about the trial court's failure to define the terms "probability," "criminal acts of violence," and "continuing threat to society" have repeatedly been rejected by the Fifth Circuit.

The constitutional standard for evaluating the propriety of a capital sentencing jury charge is set forth in *Boyde*, in which the Supreme Court held the test for determining whether jury instructions satisfy the Constitution is "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence."[213]  Cade

---

[211](...continued)
1193 (2007); *Leal v. Dretke*, 428 F.3d 543, 553 (5th Cir. 2005) (listing numerous Fifth Circuit opinions rejecting complaints about the failure of Texas courts to define the terms "probability," "criminal acts of violence," and "continuing threat to society"), *cert. denied*, 547 U.S. 1073 (2006).  All of the key terms in Cade's punishment phase jury charge about which he complains in his sixteenth claim have a common understanding in the sense that they ultimately mean what the jury says by their final verdict they mean and do not require further definition.  *James v. Collins*, 987 F.2d 1116, 1120 (5th Cir.), *cert. denied*, 509 U.S. 947 (1993); *Milton*, 744 F.2d at 1096.  Cade's constitutional complaints about the trial court's failure to define the terms "probability," "criminal acts of violence," and "continuing threat to society" have repeatedly been rejected by the Fifth Circuit.

[212]    See *James*, 987 F.2d at 1120; *Milton*, 744 F.2d at 1096.

[213]    *Johnson v. Texas*, 509 U.S. 350, 367-68 (1993) (quoting *Boyde*, 494 U.S. at 380).

- 82 -

identifies no potentially mitigating evidence before the jury at the punishment phase of his trial which he contends the jury was unable to properly consider in answering one or more of the Texas capital sentencing special issues because of the lack of definitions of the terms "personal moral culpability," "moral blameworthiness," or "mitigating circumstances."[214]  Cade's complaints about the lack of definitions of key terms and alleged vagueness in the Texas capital sentencing special issues and his punishment phase jury charge are without merit.

The TCCA's rejections on the merits during Cade's direct appeal and initial state habeas proceedings of his complaints about the lack of definitions of key terms in the future dangerousness special issue were neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in Cade's trial and direct appeal.  Cade's sixteenth claim does not warrant federal habeas corpus relief.

Cade further argues the Texas future dangerousness special issue is unconstitutionally vague under due process principles for the same reasons the Supreme Court struck down the residual clause of the federal Armed Career Criminal

---

[214]    See *Blue*, 665 F.3d at 665-66; *Beazley*, 242 F.3d at 260.

Act of 1984 ("ACCA") in *Johnson v. United States*,[215] and subsequent Supreme Court decisions construing its earlier holding in *Johnson*, including *Dimaya* and *Davis*. Cade's analogy to this line of cases is unpersuasive.

In *Johnson*, the Supreme Court reversed a long line of its own decisions construing the ACCA's residual clause and declared that clause unconstitutionally vague under the Fifth Amendment's Due Process Clause.[216] While federal law forbade certain individuals, including convicted felons, from shipping, possessing, or receiving firearms, the Court confronted statutory language which mandated a higher minimum and maximum sentence for an individual convicted of violating the ACCA if that person had three or more prior convictions for a "serious drug offense" or a "violent felony."[217]

---

[215]   576 U.S. 591 (2015).

[216]   *Id*. at 606.

[217]   *Id*. at 593.

> The ACCA define[d] 'violent felony' as follows:
>
> "any crime punishable by imprisonment for a term exceeding one year . . .that –
>
> "(i) has as an element the use, attempted use, or threatened use of physical force against the person of another; or
>
> "(ii) is burglary, arson, or extortion, involves

(continued...)

The *Johnson* Court recognized the difficulty that court and other federal appellate courts had experienced attempting to consistently construe the statute's residual clause.[218]  That problem was exacerbated dramatically by the Supreme Court's application of the "categorical approach" chosen by the Supreme Court in *Taylor v. United States*,[219] as its preferred method for determining whether an offense qualified as a "violent felony" under the ACCA's residual clause.  Under this approach, a federal sentencing court "assesses whether a crime qualifies as a violent felony 'in terms of how the law defines the offense and not in terms of how an individual offender might have committed it on a particular occasion.'"[220]  The Supreme Court concluded that, as viewed through the lens of the categorical approach, the ACCA's residual clause suffered from two defects:  first, it deprived

---

[217](...continued)
> use of explosives, *or otherwise involves conduct that presents a serious potential risk of physical injury to another*." § 924(e)(2)(B) (emphasis added).
>
> The closing words of this definition, italicized above, have come to be known as the [ACCA]'s residual clause.

*Id.* at 593-94.

[218]    See *id.* at 594-601.

[219]    495 U.S. 575, 600 (1990).

[220]    *Johnson*, 576 U.S. at 596 (quoting *Begay v. United States*, 553 U.S. 137, 141 (2008)).

defendants of fair notice; and second, it invited arbitrary enforcement by judges.[221]

More specifically, application of the categorical approach resulted in uncertainty with

regard to (1) how to estimate the risk posed by a crime, and (2) how much risk it

takes for a crime to qualify as a violent felony.[222]  Accordingly, the Supreme Court

struck down the ACCA's residual clause as unconstitutionally vague because of the

difficulty the federal courts had experienced in applying the clause in a consistent and

even-handed manner.[223]

In *Sessions v. Dimaya*,[224] the Supreme Court confronted statutory language

similar to that in the ACCA's residual clause.  The Immigration and Nationality Act

("INA") made deportable any alien convicted of an "aggravated felony" after entering

the United States.[225]  The INA defined "aggravated felony" by furnishing a long list

of offenses.[226]  One item in that long list was "a crime of violence" as defined by 18

U.S.C. § 16 for which the term of imprisonment is at least one year.  Section 16, in

---

[221]    *Id*. at 597-98.

[222]    *Id*.

[223]    *Id*. at 606.

[224]    584 U.S. 148 (2018).

[225]    *See* 8 U.S.C. § 1227(a)(2)(A)(iii).

[226]    *Dimaya*, 584 U.S. at 153-54.

turn, defined "crime of violence" in two parts, commonly known as the "elements clause" and the "residual clause":

> (a) an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or
>
> (b) any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.[227]

The Supreme Court again applied the categorical approach, this time to its construction of the residual clause of § 16's definition of a crime of violence.[228] The Court explained this judicial construct prohibited an immigration judge not only from considering whether the facts of a prior offense posed the substantial risk identified in § 16, but from considering whether the statutory elements of a crime required or entailed the creation of such a risk.[229] Instead, the categorical approach's application required a court to determine whether a hypothetical "ordinary case" of an offense posed the requisite risk under § 16.[230]

The Supreme Court then concluded that, like the ACCA's residual clause, the definition of "crime of violence" could not withstand scrutiny under the categorical

---

[227]    *Id.* at 153 (citing 18 U.S.C. § 16).

[228]    *Id.* at 153 (citing *Leocal v. Ashcroft*, 543 U.S. 1, 7 (2004)).

[229]    *Id.* at 153-54.

[230]    *Id.* at 154.

approach.  The Court acknowledged that it is impossible for any court to divine the conduct entailed in a crime's ordinary case, and found that § 16(b) "possesse[d] the second fatal feature of ACCA's residual clause:  uncertainty about the level of risk that makes a crime 'violent.'"[231]  As with the ACCA's residual clause, "the 'ordinary case' remain[ed] . . . an excessively 'speculative,' essentially inscrutable thing."[232]  Citing *Johnson*, the Supreme Court struck down § 16(b) as unconstitutionally vague, holding:

> *Johnson* tells us how to resolve this case.  That decision held that "[t]wo features of [ACCA's] residual clause conspire[d] to make it unconstitutionally vague."  Because the clause had both an ordinary-case requirement and an ill-defined risk threshold, it necessarily "devolv[ed] into guesswork and intuition," invited arbitrary enforcement, and failed to provide fair notice.  Section 16(b) possesses the exact same two features.  And none of the minor linguistic disparities in the statutes makes any real difference.  So just like ACCA's residual clause, § 16(b) "produces more unpredictability and arbitrariness than the Due Process Clause tolerates."[233]

In *United States v. Davis*,[234] the Supreme Court likewise invalidated as unconstitutionally vague 18 U.S.C. § 924(c), which threatened long prison sentences for anyone using a firearm in connection with certain other federal crimes.  The

---

[231]    *Id*. at 159-61.

[232]    *Id*. at 160-61 (citing *Johnson*, 576 U.S. at 597).

[233]    *Id*. at 174-75 (citations omitted).

[234]    588 U.S. 445 (2019).

statute's list of those federal crimes triggering possible enhanced punishment included a residual clause that identified felonies which by their nature involve a "substantial risk that physical force against the person or property of another may be used in the course of committing the offense."[235]  The statute also included a provision authorizing enhanced penalties for carrying a firearm during and in relation to, or possessing a firearm in furtherance of, any federal "crime of violence" or drug trafficking crime.[236]  According to § 924(c)(3), a crime of violence is "an offense that is a felony" and "(A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or (B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."

Just as in *Johnson* and *Dimaya*, the Supreme Court employed a categorical approach to analyzing the statutory requirements of § 924(c):

> "In determining whether petitioner's conviction falls within the ambit of § 16, the statute directs our focus to the 'offense' of conviction.  *See* § 16(a) (defining a crime of violence as '*an offense* that has *as an element* the use . . . of physical force against the person or property of another' (emphasis added)); § 16(b) (defining the term as '*any other offense* that is a felony and that, *by its nature*, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense' (emphasis added)).  This language

---

[235]    18 U.S.C. § 924(c)(3)(B).

[236]    18 U.S.C. § 924(c)(1)(A).

> requires us to look to the elements and the nature of the offense of conviction, rather than to the particular facts relating to petitioner's crime."[237]

The Supreme Court concluded the term "crime of violence" as employed in § 924(c)'s residual clause suffered from the same constitutional vagueness as did § 16's residual clause.[238] Accordingly, the Supreme Court affirmed the Fifth Circuit's conclusion that § 924(c)(3)(B) was unconstitutionally vague.[239]

Cade's attempt to analogize the Texas capital sentencing statute's future dangerousness special issue with the three federal statutes struck down as unconstitutionally vague in *Johnson*, *Dimaya*, and *Davis* fails for a variety of reasons. Most of those reasons arise from Cade's misapprehension of the constitutional role the future dangerousness special issue plays within the Texas capital sentencing scheme.

First, in sharp contrast to each of the foregoing cases in which the Supreme Court struck down a statutory term as unconstitutionally vague under a "categorical approach" to statutory construction, the Texas capital sentencing statute's future dangerousness special issue does *not* require a Texas capital sentencing jury to make

---

[237] *Davis*, 588 U.S. at 455 (quoting *Leocal*, 543 U.S. at 7) (emphasis in the original).

[238] *Id*. at 459-62 (discussing the legislative history showing Congress borrowed § 16's "crime of violence" when it enacted § 924(c)(3)(B)).

[239] *Id*. at 469-70.

any determinations regarding the nature of, or level of violence or risk of physical force involved in, a defendant's *prior* criminal convictions.  Nor does the future dangerousness special issue require a capital sentencing jury to make any discrete factual findings regarding a capital defendant's prior unadjudicated criminal misconduct.  Instead, the future dangerousness special issue requires a capital sentencing jury to (1) examine all of the evidence addressing the circumstances of a capital offense and the defendant's background, character, and personal moral culpability, and then (2) make an informed decision regarding the defendant's likely propensity to commit *future* criminal acts of violence.  Thus, unlike the three federal statutes struck down by the Supreme Court, the future dangerousness special issue is forward-looking or predictive, not retrospective, in nature.

Second, unlike the three federal statutes in question, a Texas capital sentencing jury's affirmative answer to the future dangerousness special issue does not automatically increase the potential range of a capital defendant's sentence.  Instead, an affirmative answer to the future dangerousness special issue merely opens the gate to allow the capital sentencing jury to proceed forward to consideration and resolution of the mitigation special issue, which ultimately determines the convicted capital murderer's fate.  Thus, resolution of the future dangerousness special issue does not, standing alone, enhance a defendant's potential punishment.  The Texas

future dangerousness special issue performs a wholly different purpose than the sentence enhancement provisions of the ACCA's residual clause.

Third, the federal statutes struck down as unconstitutionally vague in *Johnson*, *Dimaya*, and *Davis* required federal sentencing judges to employ a "categorical approach" to ascertaining whether a defendant's prior convictions rose to the level of a "violent felony" or "crime of violence."  Nothing in the Texas capital sentencing statute or any judicial interpretation of that statute compels a Texas capital sentencing jury to engage in any type of guesswork like that required of federal sentencing judges under the Supreme Court's categorical approach to federal statutory construction.  Texas capital sentencing juries are routinely instructed to base their answers to the special issues on all the *evidence* before them; they are not required to imagine hypothetical scenarios and ponder whether the statutory elements of a particular offense necessarily could have been committed without the application of physical force or a threat of same.  Thus, Texas capital sentencing juries are not required to apply the categorical approach adopted by the Supreme Court in *Taylor* and its progeny or to do the same "inscrutable thing" federal sentencing judges were required to do under the categorical approach when applying the federal statutes struck down in *Johnson*, *Dimaya*, and *Davis*.  The Supreme Court's categorical approach to judicial construction of federal statutes does not apply to a Texas capital sentencing jury's answer to the future dangerousness special issue.

Fourth, contrary to the suggestions in Cade's second amended petition, there is nothing inherently unconstitutional or legally suspect about a predictive judgment in a criminal proceeding.  State and federal courts routinely make both express and implicit factual findings regarding a host of potential future events when addressing a wide range of issues.  Included among these are determinations as to whether a criminal defendant should be released on bond pending trial (which necessarily includes consideration of whether the defendant poses a risk of flight or a threat to the community).  State and federal courts also engage in predictive decision-making when determining whether to issue a temporary restraining order ("TRO") or preliminary injunction.[240]  To obtain a preliminary injunction in federal court, the moving party must show a substantial likelihood of success on the merits, a substantial threat of irreparable injury in the absence of preliminary relief, the balance of equities tips in the movant's favor, and the grant of an injunction will not disserve the public interest.[241]  Thus, both the TRO and preliminary injunction standards require courts to engage in forward-looking, predictive judgments.  The fact the future dangerousness special issue requires a Texas capital sentencing jury to

---

[240]    *See* FED. R. CIV. P. 65(b)(1)(A) (requiring a showing that the movant will suffer "immediate and irreparable injury, loss, or damage" before a federal court may issue a temporary restraining order).

[241]    *Ramirez v. Collier*, 595 U.S. 411, 421 (2022) (citation omitted).

make a forward-looking, predictive determination does not inherently render such a

decision constitutionally suspect.[242]

Fifth, in Texas the "eligibility" determination described in *Tuilaepa* and

discussed above is accomplished at the guilt-innocence phase of a capital murder trial

by virtue of the manner with which Texas defines the offense of capital murder in

§ 19.03 of the Texas Penal Code.[243]

---

[242]     *Tuilaepa*, 512 U.S. at 974 (holding that the State's future dangerousness element is not unconstitutionally vague) (quoting *Jurek*, 428 U.S. at 274-76); see also *Johnson v. Lumpkin*, 76 F.4th 1037, 1038 n.1 (5th Cir. 2023) (per curiam), *cert. denied*, __ U.S. __, 144 S. Ct. 829 (2024); *Buntion v. Lumpkin*, 982 F.3d 945, 948-50 (5th Cir. 2020) (per curiam) (concluding that developments in social science have not altered the proposition that a jury can accurately determine future dangerousness), *cert. denied*, __ U.S. __, 142 S. Ct. 3 (2021); *id*. at 950-51 (explaining that a prisoner's non-violent conduct after conviction does not undermine the jury's determination that the prisoner poses a future threat of danger); *Rowell v. Dretke*, 398 F.3d 370, 378 (5th Cir.) (upholding the constitutionality of not requiring the State to disprove mitigation beyond a reasonable doubt), *cert. denied*, 546 U.S. 848 (2005); *Sprouse*, 748 F.3d at 622; *Scheanette v. Quarterman*, 482 F.3d 815, 828 (5th Cir. 2007).

[243]     *Johnson*, 509 U.S. at 362 (holding its previous opinions upholding the Texas capital sentencing scheme found no constitutional deficiency in the means used to narrow the group of offenders subject to capital punishment because the statute itself adopted different classifications of murder for that purpose); *Lowenfield v. Phelps*, 484 U.S. 231, 243-47 (1988) (comparing the Louisiana and Texas capital murder schemes and noting they each narrow those eligible for the death penalty through narrow statutory definitions of capital murder); *Jurek*, 428 U.S. at 268-75 (plurality opinion recognizing the Texas capital sentencing scheme narrows the category of murders for which a death sentence may be imposed and this serves the same purpose as the requirements of other statutory schemes which require proof of aggravating circumstances to justify the imposition of the death penalty); *Woods v. Johnson*, 75 F.3d 1017, 1033-34 (5th Cir.), *cert. denied*, 519 U.S. 854 (1996) (recognizing the Texas capital sentencing special issues "do not function as aggravating circumstances . . . but rather adequately 'guide and focus the jury's

(continued...)

Sixth, Texas is not a weighing jurisdiction in which aggravating circumstances must be proved by the State and then weighed against mitigating factors to determine the propriety of a capital sentence.[244]  A capital sentencing jury's affirmative answer to the Texas future dangerousness special issue does not constitute a factual finding on an aggravating circumstance which then must be weighed against mitigating circumstances or mitigating evidence.[245]  Thus, Cade's implicit attempt to analogize the Texas future dangerousness special issue to an unconstitutionally vague aggravating circumstance lacks arguable merit.

Seventh, any factual error in a Texas capital sentencing jury's predictive answer to the future dangerousness special issue does not render a death sentence

---

[243](...continued)
objective consideration of the particularized circumstances of the individual offense and the individual offender before it can impose a sentence of death'") (quoting *Jurek*, 428 U.S. at 274).  Thus, the constitutionally required narrowing function described in *Tuilaepa* as the "eligibility determination" is accomplished at the guilt-innocence phase of trial by virtue of the narrow manner with which Texas has statutorily defined the offense of capital murder.  *Johnson*, 509 U.S. at 362; *Jurek*, 428 U.S. at 268-72; *Turner*, 481 F.3d at 299-300 ("The terms about which Turner complains are not invoked until after the defendant has been judged death-eligible and the jury is being instructed how to decide whether selection of the death penalty is appropriate."); *Woods*, 75 F.3d at 1033-34 (the Texas capital sentencing special issues do not function as aggravating circumstances but rather guide and focus the jury's objective consideration of particularized circumstances of the individual offense and the individual offender).

[244]    *Turner*, 481 F.3d at 299-300; *Woods*, 75 F.3d at 1033-34; *James*, 987 F.2d at 1120.

[245]    *Turner*, 481 F.3d at 299-300; *Woods*, 75 F.3d at 1033-34.

unconstitutional.  The Supreme Court "'has *never* intimated that the factual correctness of the jury's prediction on the issue of future dangerousness . . . bears upon the constitutionality' of a death sentence."[246]

Eighth, because the eligibility decision recognized in *Tuilaepa* is made in Texas at the guilt-innocence phase of trial, and because an affirmative answer to the future dangerousness special issue does not in any way foreclose the jury's consideration of mitigating circumstances or mitigating evidence, any vagueness in the language of the future dangerousness special issue is necessarily harmless under *Brecht v. Abrahamson*.[247]  A negative answer to the future dangerousness special issue does not harm a defendant within the meaning of *Brecht* – it effectively guarantees the defendant a sentence of life imprisonment.  Even if premised upon an unconstitutionally vague set of key terms, an affirmative answer to the future dangerousness special issue likewise does not deprive a Texas capital defendant of any constitutional right; it merely permits the jury to proceed to the selection phase of the capital sentencing process by addressing the mitigation special issue.[248]  An affirmative answer to the future dangerousness special issue merely furnishes a Texas

---

[246]    *Buntion*, 982 F.3d at 950 (emphasis added) (quoting *Lincecum v. Collins*, 958 F.2d 1271, 1281 (5th Cir.), *cert. denied*, 506 U.S. 957 (1992)).

[247]    507 U.S. at 623-24 (1993) (the test for harmless error in federal court is whether the error "had a substantial and injurious effect or influence in determining the jury's verdict").

[248]    *Turner*, 481 F.3d at 299-300; *Woods*, 75 F.3d at 1033-34.

capital sentencing jury with an opportunity to consider all mitigating evidence and then determine whether to engage in the selection determination described in *Tuilaepa*. Thus, any ambiguity in the future dangerousness special issue is harmless within the meaning of *Brecht*.

Finally, for the reasons discussed at length in Respondent's answer,[249] Cade's attempts to apply the holdings in *Johnson*, *Dimaya*, and *Davis* to the Texas capital sentencing special issues are foreclosed by the *Teague* nonretroactivity doctrine. The "categorical approach" to statutory construction is a judicial construct created by the Supreme Court in *Taylor* and *Leocal* to be employed by federal courts when construing the meaning of terms contained in specific federal criminal sentencing statutes. As explained above, in *Taylor* and *Leocal*, the Supreme Court imposed the categorical approach on federal courts based upon a confluence of (1) its conclusion that Congress intended to require a categorical approach to the federal criminal sentencing statutes in question and (2) its application of the rule of lenity. The categorical approach to federal statutory construction recognized in *Taylor* and *Leocal* and applied in *Johnson*, *Dimaya*, and *Davis* has never been applied by any court to the statutory construction of any part of a state capital sentencing statute, such as Article 37.071, § 2(b)(1) of the Texas Code of Criminal Procedure. Doing so in Cade's case would violate *Teague*.

---

[249]     ECF no. 132, 148-51.

In conclusion, the Texas capital sentencing statute's future dangerousness special issue functions in a manner wholly dissimilar to the federal sentencing enhancement statutes struck down in *Johnson*, *Dimaya*, and *Davis*. An affirmative answer to the future dangerousness special issue does not constitute an aggravating circumstance to be weighed by Texas capital sentencing juries against mitigating evidence. There is nothing unconstitutionally vague about a capital sentencing statute which requires a jury to make a forward-looking, predictive evaluation based upon an examination of evidence showing the circumstances of a capital offense and the defendant's background, character, and personal moral culpability. Any ambiguity in the future dangerousness special issue is harmless under *Brecht*. *Teague* forbids application of the categorical approach to federal statutory construction employed in *Johnson*, *Dimaya*, and *Davis* to the Texas capital sentencing special issues. For the foregoing reasons, Cade's sixteenth claim does not warrant federal habeas relief under *de novo* review.

### H.  Lesser-Included Offense Instruction

In his eighth claim in his second amended petition, Cade argues his trial court erred in denying his request for a jury instruction on the lesser-included offense of ordinary murder, in part because the jury could have concluded Cade was legally

insane when he fatally stabbed Desaree.[250]  Cade presented essentially the same

argument as his sixth point of error on direct appeal.[251]  The TCCA rejected this

argument on the merits when it affirmed Cade's conviction and sentence on direct

appeal.[252]

A capital murder defendant is constitutionally entitled to an instruction on a

lesser-included offense if the evidence would permit a jury rationally to find the

defendant guilty of the lesser offense and acquit him of the greater.[253]  "Due process

requires a jury charge on a lesser included offense 'when the evidence unquestionably

establishes that the defendant is guilty of a serious, violent offense – but leaves some

doubt with respect to an element that would justify conviction of a capital offense . . .

.'"[254]  A defendant is constitutionally entitled to the instruction if the jury could

---

[250]    ECF no. 127, 109-12.

[251]    Appellant's Brief 50-54 [ECF no. 68-17, 73-77].

[252]    *Cade v. State*, 2015 WL 832421, at *11 ("[T]he evidence does not support a finding that [Cade]'s state of mind when he killed Desaree was different from his state of mind when he killed Fuller.").

[253]    See *Hopper v. Evans*, 456 U.S. 605, 611-12 (1982) (holding "due process requires a lesser included offense instruction be given *only* when the evidence warrants such an instruction") (emphasis in the original); *Beck v. Alabama*, 447 U.S. 625, 637-38 (1980) (holding unconstitutional a state statutory prohibition against the submission of lesser-included offense instructions in capital murder cases).

[254]    *Pippin v. Dretke*, 434 F.3d 782, 791 (5th Cir. 2005) (quoting *Beck*, 447 U.S. at 637), *cert. denied*, 549 U.S. 828 (2006); see also *Reed v. Quarterman*, 504 F.3d 465, 488-89 (5th Cir. 2007); *Aguilar v. Dretke*, 428 F.3d 526, 531 (5th Cir. 2005),

(continued...)

"rationally acquit" that defendant on the capital crime and convict on the non-capital crime.[255]  This inquiry necessarily requires careful review of the elements of each offense and other applicable provisions of state law.[256]

The TCCA reasonably concluded that no rational jury could have found Cade was sane when he fatally stabbed one of his two victims but insane when he stabbed his other victim.  This conclusion was fully supported by the evidence from Cade's trial.  Cade's own statements to police shortly after his arrest established that he stabbed both victims during the same attack:  first he stabbed Fuller multiple times; then he stabbed Desaree multiple times when she attempted to respond to her mother's screams; Cade then returned to Fuller; when Desaree attempted to crawl

---

[254](...continued)
*cert. denied*, 547 U.S. 1136 (2006).

[255]    *Jones v. Johnson*, 171 F.3d 270, 274 (5th Cir.) (citations omitted), *cert. denied*, 527 U.S. 1059 (1999); see also *Foster v. Dretke*, No. 05-70016, 2006 WL 616980, at *8 (5th Cir. Mar. 13, 2006) (citing *Hopper*, 456 U.S. 611-12; *Beck*, 447 U.S. at 637-38; *Cordova v. Lynaugh*, 838 F.2d 764, 767 (5th Cir.), *cert. denied*, 486 U.S. 1061 (1988)), *cert. denied sub nom*. 549 U.S. 859 (2006); *Reed*, 504 F.3d at 488-89; *Aguilar*, 428 F.3d at 531; *Ransom v. Johnson*, 126 F.3d 716, 724-25 (5th Cir.), *cert. denied*, 522 U.S. 944 (1997).

[256]    See *Livingston v. Johnson*, 107 F.3d 297, 312-13 (5th Cir.) (analyzing the difference under Texas law between felony murder and capital murder in the course of rejecting a *Beck* claim), *cert. denied*, 522 U.S. 880 (1997); *East v. Scott*, 55 F.3d 996, 1005-06 (5th Cir. 1995) (examining the distinction under Texas law between murder and felony murder, as well as the impact under Texas law of evidence of voluntary intoxication, in analyzing a *Beck* claim); *Cordova*, 838 F.2d at 768-70 (analyzing the distinction under Texas law between capital murder and murder, as well as the Texas law of parties, while granting federal habeas relief based on *Beck* error).

away from her mother's bedroom, Cade stabbed Desaree more times; he then

returned to Fuller and stabbed her additional times.[257]  By his own admission Cade's

assaults on Fuller and Desaree were virtually simultaneous.

The TCCA then turned to the expert testimony presented by both parties:

> Dr. Proctor, the State's expert, testified that [Cade] was
> sane during both killings.  [Cade]'s expert, Dr. Kessner,
> opined that [Cade] was insane during both killings because
> he was in a state of "abandonment rage" and autonomic
> arousal from the moment Fuller screamed (upon seeing
> [Cade] in her bed with a knife) until "the violence
> stopped."  For the jury to find [Cade] guilty of the
> lesser-included offense, it would necessarily have to
> disregard both Proctor's and Kessner's testimony.  It would
> have to find that [Cade] was thinking rationally when he
> began to stab Fuller, but he then entered a state of
> autonomic arousal (i.e., became insane) when Desaree
> entered the bedroom, and he began stabbing her.  He then
> regained rational thought when he stopped stabbing
> Desaree and returned to stabbing Fuller.  Finally, he
> returned to a state of autonomic arousal (i.e., became
> insane again) when Desaree began to get up, and he
> stabbed her multiple additional times.  In short, the
> evidence could not allow a rational jury to find [Cade]
> guilty of only murder.[258]

The TCCA's opinion on direct appeal accurately summarized the evidence from the

guilt-innocence phase of Cade's trial and reasonably concluded that no rational juror

could have found Cade guilty of only one murder while sane.

---

[257]    *Cade v. State*, 2015 WL 832421, at *2.

[258]    *Id.* at *11.

The TCCA's rejections on the merits during Cade's direct appeal of his complaint about the trial court's failure to submit a lesser-included offense instruction on murder were neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in Cade's trial and direct appeal.  Cade's eighth claim does not warrant federal habeas corpus relief.

## I.  Exclusion of the Defendant's Experts' Testimony

In his eleventh claim in his second amended petition Cade argues the trial court erred in excluding the testimony of two experts his trial counsel proffered at the punishment phase of trial:  Dr. Jonathan Sorensen and Dr. Mark Vigen.[259]  Cade presented the same complaints as his eighth and ninth points of error on direct appeal.[260]

In its opinion affirming Cade's conviction and sentence, the TCCA explained the trial court held a hearing outside the jury's presence to determine the admissibility of testimony to be offered by several defense witnesses, including Dr. Sorensen and Dr. Vigen, as experts.  Dr. Sorensen proposed to testify that inmates convicted of intimate-partner homicides are less likely to commit acts of

---

[259]    ECF no. 127, 134-46.

[260]    Appellant's Brief 58-66 [ECF no. 68-17, 81-89].

violence in prison than other inmates.[261]  His opinion was based on his own study of

TDCJ inmates convicted of intimate-partner homicides.  The State elicited testimony

that Sorensen's study was the first of its kind, incomplete, had not been peer-

reviewed or published, and no one had replicated his study's results.  Dr. Sorensen

acknowledged that, although successful peer review is some indication of a study's

reliability, replication of a study's results, rather than peer review, validates the study.

After recessing to review *Kelly v. State*,[262] the trial judge excluded Dr. Sorensen's

testimony.

Dr. Vigen proposed to testify that TDCJ "has a high probability of controlling

individual inmates."[263]  He based his opinion on thirty-five years of working as a

psychologist in Texas prisons; articles on prison violence written by other people,

including Dr. Sorensen; Dr. Vigen's own co-authored article which "summariz[ed]

research indicating that a majority of death row inmates do not exhibit violence in

prison even in more open institutional settings[;]" and other trial testimony regarding

TDCJ's inmate-classification system and ability to control inmates, including the

testimony of defense expert S.O. Woods ("Woods") and prosecution witness Travis

---

[261]    The proffered testimony of Dr. Sorensen appears at 50 R.R. Trial [ECF no. 69-50], 112-18, 183-216.

[262]    824 S.W.2d 568, 572-73 (Tex. Crim. App. 1992) (en banc).

[263]    The proffered testimony of Dr. Vigen appears at 50 R.R. Trial [ECF no. 69-50] 218-34.

Turner ("Turner").  Turner testified regarding the availability of weapons to TDCJ inmates inside penal facilities and some of the procedures TDCJ employed in an attempt to maintain control over its inmate population.[264]  Woods agreed with Turner that TDCJ inmates were creative when it came to fashioning weapons from commonplace items (*e.g.*, eyeglasses, shoelaces, plastic combs, handkerchiefs) available inside TDCJ facilities.[265]

Although Dr. Vigen initially asserted that he would not offer an opinion specific to Cade, he ultimately stated that he would testify that there was a high probability that TDCJ could control Cade, in particular.  When asked whether he based his opinion on anything specific to Cade, Dr. Vigen acknowledged that he had not evaluated Cade but noted that had listened to listened to the testimony of Turner and Woods.  The State objected to Dr. Vigen's proposed testimony.  It argued that Dr. Vigen was not "qualified" to render an opinion about the probability that TDCJ could control Cade because Dr. Vigen had reviewed little information about the case, had not been present throughout the entire trial, and had not interviewed Cade.[266]  Cade's trial counsel countered that the State's argument concerned the weight to be given to Dr. Vigen's opinion, rather than Dr. Vigen's

---

[264]   Testimony of Travis Turner, 49 R.R. Trial [ECF no. 69-49] 232-99.

[265]   Testimony of S.O. Woods, 50 R.R. Trial [ECF no. 69-50] 126-82.

[266]   *See* 50 R.R. Trial [ECF no. 69-50] 235.

qualifications to render it.[267] The trial judge ruled Dr. Vigen's testimony was inadmissible.[268]

On appeal, Cade argued that the trial court should have permitted Dr. Vigen to testify about TDCJ's ability to control Cade because Dr. Vigen reviewed, and based his opinion on, Cade's prison records, some offense reports concerning Cade's aggravated-sexual-assault conviction, Woods's and Turner's testimony, and relevant research in his field. Alternatively, Cade asserted that the trial court should have permitted Dr. Vigen to testify through answers to hypotheticals that Cade would not be a future danger in prison. The TCCA rejected these arguments.[269]

---

[267] *Id*.

[268] *Id*. at 237.

[269] The TCCA concluded, in pertinent part, as follows:

> To the extent Vigen proposed to testify about the probability that TDCJ could control [Cade], the trial court's ruling fell within the zone of reasonable disagreement. The record does not support [Cade]'s assertion that Vigen based his opinion on any information specific to [Cade]. At the admissibility hearing, the State asked Vigen repeatedly about the bases for his opinion, and Vigen responded by listing his own experience, articles that were not specific to [Cade], and Turner's and Woods's testimony before the jury. Vigen did not include his review of [Cade]'s prison record and offense reports related to [Cade]'s aggravated-sexual-assault conviction as a basis for his opinions. Further, neither Turner nor Woods offered testimony specific to [Cade]. The trial court did not abuse its discretion when it precluded Vigen

(continued...)

[269](...continued)
from testifying about the probability that TDCJ could control [Cade].

To the extent [Cade] argues that the trial court should have allowed Vigen to testify via hypotheticals that [Cade] would not be a future danger in prison, the record does not show that [Cade] suggested this alternative to the trial court.  In responding to the State's objection to Vigen's proposed testimony, defense counsel argued:

> Many times mental health professionals are given hypotheticals and asked to render opinions about future dangerousness and [sic] certainly qualifies within that category and meets the test of [*Nenno*] on the soft sciences that he's qualified to give an expert opinion. Any objection would go to the weight. There's no question about his qualifications and he's been qualified to testify in other death penalty cases [sic] the same or similar type of issues.

Although counsel mentioned the word "hypotheticals," it was in the context of an argument that the trial court should allow Vigen to testify that TDCJ would be able to control [Cade].  The trial court cannot be fairly expected to have known from counsel's argument that, if the trial court did not allow Vigen to testify about TDCJ's ability to control [Cade], then [Cade] wished to put Vigen on the stand to testify about [Cade]'s future dangerousness via hypotheticals.  And when the trial court ruled that Vigen's testimony was inadmissible, [Cade] did not seek clarification of the ruling's scope.  To the extent he would have otherwise presented Vigen's testimony in the form of hypotheticals, [Cade] failed to preserve any complaint.  *See* TEX. R. APP. P. 33.1(a).  Point of error eight is overruled.

(continued...)

The TCCA also rejected Cade's arguments regarding the exclusion of Dr. Sorensen's testimony.[270]

Cade argued in his fourth claim in his initial state habeas application that exclusion of the testimony of Dr. Sorensen and Dr. Vigen violated his due process rights.[271]  The state habeas trial court held the exclusion of Drs. Sorensen's and Vigen's proffered testimony did not violate Cade's due process right based on its findings that (1) their testimony was inadmissible under Texas Rule of Evidence 702; (2) Cade failed to show that the proffered testimony of Dr. Sorensen and Dr. Vigen was both relevant and reliable; (3) Dr. Sorensen's proffered testimony was based on an incomplete, unpublished study which had not been peer-reviewed and involved comparing the entire TDCJ disciplinary records of 189 prisoners convicted of intimate-partner homicides with the disciplinary records of more than ninety

---

[269](...continued)
*Cade v. State*, 2015 WL 832421, at *14-*15.

[270]   The TCCA held as follows:

> Sorensen proposed to offer an opinion based on the results of a novel and incomplete study that had not been peer-reviewed, published, or replicated.  The trial court acted within its discretion when it found Sorensen's testimony inadmissible under Rule 702.  Point of error nine is overruled.

*Id*. at *15 (footnote and citations omitted).

[271]   Initial State Habeas Application 77-82 [ECF no. 71-4, 80-85].

thousand TDCJ inmates covering only a single year of their incarceration (an untested methodology); (4) Dr. Vigen's proffered testimony at the hearing pertained almost exclusively to prison's ability to control inmates generally; (5) Dr. Vigen's proffered testimony regarding Cade was based on a limited review of records relating to Cade and not on a mental health evaluation of Cade; (6) Dr. Vigen's opinion regarding the ability of TDCJ to control Cade was based his review of articles on prison violence, his 35 years of work as a psychologist inside Texas prisons, his observation of the trial testimony of Woods and Turner, and a 2002 article he co-authored which concluded a majority of death row inmates do not exhibit violence even in more open institutional setting; (7) the exclusion of Drs. Sorensen's and Vigen's proffered opinion testimony did not prevent Cade from presenting a defense at the punishment phase of his trial; (8) the exclusion of Drs. Sorensen's and Vigen's proffered opinion testimony was harmless in light of (a) the substantial and compelling evidence showing Cade's propensity for violent misconduct, (b) the fact that only 24 of the inmates studied by Dr. Sorensen had killed both an intimate partner and a non-intimate victim, (c) Cade not only murdered two victims in the same criminal episode but also repeatedly sexually assaulted Fuller – both as she was dying and after her demise, and (d) the fact other evidence was offered by the defense regarding the ability of the TDCJ to reduce the risk of violence among its inmates; (9) the proffered opinions of Dr. Sorensen and Dr. Vigen added nothing substantial

to the punishment phase evidence already before the jury; and (10) the State's

evidence of Cade's violent past and the facts and circumstances of Cade's capital

murder "constituted strong and persuasive evidence of Cade's future

dangerousness."[272]  The TCCA expressly adopted all of the foregoing factual findings

when it denied Cade's initial state habeas application.[273]  The TCCA also expressly

held that Cade's fourth claim was procedurally defaulted because it had been raised

and rejected on the merits on direct appeal.[274]

Cade re-urged his due process challenge to the exclusion of proffered testimony

of Dr. Sorensen and Dr. Vigen in the twelfth claim of his first subsequent (second)

state habeas application.[275]  The TCCA summarily dismissed Cade's first subsequent

(second) state habeas application.[276]

"A federal court may grant habeas relief based on an erroneous state court

evidentiary ruling only if the ruling violates a specific federal constitutional right or is

---

[272]    FFCL pp. 51-61, ¶¶ 271-320 [ECF no. 71-9, 697-707].

[273]    *Ex parte Cade*, 2017 WL 4803802, at *2-*3.

[274]    *Id*. at *2.

[275]    First Subsequent (Second) State Habeas Application 142-53 [ECF no. 134-17, 345-67].

[276]    See *Ex parte Cade*, 2021 WL 1202479, at *2.

so egregious such that it renders the petitioner's trial fundamentally unfair."[277]

Federal habeas relief does not exist for the purpose of correcting errors of state law.[278]

In the course of reviewing state criminal convictions in federal habeas corpus

proceedings, federal district courts "do not operate as super state supreme

courts[.]"[279]

The TCCA's conclusion in the course of Cade's direct appeal that the proffered

opinion testimony of Dr. Sorensen and Dr. Vigen was inadmissible under Texas

evidentiary rules is binding upon this court in this federal habeas corpus

---

[277] *Brown v. Dretke*, 419 F.3d 365, 376 (5th Cir. 2005), *cert. denied*, 546 U.S. 1217 (2006); see also *Payne v. Tennessee*, 501 U.S. 808, 825 (1991); *Darden v. Wainwright*, 477 U.S. 168, 179-83 (1986); *Wood v. Quarterman*, 503 F.3d 408, 414 (5th Cir. 2007), *cert. denied*, 552 U.S. 1314 (2008).

[278] See *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (holding complaints regarding the admission of evidence under California law did not present grounds for federal habeas relief absent a showing that admission of the evidence in question violated due process); *Lewis*, 497 U.S. at 780 (recognizing that federal habeas relief will not issue for errors of state law); *Pulley v. Harris*, 465 U.S. 37, 41 (1984) (holding a federal court may not issue the writ on the basis of a perceived error of state law).

[279] *Davis v. Guerrero*, 798 F. Supp. 3d 633, 655 (N.D. Tex. Sept. 5, 2025) (Boyle, J.); see also *Cruz v. Johnson*, 159 F.3d 1355 (5th Cir.) (per curiam), *cert. denied*, 524 U.S. 983 (1998); *Dillard v. Blackburn*, 780 F.2d 509, 513 (5th Cir. 1986) ("[F]ederal courts do not sit as courts of appeal and error for state court convictions.").

proceeding.[280]  Thus, the question before this court is not whether the state trial

court properly applied state evidentiary rules but, rather, whether Cade's federal

constitutional rights were violated by the state trial court's rulings on evidentiary

matters.[281]

As the Fifth Circuit has explained "[d]ue process is implicated only for rulings

'of such a magnitude' or 'so egregious' that they 'render the trial fundamentally

unfair.'"[282]  Due process does not grant federal habeas courts authority to review the

"mine run of evidentiary rulings of state trial courts."[283]  "Relief will be warranted

only when the challenged evidence 'played a crucial, critical, and highly significant

role in the trial.'"[284]  Further, the due process inquiry considers the significance of the

---

[280]    See *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.") (citing *Estelle*, 502 U.S. at 67-68; *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975)); *Garza v. Stephens*, 738 F.3d 669, 677 (5th Cir. 2013) (holding a Texas habeas court's interpretation of evidentiary rules was binding in a federal habeas case), *cert. denied*, 573 U.S. 949 (2014); *Paredes*, 574 F.3d at 291.

[281]    See *Bigby v. Dretke*, 402 F.3d 551, 563 (5th Cir.), *cert, denied*, 546 U.S. 900 (2005).

[282]    *Gonzales v. Thaler*, 643 F.3d 425, 430-31 (5th Cir. 2011) (quoting *Pemberton v. Collins*, 991 F.2d 1218, 1226, 1227 (5th Cir.), *cert. denied*, 510 U.S. 1025 (1993)); *Hills v. Henderson*, 529 F.2d 397, 401 (5th Cir.), *cert. denied sub nom*. 429 U.S. 850 (1976)).

[283]    *Id*. (citations omitted).

[284]    *Id*. (quoting *Little*, 162 F.3d at 862) (citing *Andrade v. McCotter*, 805

(continued...)

challenged evidence "in the context of the entire trial."[285]  There is no relief under the Due Process Clause in situations where the challenged evidence was not the principal focus at trial and the errors were not "'so pronounced and persistent that it permeates the entire atmosphere of the trial.'"[286]

The TCCA concluded on direct appeal that the opinion testimony of Dr. Sorensen and Dr. Vigen was inadmissible under state evidentiary rules because neither was sufficiently relevant and reliable under Rule 702 of the Texas Rules of Evidence.  During Cade's initial state habeas proceeding, the state habeas trial court expressly found a wide range of reasons justified the exclusion of the proffered testimony of Dr. Sorensen and Dr. Vigen.  The TCCA expressly adopted all those findings.

This court has reviewed the entire record from Cade's trial, initial state habeas proceeding, and first subsequent (second) state habeas proceedings.  This court concludes, as did the state habeas court during Cade's initial state habeas proceeding, that the state trial court's exclusion of the proffered testimony of Dr. Sorensen and Dr. Vigen did not render Cade's trial fundamentally unfair.  Both Dr. Sorensen and Dr. Vigen proposed to offer expert opinions that Cade would not pose a risk of future

---

[284](...continued)
F.2d 1190, 1193 (5th Cir. 1986)).

[285]    *Id.*

[286]    *Id.* (citations omitted).

- 112 -

violence if sentenced to serve a life sentence without parole in the custody of the

TDCJ.  Neither proposed to offer any new mitigating testimony impacting Cade's

moral blameworthiness for his capital offense.  That is, neither of these experts could

point to any evidence directly addressing Cade's background or character which

supported their opinions.  Thus, their proffered expert opinion testimony related

exclusively to the future dangerousness special issue.

Dr. Sorensen, an educator trained in prison administration, offered the results

of a "[f]irst study of its kind" which he admitted (1) had been commissioned for the

purpose of being introduced during Cade's trial; (2) included review of the

disciplinary records of 189 randomly selected inmates in the TDCJ who had killed an

intimate partner but only 24 of whom he identified as having murdered both an

intimate partner and a second, non-intimate, victim; (3) had never been published,

replicated, or peer-reviewed; (4) involved comparison of the entire disciplinary

records of an extremely small sample size of double-murderers against a much larger

cohort of TDCJ inmates whose disciplinary records were reviewed for a period of only

a single year; and (5) included virtually no information focused on Cade's conduct,

either in or out of a penal facility.[287]

Dr. Vigen, a psychologist, offered no opinion based upon a mental health

evaluation of Cade which he had conducted.  Instead, Dr. Vigen reviewed a limited

---

[287]    *See* 50 R.R. Trial [ECF no. 69-50] 113-18, 183-218.

array of records relating to Cade and purported to rely primarily upon his experience as a practicing psychologist to support his opinion that Cade would not pose a significant risk of future violence if incarcerated for life inside a TDCJ facility. Dr. Vigen's proffered testimony did not include any suggestion that he had ever taken any academic courses in prison administration like Dr. Sorensen. Likewise, Dr. Vigen did not testify that he had ever been employed in actual prison administration like defense witness Woods or prosecution witness Turner.

The state habeas trial court and TCCA expressly found the evidence of Cade's violent criminal history presented during Cade's trial was substantial and compelling. This court's independent review of the record from Cade's trial compels the same conclusion reached by the TCCA in Cade's direct appeal – the evidence at trial established Cade engaged in an escalating pattern of violent criminal misconduct culminating in his double-murder of Fuller and Desaree.[288] Cade's statements to police following his arrest included a detailed account of how he (1) planted a recording device under his and Fuller's bed; (2) later retrieved that device; (3) listened for hours to Fuller's telephone conversation with her ex-husband; and (4) then obtained a knife *before* he confronted Fuller about the contents of that recorded conversation. This court's independent review of Cade's writings, apparently written during the aftermath of Cade's crimes and left at the crime scene, establishes those

---

[288]     *Cade v. State*, 2015 WL 832421, at *4.

writings included numerous statements in which Cade declared that the blame for his murderous conduct rested with Fuller and her ex-husband. Thus, the evidence introduced at trial show Cade's violent actions toward Fuller on the night of the murders was premeditated. The trial evidence also showed that, despite his verbal expressions of sorrow and remorse to police, in the immediate aftermath of his offense, Cade remained unrepentant and unwilling to accept responsibility for his criminal misconduct. The TCCA reasonably concluded on direct appeal that the evidence of Cade's future dangerousness was legally sufficient to support the jury's affirmative answer to the future dangerousness special issue.[289] This evidence was not merely sufficient to support the jury's answer to the future dangerousness special issue. It was compelling.

As the TCCA pointed out both on direct appeal and in the factual findings it adopted during Cade's initial state habeas corpus proceeding, numerous witnesses testified for both parties in a manner relevant to the future dangerousness special issue. Defense expert Woods countered some, but not all, of the things included in prosecution expert Turner's descriptions of the TDCJ inmate classification system, *i.e.*, the TDCJ's policy for managing inmates. The mental health experts who testified at Cade's trial agreed that Cade functioned intellectually in the low average to borderline range yet had managed to graduate from high school, earn college credits,

---

[289]     *Id*. at *8.

- 115 -

obtain a Texas driver's license, and earn a forklift operator's certification.  What none of the expert or lay witnesses who testified on behalf of Cade at trial could do, however, was effectively negate the prosecution's unchallenged evidence showing both the depraved circumstances of Cade's capital offense and Cade's lengthy history of escalating violence, especially toward women.

The proffered opinions of Dr. Sorensen and Dr. Vigen were premised upon extremely sparse information relating to Cade personally and would have done little to diminish the prosecution's evidence of Cade's future dangerousness.  The state trial court reasonably concluded the speculative opinions in question lacked demonstrated methodologies to support them, were not based upon mental health evaluations of Cade, were not based on adequate information about Cade personally, and were unreliable and inadmissible.

The TCCA's rejections on the merits during Cade's direct appeal and initial state habeas proceeding of his complaint about the trial court's exclusion of the expert testimony of Dr. Sorensen and Dr. Vigen were neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in Cade's trial, direct appeal, and initial state habeas proceedings.  Under AEDPA, Cade's eleventh claim does not warrant federal habeas corpus relief.

For the same reasons, even under a *de novo* standard of review, the exclusion of the proffered testimony of Cade's experts (Dr. Sorensen and Dr. Vigen) did not render Cade's capital murder trial fundamentally unfair.  The exclusion of their proffered testimony was not crucial or critical to the outcome of the punishment phase of Cade's trial.[290]  Furthermore, the evidence at trial showing Cade's propensity for future violence was compelling.  Any error resulting from the exclusion of the proffered expert testimony in question was harmless under *Brecht*.

Texas courts generally decline to admit expert opinion testimony in a capital sentencing proceeding that is unrelated to the defendant's individual characteristics or unsupported by established research methodologies and theory.[291]  The state trial court did not render Cade's capital murder trial fundamentally unfair by excluding the proffered expert opinion testimony in question.  Nor did it harm Cade within the meaning of *Brecht*.  Cade's eleventh claim does not warrant federal habeas relief even when reviewed under a *de novo* standard.

---

[290]    See *Gonzalez*, 643 F.3d at 431.

[291]    See *Coble v. State*, 330 S.W.3d 253, 277-80 (Tex. Crim. App. 2010) (holding trial court erred in admitting opinion testimony on future dangerousness from a forensic psychiatrist where the expert (1) identified no objective source material to substantiate his methodology and (2) evaluated the defendant eighteen years before but retained no contemporaneous notes of that evaluation and presumably had no independent recollection of same), *cert. denied*, 564 U.S. 1020 (2011).

J.  Punishment Phase Prosecutorial Jury Argument

In his fourteenth claim in his second amended petition Cade argues the trial court erred in overruling his trial counsel's objections to various closing jury arguments made by the prosecution at the punishment phase of trial.[292]  Succinctly stated, Cade contends that the State misstated the law by suggesting that the death penalty would be a proper verdict based only on an affirmative answer to the future-dangerousness special question.  Cade presented a similar argument as his fourteenth point of error on direct appeal.[293]  The TCCA rejected this argument on the merits when it affirmed Cade's conviction and sentence on direct appeal.[294]

---

[292]    ECF no. 127, 148-50.

[293]    Appellant's Brief 78-80 [ECF no. 68-17, 101-03].

[294]    The TCCA concluded as follows:

> The record shows that, after correctly stating the two special issues, the prosecutor linked the evidence presented at trial to them.  *See* Art. 37.071, § 2(b)(1), 2(e)(1).  The prosecutor first focused on the offense facts, arguing that the "horrific[,] senseless, unjustified violence" [Cade] had inflicted was relevant to both special issues and showed that [Cade] was the type of person who "deserv[ed] a death sentence" – "exactly what Special Issue 1 and 2 are about."  She also drew the jury's attention to the evidence of [Cade]'s extraneous offenses and other bad acts, arguing that they constituted additional reasons for the jury to return an affirmative answer to the future-dangerousness special issue.  After asking the jury to return an affirmative answer on future dangerousness, the prosecutor segued into her argument concerning the mitigation issue:

(continued...)

- 118 -

Improper jury argument by a prosecutor furnishes a sufficient basis for federal

---

[294](...continued)

> The answer to Special Issue No. 1 is yes. What the State of Texas asks [is] that you vote that way, all of you, and you move on to Special Issue No. 2.
>
> Now on this special issue, we don't have the burden of proof, [and] neither does the defense. It's left up to you. And [Special Issue No. 2] really asks you is there anything that is sufficiently mitigating to warrant that he shouldn't have the death sentence that you've already determined that he deserves by the answer of yes to Special Issue No. 1.

[Cade] objected to the last sentence of the passage set forth above, arguing that it misstated the law because "the death sentence is not imposed until all questions are answered." The trial court overruled the objection.

We perceive no misstatement of law. The prosecutor did not argue that [Cade] could lawfully receive a death sentence based only on an affirmative answer to the future-dangerousness special issue. The State's argument was reasonably understood as a hypothetical, in which it posited that the jury had already answered "yes" to the future-dangerousness special issue and was beginning to deliberate on the mitigation issue. Once the jury has made an affirmative finding concerning future dangerousness, a defendant's sentence is presumptively death unless, after considering the mitigating evidence presented to it, the jury also answers the mitigation special issue in the affirmative or deadlocks on that issue. *See* Art. 37.071, § 2(g). Point of error fourteen is overruled.

*Cade v. State*, 2015 WL 832421, at *18.

- 119 -

habeas relief only if the prosecutor's remarks are "'so prejudicial that they [violate the defendant's due process rights] and render the trial fundamentally unfair.'"[295]  "'To establish that a prosecutor's remarks are so inflammatory as to prejudice the substantial rights of a defendant, the petitioner must demonstrate either persistent and pronounced misconduct or that the evidence was so insubstantial that (in probability) but for the remarks no conviction would have occurred.'"[296]  Under Texas law, proper prosecutorial jury argument takes four forms:  (1) summation of the evidence; (2) reasonable inference or deduction from the evidence; (3) response or rebuttal to the arguments of the defense; and (4) plea for law enforcement.[297]

The TCCA's conclusion in its opinion on direct appeal that the prosecutor's punishment phase jury argument to which Cade's trial counsel objected accurately stated Texas law is binding on this court in this federal habeas corpus action.[298]  The TCCA's assessment of Texas law is consistent with the Supreme Court's construction

---

[295]    *Hughes v. Quarterman*, 530 F.3d 336, 347 (5th Cir. 2008) (quoting *Harris v. Cockrell*, 313 F.3d 238, 245 (5th Cir. 2002), *cert. denied*, 540 U.S. 1218 (2004)), *cert. denied*, 556 U.S. 1239 (2009); see also *Romano v. Oklahoma*, 512 U.S. 1, 12-13 (1994).

[296]    *Bridge v. Lynaugh*, 838 F.2d 770, 774 (5th Cir. 1988) (per curiam) (quoting *Felde v. Blackburn*, 795 F.2d 400, 403 (5th Cir. 1986)).

[297]    *Ward v. Dretke*, 420 F.3d 479, 497 (5th Cir. 2005) (citations omitted), *cert. denied*, 547 U.S. 1040 (2006); see also *Hughes*, 530 F.3d at 347; *Milton v. State*, 572 S.W.3d 234, 239 (Tex. Crim. App. 2019) (citation omitted).

[298]    See *Bradshaw*, 546 U.S. at 76; see also *Garza*, 738 F.3d at 677; *Paredes*, 574 F.3d at 291.

of the Texas capital sentencing special issues.[299]  The TCCA reasonably concluded there was no error under Texas law in the prosecution's closing punishment phase jury argument in question.

Furthermore, the prosecution's punishment phase jury argument in question did not preclude the jury from giving effect to any of the mitigating evidence before the jury at the punishment phase of Cade's trial.  Cade's arguments to the contrary are unpersuasive.  Cade relies on the Supreme Court's decisions in *Smith v. Texas*[300] and *Brewer v. Quarterman*,[301] but his reliance on these opinions is misplaced.  Both of those decisions dealt with Texas capital sentencing proceedings conducted prior to the Texas Legislature's adoption of the Texas capital sentencing statute's mitigation special issue.[302]

Cade's capital sentencing jury, in contrast, had before it the mitigation special issue and trial court instructions directing the jury to consider all of the evidence

---

[299]     See *Andrus v. Texas*, 590 U.S. 806, 821 (2020) ("In Texas, a jury cannot recommend a death sentence without unanimously finding that a defendant presents a future danger to society (*i.e.*, that the State has made a sufficient showing of aggravation).  Tex. Code Crim. Proc. Ann., Art. 37.071, § 2(b)(1).  Only after a jury makes a finding of future dangerousness can it consider any mitigating evidence. *Ibid*.").

[300]     543 U.S. 37 (2004).

[301]     550 U.S. 286 (2007).

[302]     *Brewer*, 550 U.S. at 290-91; *Smith*, 543 U.S. at 39-40.

addressing the circumstances of Cade's capital offense and all of the evidence addressing Cade's background, character, and personal moral culpability when answering the special issues.[303]  Under such circumstances, the failure of the trial court to sustain Cade's trial counsel's objection in question did not render the punishment phase of Cade's capital murder trial fundamentally unfair.

The TCCA's rejection on the merits during Cade's direct appeal of his complaint about the trial court's overruling of his objection to the prosecution's punishment phase jury argument in question was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in Cade's trial and state direct appeal proceedings.  Under AEDPA, Cade's fourteenth claim does not warrant federal habeas corpus relief.

## K.  Ineffective Assistance Claims

Cade asserts several complaints about the performance of his trial counsel, including that his trial counsel:  stipulated to the summary excusal of several venire members based on their answers to juror questionnaires (Claim 2); failed to present a defense at the guilt-innocence phase of trial based upon the assertion that Cade was

---

[303]  Cade's punishment phase jury charge appears at ECF no. 68-5 at 415-421.

"not sufficiently conscious at the time of the killings" to possess the requisite mental state to be liable for the offense (Claim 4); elicited testimony at the guilt-innocence phase of trial showing Cade was a convicted felon (Claim 5); failed to timely object at the guilt-innocence phase of trial to victim impact testimony (Claim 6); failed to object to the prosecution's outside-the-record jury argument drawing the jury's attention to the conduct of defense witness Gregory Scott after Scott exited the witness stand (Claim 7); failed to adequately investigate Cade's background and present all available mitigating evidence, including the proffered testimony of Dr. Vigen relating to future dangerousness (Claim 10); and failed to adequately investigate Cade's background and present all available mitigating evidence, including evidence showing Cade's offense was out-of-character for him, Cade was profoundly remorseful, Cade experienced an impoverished, neglected and abusive childhood, and Cade suffered from a variety of psychological and neurological conditions (low intellectual functioning, frontal lobe brain damage, post-traumatic stress symptoms, and symptoms of schizophrenia) (Claim 15).[304]

Many of these ineffective assistance claims reference or are premised upon Cade's trial counsels' alleged failure to comply with the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases. Insofar as Cade relies upon the ABA's Guidelines, those recommendations for the

---

[304] *See* ECF no. 127, 48-56, 65-109, 119-134, 151-232.

performance of trial counsel do not set forth the operative standard of *judicial* review for the performance of trial counsel.[305]  Indeed, "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant.  Any such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions."[306]

The constitutional standard for determining whether a criminal defendant has been denied the effective assistance of trial counsel, as guaranteed by the Sixth Amendment, was announced by the Supreme Court in *Strickland*:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components.  First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the

---

[305]    *Bobby v. Van Hook*, 558 U.S. 4, 8 (2009) (per curiam) (the ABA Guidelines "are 'only guides' to what reasonableness means, not its definition") (quoting *Strickland*, 466 U.S. at 688); *Druery v. Thaler*, 647 F.3d 535, 541 n.2 (5th Cir. 2011) ("Petitioner relies upon ABA Guidelines and State Bar of Texas Guidelines to support his ineffective-assistance-of-counsel claim.  We note that while these may be 'useful as 'guides' to what reasonableness entails,' they certainly do not define reasonableness. . . .  Best practices urged by the ABA do not necessarily track the contours of the Sixth Amendment.  Consequently, the guidelines do not function as 'inexorable commands' with which all capital defense counsel 'must fully comply.'") (quoting *Bobby*, 558 U.S. at 7, 8)), *cert. denied*, 565 U.S. 1207 (2012).

[306]    *Strickland*, 466 U.S. at 688-89.

> defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.  Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.[307]

To satisfy the first prong of *Strickland*, a convicted defendant must show that counsel's representation "fell below an objective standard of reasonableness."[308]  In so doing, a convicted defendant has the burden of proof and must overcome a "strong presumption" that the conduct of his trial counsel "falls within [a] wide range of reasonable professional assistance[.]"[309]  "That standard is necessarily a general one.  'No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant.'"[310]  Under the well-settled *Strickland* standard, the Supreme Court recognizes a strong presumption that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."[311]

---

[307]   *Id*. at 687.

[308]   *Id*. at 688; see also *Wiggins*, 539 U.S. at 521.

[309]   *Strickland*, 466 U.S. at 689.

[310]   *Bobby*, 558 U.S. at 7 (quoting *Strickland*, 466 U.S. at 688-89).

[311]   *Strickland*, 466 U.S. at 690; see also *Cullen*, 563 U.S. at 189.

To satisfy the "prejudice" prong, a convicted defendant must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[312]  "Reasonable probability" means "a probability sufficient to undermine confidence in the outcome of the proceeding."[313]

In those instances in which the state courts failed to adjudicate either prong of the *Strickland* test, such as those complaints the state courts summarily dismissed under the Texas writ-abuse statute or which the petitioner failed to fairly present to the state courts, this court's review of the unadjudicated prong is *de novo*.[314]

Under AEDPA's deferential standard of review, claims of ineffective assistance adjudicated on the merits by a state court are entitled to a doubly deferential form of federal habeas review.  AEDPA, by setting forth necessary predicates before state court judgments may be set aside, "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court."[315]  Under 28 U.S.C. § 2254(d)(1), "'a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error

---

[312]    *Strickland*, 466 U.S. at 694.

[313]    *Id*.

[314]    See *Porter*, 558 U.S. at 39 (citing *Rompilla*, 545 U.S. at 390).

[315]    *Burt v. Titlow*, 571 U.S. 12, 19 (2013).

- 126 -

well understood and comprehended in existing law beyond any possibility for

fairminded disagreement.'"[316]

As the Supreme Court explained in *Harrington v. Richter*:

> The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland*'s standard.  Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court.  Under AEDPA, though, it is a necessary premise that the two questions are different.  For purposes of § 2254(d)(1), "an *unreasonable* application of federal law is different from an incorrect application of federal law."  A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.
>
> A state court's determination that a claim lacks merit precludes federal habeas relief so long as "fairminded jurists could disagree" on the correctness of the state court's decision.  And as this Court has explained, "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations."  "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court."[317]

---

[316]   *White v. Wheeler*, 577 U.S. 73, 77 (2015) (quoting *White v. Woodall*, 572 U.S. 415, 419-20 (2014) (quoting *Harrington*, 562 U.S. at 103)).

[317]   *Harrington*, 562 U.S. at 101 (citations omitted, emphasis in the original).

1. *Stipulation to Excusing Venire Members (Claim 2)*

In his second ground for relief in his second amended federal habeas petition, Cade argues his trial counsel rendered ineffective assistance by agreeing to a stipulation with the prosecution under which those venire members whose juror questionnaire answers fell into the extreme at both ends of the spectrum in terms of their support for or opposition to the death penalty would be excused without having to be examined during voir dire.[318]  Cade did not present this complaint of ineffective assistance to any state court until he included it as his second claim in his first subsequent (second) state habeas application.[319]  The TCCA summarily dismissed this claim when it dismissed Cade's first subsequent (second) state habeas application based on state writ-abuse principles.[320]

Here, Cade complains that his trial counsel stipulated to the summary dismissal of 57 venire members (out of more than 540) based upon the attitudes toward the death penalty reflected in their answers to the juror questionnaire.[321]

---

[318]    ECF no. 127, 49-56.

[319]    *See* First Subsequent (Second) State Habeas Application 39-46 [ECF no. 134-17, 139-53].

[320]    *Ex parte Cade*, 2021 WL 1202479, at *1-*2.

[321]    ECF no. 127, 53.

Cade alleges further that a May 2012 survey found 42% of Dallas County residents strongly supported the death penalty while 10% strongly opposed it.[322]

Assuming the accuracy of the polling numbers cited by Cade, the decision by his trial counsel to remove those venire members whose views on the death penalty as expressed in their juror questionnaires fell into either extreme of the spectrum, that decision was objectively reasonable. Such a strategy was likely to result in the removal of far more venire members who were strongly in favor of the death penalty than in the removal of venire members who were strongly opposed to the death penalty. This statistical assumption is supported by the fact that Cade's trial counsel utilized all fifteen of their peremptory strikes during jury selection and then requested and obtained additional peremptory strikes – all of which they exhausted. Meanwhile, the prosecution used only seven of its fifteen peremptory strikes. It was objectively reasonable for Cade's trial counsel to assume that the majority of the Dallas County citizens called to serve as potential jurors in his capital murder trial who held strong views on the death penalty would likely be supporters of the death penalty.

In fact, the disparate use of peremptory strikes by both sides during jury selection in Cade's case confirms it was objectively reasonable for Cade's trial counsel to stipulate to the dismissal of a group of venire members likely to favor the death

---

[322]    *Id*. at 53-54.

penalty quite strongly (versus opposing it) by a ratio of more than four-to-one.  Based on the polling data alleged by Cade in his second amended federal habeas petition, his trial counsels' decision to stipulate to removal of all venire members with strongly held opinions on the death penalty was a sound, objectively reasonable, strategic decision.

Cade's statistics and arguments are insufficient to overcome the presumption that the decision by his trial counsel to enter the joint stipulation with the prosecution fell within the wide range of objectively reasonable trial strategy permissible under *Strickland*.[323]  Cade's second claim does not satisfy the deficient performance prong of *Strickland*.

Cade has alleged no specific facts showing that, but for his state trial counsels' decision to enter into the stipulation in question, there is a reasonable probability the outcome of either phase of Cade's capital murder trial would have been any different. Cade can only speculate that a juror favorable to the defense might have been discoverable during individual voir dire within the group of venire members removed by stipulation.  The premise underlying this ineffective assistance claim appears to be that Cade possessed a Sixth Amendment right to have his jury selected from a jury venire constructed without consideration of the views those venire members possessed on the propriety of capital punishment.  As the Supreme Court explained

---

[323]    *Strickland*, 466 U.S. at 689.

in *Lockhart*, however, prosecution challenges for cause or peremptory strikes based upon a venire member's views on capital punishment do not violate the Constitution.[324]  The evidence presented by the prosecution at both phases of Cade's capital murder trial was not just compelling but overwhelming.  Cade's second claim also fails to satisfy the prejudice prong of *Strickland*.

Cade's second claim fails to satisfy either prong of *Strickland* and does not warrant federal habeas relief under a *de novo* standard of review.

2.  *Failure to Present a Diminished Capacity Defense at Guilt-Innocence Phase (Claim 4)*

In his fourth claim in his second amended federal habeas petition, Cade argues that his trial counsel should have avoided presenting his "nonviable" insanity defense and, instead, should have presented a defense at the guilt-innocence phase of trial arguing that Cade was insufficiently conscious at the time of the killings to possess the requisite criminally liable mental state.[325]

Cade presented a somewhat similar set of ineffective assistance complaints as his first, third, and fifth claims in his initial state habeas application.[326]  In those

---

[324]    *Lockhart*, 476 U.S. at 176-77 ("In sum, "*Witherspoon*-excludables," or for that matter any other group defined solely in terms of shared attitudes that render members of the group unable to serve as jurors in a particular case, may be excluded from jury service without contravening any of the basic objectives of the fair-cross-section requirement.").

[325]    ECF no. 127, 65-98.

[326]    *See* Initial State Habeas Application 31-44, 59-76, 82-85 [ECF no. 71-4, (continued...)

- 131 -

three claims, Cade argued that his trial counsel rendered ineffective assistance by (1) asserting an insanity defense that was without merit, thereby losing credibility with the jury; (2) failing to present a detailed account of Cade's abusive, neglected, and impoverished childhood and tying same to Cade's emotional difficulties during his offense through the testimony of a social historian; and (3) failing to present the testimony of Dr. McGarrahan at the punishment phase of trial to establish that Cade suffered from depression, sleep deprivation, and suicidal ideation.

The state habeas trial court made numerous factual findings concerning the conduct of Cade's trial counsel.  In connection with Cade's complaint about his trial counsels' assertion of an insanity defense unsupported by expert opinion testimony, the state habeas trial court concluded that "counsel's investigation into an insanity defense was timely initiated, diligently pursued, and thorough [and] certainly fell within reasonable professional norms and was not deficient[,]" finding in part as follows:

- Cade informed his lead defense counsel shortly after said counsel's appointment that Cade had recorded his girlfriend talking via Skype with her ex-husband, his girlfriend had previously threatened Cade with a knife, so he did likewise, but he "got out of control," and when her daughter came into the room "to help mom . . . he lost it with her too."
- Early in their representation of Cade, his trial counsel hired an experienced clinical and forensic psychologist, Dr. Compton, to serve as defense mitigation specialist "because she was experienced at

---

[326](...continued)
34-47, 62-79, 85-88].

evaluating for insanity and competency."

- Cade's defense team early on "sought out the services of and ultimately employed numerous psychological experts" to assist in developing an insanity defense.
- Cade's defense explored the defenses of insanity and sudden passion, including retaining the services of multiple mental health experts but ultimately chose not to assert a sudden passion defense.
- After evaluating Cade, Dr. McGarrahan reported that Cade functioned in the borderline to low-average range intellectually, was depressed, reported symptoms of PTSD, and his ability to process information was mildly impaired.
- Dr. Lisa Clayton, a board certified psychiatrist, evaluated Cade for the defense and concluded Cade was not legally insane.
- The defense retained Dr. Michael Gottlieb, a psychologist, to examine what effects that childhood sexual abuse might have had on Cade.
- A June 2012 MRI of Cade's brain revealed "nothing of significance."
- In an email to defense counsel dated June 9, 2012, Dr. Compton hypothesized that Cade's offense could be explained as "an emotional hijacking in which rage overtook rational thought processes and diminished behavior control [and thus was] a sudden passion offense which rendered [Cade] temporarily insane."
- In furtherance of the insanity defense "premised on abandonment rage and amygdala highjacking," the defense hired additional experts, including Dr. William Flynn.
- Dr. Flynn conducted and recorded an evaluation during which Cade "reenacted [his] victims' screams while he was stabbing them."
- To avoid prosecution access to the recording of Dr. Flynn's evaluation session, the defense chose not to employ Dr. Flynn as a testifying witness.
- The defense retained another forensic psychologist, Dr. Emily Fallis, to evaluate Cade for sudden passion and other defenses, but she reported her conclusion that Cade was not insane at the time of his capital offense.
- The defense retained the services of psychologist Dr. Daniel Altman to testify regarding the chances of inheriting a mental disease or defect (such as Cade's father's schizophrenia).
- The defense retained the services of Dr. Gilda Kessner, initially to assist with the insanity defense but later chose to employ her as an expert on abandonment rage. "Counsel did not send her in to personally evaluate

[Cade] or render a professional opinion as to whether [Cade] was, in fact, insane at the time of the offense."

- Cade's trial counsel chose to assert an insanity defense despite the absence of any expert opinion testimony corroborating same, in part, because doing so (1) allowed the defense to voir dire potential jurors with regard to insanity and mental health issues, and (2) it allowed the defense to "frontload" its case in mitigation through guilt-innocence phase presentation of testimony detailing Cade's (a) abusive, neglected, and impoverished childhood, (b) history of childhood sexual abuse, (c) depression, (d) PTSD symptoms, and (e) father suffered from schizophrenia.
- Because Texas law does not require expert opinion testimony to establish insanity, Cade's defense team was able to rely on lay witness testimony and the grisly circumstances of Cade's capital offense to argue that Cade was insane at the time of his offense.
- Cade's insanity defense was premised upon the extremely violent nature of the crime, the level of overkill involved therein, and the abandonment rage theory, which suggested Cade's traumatic childhood caused him to experience an overwhelming fear when Fuller threatened to end their relationship, which morphed into uncontrolled rage and a need to protect himself.
- Cade's defense team reasonably concluded that "an insanity-qualified jury would be more receptive to" Cade's mental health mitigating evidence.
- Cade's insanity defense had the potential to result in a conviction for the lesser-included offense of murder if the jury believed Cade's murder of Desaree was the product of uncontrollable abandonment rage resulting in temporary insanity.[327]

With regard to Cade's complaint about his trial counsels' failure to present testimony detailing Cade's childhood trauma and abuse through a social historian, the state habeas trial court concluded that Cade "fail[ed] to demonstrate by a preponderance of the evidence any deficiency in trial counsel's decision not to

---

[327]    *See* FFCL pp. 11-27, ¶¶ 14-66 [ECF no. 71-9, 650-66]; see also *id*. pp. 20-27, ¶¶ 67-115 [ECF no. 71-9, 666-673].

present the testimony of a social historian[, but e]ven assuming counsel's decision

was deficient, [Cade] fail[ed] to demonstrate by a preponderance of the evidence any

resulting prejudice[,]" finding in part that:

- Cade's trial counsel presented extensive testimony through expert and lay witnesses showing Cade's history of (1) childhood neglect and abuse, including sexual abuse, (2) a lack of adult supervision throughout childhood, (3) physical abuse by both his parents, (4) exposure to violence as a child, (5) parental drug and alcohol abuse, and (6) a lack of a stable environment at home.
- Cade's trial counsel also presented expert and lay testimony showing Cade experienced many psycho-social stressors at the time of his offense, including back pain which had rendered him unable to work, emotional trauma arising from Fuller's rejection of their romantic relationship, and other psychological issues which combined to cause Cade to lose control of his emotions at the time of his offense.
- Utilizing the testimony of a social historian to furnish a comprehensive overview of Cade's entire life story had the potential to disclose a wealth of aggravating evidence of which the prosecution was unaware, including evidence showing that (1) Cade had worked as a drug dealer, (2) Cade once intentionally dropped a bowling ball on a cat's head, and (3) Cade left the crime scene hours after the murders, obtained lubricant, returned to the crime scene, watched pornography, and then sexually assaulted Fuller's corpse.
- The testimony from social historian and social worker Laura Sovine during Cade's state habeas proceeding regarding her biopsychosocial assessment of Cade offered little of substance in terms of mitigating evidence about Cade's background that was new or genuinely helpful to the defense.
- The affidavit of Dr. Scott Bowman, a professor of criminal justice, attached to Cade's initial state habeas application [found at ECF no. 71-4, 158-81] discussed general theories about the causes and risks of criminal behavior, which Dr. Bowman unsurprisingly associated with a turbulent, unstable childhood lacking in parental guidance, which often leads to an adult who lacks self-control.
- The record from Cade's trial is inconsistent with Dr. Bowman's characterization of Cade as a person lacking in the ability to plan;

"[r]ather, the record shows [Cade to be] a man capable of patience and forethought."

• Dr. Bowman's opinions would have supported an affirmative finding on the future dangerousness special issue if offered at Cade's trial "and, thus, would have harmed [Cade]'s defense, not helped it."

• Social worker Laura Sovine's assessment of Cade was based exclusively on Cade's life history from birth to age eighteen, did not include any consideration of Cade's behavior during the remainder of his life, and, thus, was of limited utility.

• Laura Sovine "would also have had to acknowledge [Cade]'s prior drug dealing [, and] she would have had to acknowledge that Al Merchant, a sex offender treatment provider and social worker who treated [Cade] after his conviction for the sexual assault of Charity Trice, rightly predicted that [Cade] would reoffend."

• The prosecution's evidence of Cade's violent past and the facts and circumstances of the capital murder constituted strong and persuasive evidence of Cade's future dangerousness which rendered it improbable that testimony such as that proffered by Laura Sovine or included in Dr. Bowman's affidavit would have altered the outcome of the punishment phase of Cade's trial.[328]

With regard to Cade's trial counsels' decision not to present a mental health expert like Dr. McGarrahan, who had actually evaluated Cade, to testify regarding Cade's propensity for future violence, the state habeas trial court concluded that counsels' "concerns about offering Dr. McGarrahan's testimony in the punishment phase were well-founded[,]" finding in part that:

• Dr. McGarrahan proffered testimony during the guilt-innocence phase of trial which showed Cade suffered from depression, reported symptoms of PTSD, scored in the borderline to low-average range of intellectual functioning, and appeared remorseful.

• Cade's defense team chose not to present Dr. McGarrahan's testimony at the punishment phase of trial because they believed doing so would

---

[328]   See *id*. pp. 43-51, ¶¶ 220-70 [ECF no. 71-9, 689-97].

require them to allow a prosecution mental health expert to evaluate Cade with regard to mitigation, a much wider form of evaluation than that conducted on insanity.

- The prosecution confirmed that, if Dr. McGarrahan had testified at the punishment phase of trial, it would have sought to conduct further expert evaluation of Cade on future dangerousness and mitigation; the trial court would have granted such a request by the State.

- Defense counsels' decision not to present Dr. McGarrahan's testimony at the punishment phase of trial was "a sound and reasonable strategic choice" and did not prejudice Cade.

- Under *Lagrone v. State*, 942 S.W.2d 602, 609-12 (Tex. Crim. App.), *cert. denied*, 522 U.S. 917 (1997), if a defendant plans to introduce expert testimony on future dangerousness, the State is entitled to compel the defendant to undergo an examination by the State's expert for rebuttal purposes.

- By offering Dr. McGarrahan's testimony for the purpose of showing mitigation or a lack of future dangerousness the defendant would have "open[ed] the door to the State offering its own expert rebuttal· testimony on those issues."

- An evaluation of Cade by a State expert for purposes of rebutting mitigation or lack of dangerousness testimony by a defense expert would have risked disclosing to the prosecution additional aggravating evidence, including evidence Cade had informed others that he left the scene after the murders, purchased lubricant, returned later, watched pornography, and sexually assaulted Fuller's corpse.

- Cade told some of the defense's other experts things which contradicted the information he had related to Dr. Compton.

- Dr. McGarrahan's proffered testimony was largely repetitious of the testimony of other witnesses, such as Dr. Kessner and Dr. Proctor, and would have afforded Cade little benefit.

- Cade's trial counsel presented evidence of Cade's remorse through Cade's recorded post-arrest interviews.[329]

---

[329]    See *id*. pp. 61-66, ¶¶ 321-50 [ECF no. 71-9, 707-12].

The TCCA expressly adopted all of the foregoing factual findings when it denied Cade's initial state habeas application on the merits.[330] Cade has not alleged any specific facts or presented this court with clear and convincing evidence showing that any of the foregoing factual findings were erroneous.

Cade included an expanded and revamped version of this ineffective assistance claim, supported by new affidavits and other exhibits, as his fourth claim in his first subsequent (second) state habeas application.[331] The TCCA summarily dismissed this claim when it dismissed Cade's first subsequent (second) state habeas application based on state writ-abuse principles.[332]

This court will undertake AEDPA analysis of the portion of Cade's fourth claim in his second amended habeas corpus petition that was fairly presented to the state courts during Cade's initial state habeas corpus proceeding. Insofar as Cade's fourth federal habeas claim incorporates the expanded version of this ineffective assistance claim included in Cade's dismissed first subsequent (second) state habeas application or any additional materials submitted by Cade for the first time in this proceeding, this court will undertake *de novo* review of the expanded claim.

---

[330] *Ex parte Cade*, 2017 WL 4803802, at *3.

[331] First Subsequent (Second) State Habeas Application 56-95 [ECF no. 134-17,173-251].

[332] *Ex parte Cade*, 2021 WL 1202479, at *1-*2.

- 138 -

Cade's fourth claim in his second amended federal habeas petition is premised upon an erroneous view of applicable Texas law.  More specifically, Cade cites *Bradley v. State*[333] for the proposition that Texas recognizes a defense to a charge of murder based on a showing the defendant experienced confused thoughts of awakening consciousness at the time of the offense.[334]  Cade argues his trial counsel should have presented evidence showing Cade was experiencing "confusional arousal" at the time of his offense.  Cade misconstrues the holding in *Bradley* and its progeny.  *Bradley* was decided almost a half-century before the Texas Legislature adopted the Texas Penal Code, which limits the availability of diminished capacity defenses in criminal proceedings.

In *Bradley*, the TCCA recognized as a defense in a criminal proceeding based upon a showing that the defendant was engaged in somnambulism or sleepwalking, and therefore in a state of unconsciousness or automatism at the time of the offense.[335]  A few years before deciding *Bradley*, the TCCA held in *Zimmerman v. State*[336] that evidence showing the defendant was experiencing an epileptic seizure at the time of the offense was a viable defense in a Texas criminal prosecution.

---

[333]    102 Tex. Crim. 41, 277 S.W. 147, 149 (Tex. Crim. App. 1925).

[334]    ECF no. 127, 80-82.

[335]    *Bradley*, 277 S.W. at 148-49.

[336]    85 Tex. Crim. 630, 215 S.W. 101, 105-06 (Tex. Crim. App. 1919).

Although the TCCA's early-twentieth-century opinions in *Bradley* and *Zimmerman* referred to these defenses as forms of "insanity,"[337] the TCCA used the term "insanity" to describe a concept inconsistent with the narrow statutory definition of that term currently found in § 8.01(a) of the Texas Penal Code.

At present, Texas law recognizes no "diminished capacity" defense except when evidence shows a defendant suffered from a mental disease or defect so severe as to rebut or disprove the culpable mental state for the offense.[338]  Section 8.01(a) of the Texas Penal Code provides:  "[Insanity] is an affirmative defense to prosecution that, at the time of the conduct charged, the actor, as a result of severe mental disease or defect, did not know that his conduct was wrong."[339]

All of the TCCA opinions citing *Bradley* since the adoption of the Texas Penal Code either addressed other aspects of that decision or discussed *Bradley* for the principle that an affirmative defense to a criminal prosecution exists under Texas law based upon a showing that the defendant experienced a condition which made it

---

[337]   See *Bradley*, 277 S.W. at 149 ("Somnambulism is recognized as a species of insanity."); *Zimmerman*, 215 S.W. at 105-06 (rejecting argument that the defendant was not guilty by reason of "insanity" due to epilepsy because no evidence suggested the defendant actually experienced an epileptic seizure at the time of the offense).

[338]   See *Ruffin v. State*, 270 S.W.3d 586, 593 (Tex. Crim. App. 2008) ("Insanity is the only 'diminished responsibility' or 'diminished capacity' defense to criminal responsibility in Texas.") (citation omitted).

[339]   TEX. PENAL CODE § 8.01(a); see also *Ruffin*, 270 S.W.3d at 593.

physically impossible for the defendant to form the requisite mental state to commit

the offense, *i.e.*, a condition which rendered the defendant unconscious and his

physical movements involuntary.[340]  The TCCA has never held that evidence showing

a criminal defendant was sleepwalking, experiencing an epileptic seizure, or otherwise

unconscious at the time of an offense satisfies the statutory definition of insanity

contained in § 8.01(a).

Instead, the TCCA has explained the type of evidence necessary to establish

that an otherwise sane criminal defendant lacked the necessary *mens rea* to commit an

offense under Texas law as follows:

> The Texas Legislature has not enacted any affirmative
> defenses, other than insanity, based on mental disease,
> defect, or abnormality.  Thus, they do not exist in Texas.
>
> But both physical and mental diseases or defects may
> affect a person's perception of the world just as much as
> they may affect his rational understanding of his conduct
> or his capacity to make moral judgments.  For example,
> suppose that a blind person is sitting on his front porch

---

[340]    See *Lugo-Lugo v. State*, 650 S.W.2d 72, 76 (Tex. Crim. App. 1983) (en banc) (citing *Bradley* in the course of explaining that an indictment need not allege voluntariness as an element of a criminal offense because it is an affirmative defense to prosecution); *Jernigan v. State*, 585 S.W.2d 701, 704 (Tex. Crim. App. 1979) (citing *Bradley* for the principle that evidence of a wife's infidelity was admissible in a matricide prosecution only if there was evidence showing the husband/defendant was aware of the wife's infidelity); *Bermudez v. State*, 533 S.W.2d 806, 807 (Tex. Crim. App. 1976) (citing *Bradley* in the course of discussing why voluntariness need not be alleged in a criminal indictment); *Brumfield v. State*, 445 S.W.2d 732, 736 (Tex. Crim. App. 1969) (citing *Bradley* in the course of discussing the proper scope of cross-examination of a defendant who chose to testify at his trial).

and hears what he thinks is a trespasser coming up his walk.  He shoots at the person to scare him away, knowing that it is illegal to shoot at people, even trespassers.  The "trespasser" turns out to be a uniformed police officer who is coming to serve a subpoena.  The blind man may be prosecuted for aggravated assault with a deadly weapon, but he cannot be convicted of aggravated assault of a police officer if, because of his blindness, he did not see the uniform and did not know that the person was a police officer.  Evidence of the defendant's blindness would, of course, be relevant and admissible to rebut the State's assertion that the defendant intended to shoot at a police officer.  Such evidence might be elicited from the defendant, a lay witness – mother, brother, friend, or neighbor – or from an expert, an optometrist, physician, etc.  Courts routinely admit evidence of a physical abnormality offered to prove a lack of *mens rea*.

In Texas, the same rule applies to evidence of a mental disease or defect offered to rebut or disprove the defendant's culpable *mens rea*.  If, instead of blindness, the defendant suffers from mental delusions such that he sees a "trespasser" . . . when everyone else around him sees a police officer, he cannot be convicted of intentionally shooting at a police officer, although he may be convicted of intentionally shooting at a trespasser . . . .  Guilt of the greater offense requires that the State prove, beyond a reasonable doubt, that the defendant intended to shoot a police officer, not a trespasser . . . .  That is the required *mens rea* and that is the State's constitutional burden of proof.[341]

Thus, while the TCCA has recognized the continued vitality of the holdings in

*Bradley* and *Zimmerman* on the question of the *voluntariness* of alleged criminal

conduct, those opinions provide little cover for Cade.  There was no evidence at trial

---

[341]    *Ruffin*, 270 S.W.3d at 593-94 (footnotes omitted).

- 142 -

showing that Cade was sleepwalking, experiencing an epileptic or any other types of seizure, or otherwise unconscious at the time he stabbed Fuller and Desaree dozens of times each and then sexually assaulted Fuller. Nor does Cade identify any opinions or conclusions by any of the numerous defense mental health experts who evaluated him prior to trial showing that any of them were available and willing to testify at trial that Cade was either sleepwalking, suffering a seizure, or otherwise unconscious at the time of his offense. The undisputed fact Cade was able to describe his offense in detail both to law enforcement officers after his arrest and to his own defense team belies any contention that he was sleepwalking, suffering from a seizure, or otherwise unconscious at the time of his offense.

The decision by Cade's trial counsel to refrain from presenting a defense based upon Cade's lack of *mens rea* to commit capital murder was objectively reasonable for another reason: it would have been futile.[342] A pair of TCCA decisions both handed down after the advent of the Texas Penal Code explain why the decision not to present mental health evidence and a defense theory of the type Cade now complains his trial counsel should have presented at the guilt-innocence phase of trial was objectively reasonable. In *Wagner v. State*,[343] the TCCA recognized that "diminished

---

[342]  See *Coble v. Quarterman*, 496 F.3d 430, 437 (5th Cir. 2007) ("[C]ounsel was not ineffective for failing to present a diminished capacity defense because diminished capacity is not cognizable in Texas.").

[343]  687 S.W.2d 303 (Tex. Crim. App. 1984).

- 143 -

capacity" defenses, as recognized in other jurisdictions, are inapplicable under Texas

penal law:

> Many jurisdictions that recognize different degrees of
> murder based upon whether or not "deliberation" and
> "premeditation" are present will admit evidence of
> abnormal mental capability where it may contribute to a
> reduction from first to second degree murder.  However,
> V.A.P.C., § 19.02 recognizes no such "degrees" of murder.
> Hence, the doctrine of diminished responsibility will not
> justify admission of appellant's proffered evidence to
> establish a lesser "degree" of murder.[344]

After the Texas Legislature amended the Penal Code to make "sudden passion" a

sentencing issue instead of an affirmative defense, the TCCA clarified its holding in

*Wagner* as follows:

> This case does not really present us with a reason to
> determine whether the doctrine of diminished capacity
> exists in Texas because the evidence of mental illness in
> this case does not negate *mens rea*.  Rather, the evidence
> presented an excuse for the crime, i.e., that Appellant
> killed his brother because he was so paranoid that he
> thought his brother was out to get him.  In fact, this
> evidence makes it even more apparent that Appellant
> intended to cause serious bodily injury or death to his
> brother.  The evidence of appellant's paranoia simply
> provides a motive for the intentional act.  The evidence
> presented was the type of excuse-based evidence that
> would be raised as an affirmative defense.  As even
> Appellant acknowledges, Texas law does not recognize a
> lesser form of the insanity affirmative defense.  However,
> we will address Appellant's claims.

---

[344]    *Id*. at 311 (citation omitted).

- 144 -

> First, we disagree with Appellant's contention that the opinion of the court of appeals conflicts with our opinion in *Wagner*. As in the case before us, Wagner did not raise an insanity defense. He did, however, want to admit evidence of a physical injury which may have caused impaired mental function and lack of impulse control. We stated that the evidence may have been admissible if it showed that Wagner acted with sudden passion arising from an adequate cause. However, because it did not, we held that admitting evidence of impaired mental function at the guilt phase of the trial would have confused the jury and therefore, it was not admissible. We note that this has changed because sudden passion is now a punishment issue. As a result, even the part of *Wagner* which states that the doctrine of diminished capacity might require the admission of evidence of sudden passion arising from an adequate cause now would apply only to the punishment phase of trial and does not require evidence of mental illness falling short of insanity to be admitted at the guilt phase. Under Penal Code section 19.02(d), sudden passion and adequate cause are raised at the punishment stage of a trial to reduce the offense to a second-degree felony.[345]

The TCCA reasonably concluded that the decision by Cade's trial counsel to present an insanity defense, as opposed to a diminished capacity defense, was objectively reasonable. None of the many mental health experts retained by the defense prior to trial concluded that Cade was insane at the time of his capital offense. Moreover, during his initial state habeas proceeding Cade presented the state courts with no testimony, affidavits, or other evidence from a qualified mental

---

[345]   *Jackson v. State*, 160 S.W.3d 568, 572-73 (Tex. Crim. App. 2005) (citations and footnote omitted).

health professional showing that, at the time of his capital offense, Cade was so psychotic, hallucinatory, or delusional that he was incapable of either forming the intent to kill Fuller and Desaree or of recognizing that his conduct was illegal.  The details of Cade's capital offense and the contents of Cade's writings and statements to the police in the hours and days immediately following his offense refute any assertion that Cade's actions were not intentional.  Cade stabbed both of his victims dozens of times with great force.  As the TCCA explained in *Jackson*, impaired mental function and a lack of impulse control are not defenses to murder under Texas law.[346]

During Cade's initial state habeas proceeding, his forensic psychiatrist, Dr. Seth Silverman, testified as follows:

- Cade reported that he was hearing voices at that time, usually when he was isolated from other inmates.
- Cade exhibited some symptoms of schizophrenia, but he could not diagnose Cade as a schizophrenic.
- Cade has never been to a psychiatric facility for treatment or been prescribed anti-psychotic medications.
- Cade exhibited emotional lability, impulsivity, and rebelliousness.
- While he had seen evidence indicating Cade's mother drank excessively while pregnant with Cade, he could not diagnose Cade with Fetal Alcohol Syndrome.
- Cade exhibited memory problems.

---

[346]  Accord *Roberson v. State*, No. AP-74,761, 2002 WL 34217382, at *8 (Tex. Crim. App. June 20, 2007) (trial court in capital murder trial did not abuse discretion in excluding proffered mental expert testimony regarding organic brain syndrome and poor impulse control "not relevant to the defendant's ability to form the requisite *mens rea* for the offense[;] evidence was offered "as a mental-health defense not rising to the level of insanity"), *cert. denied*, 552 U.S. 1314 (2008).

- He was unfamiliar with the term "abandonment rage" and first encountered it when reading a portion of the record from Cade's trial.
- Based on Cade's reports of multiple head injuries, his clinical interview with Cade, and his review of Cade's medical and penal records, he diagnosed Cade with frontal lobe disinhibition exacerbated by stress, which resulted in Cade having an impaired ability to control his emotions.[347]

Prosecution forensic psychologist Dr. Timothy Proctor testified during Cade's initial state habeas proceeding that he re-evaluated Cade in light of Dr. Silverman's testimony and concluded that:

- He hypothesized that the voices Cade reported hearing were the thoughts in Cade's head, *i.e.*, Cade's internal dialogue, and not auditory hallucinations.
- He found Cade displayed no evidence of paranoia.
- Cade's emotions were within the normal range.
- While Cade reported being involved in two automobile accidents, he reported no loss of consciousness in either incident.
- Between seventy and eighty-five percent of incarcerated individuals display anti-social personality disorder.[348]

Prosecution neuropsychologist Dr. Randall Price testified during Cade's initial state habeas proceeding that:

- He evaluated Cade in August 2016 and concluded Cade functioned intellectually in the low average to average range.
- Cade displayed mild impairment in verbal and visual processing, primarily with recall of information.
- Nothing in Dr. McGarrahan's report or data suggested Cade suffered from brain damage.

---

[347]   Dr. Silverman's testimony during Cade's initial state habeas proceeding appears at 6 R.R. Initial State Habeas Hearing [ECF no. 72-6] 7-90.

[348]   Dr. Proctor's testimony during Cade's initial state habeas proceeding appears at 6 R.R. Initial State Habeas Hearing [ECF no. 72-6] 91-135.

- Cade displayed some frustration during testing but scored average to slightly above average when compared with persons of similar education.
- He observed no mood swings by Cade.
- He found no indication of frontal lobe damage or brain dysfunction.
- While multiple concussions can cause brain damage, he believed the "stingers" reported by Cade during his football career were likely temporary loss of sensation or paralysis unrelated to brain injury.[349]

Cade's defense team had him evaluated prior to trial by multiple mental health experts. None of them testified that Cade was insane or incapable of forming the *mens rea* necessary for murder. Nonetheless, as the state habeas trial court and TCCA found during Cade's initial state habeas proceeding, there were legitimate, objectively reasonable, strategic reasons which fully supported the decision by Cade's trial counsel to proceed with presenting an insanity defense in the absence of expert testimony to support same. Asserting insanity furnished the defense an opportunity to attack the prosecution's case at the guilt-innocence phase of trial instead of sitting back and tacitly admitting guilt. An insanity defense allowed the defense an opportunity to furnish an explanation for the grisly and repulsive aspects of the offense. Asserting insanity also allowed defense counsel to voir dire the jury venire on insanity and, hopefully, obtain a jury more receptive to mental health evidence. Asserting insanity also allowed the defense to "front load" much of its mitigating evidence during the guilt-innocence phase of trial without having to make Cade

---

[349]   Dr. Price's testimony during Cade's initial state habeas proceeding appears at 6 R.R. Initial State Habeas Hearing [ECF no. 72-6] 136-64.

available for a mental evaluation by defense experts on any subject other than

insanity.

Cade's trial counsel and mitigation specialist testified to the foregoing strategic

rationale chosen by Cade's defense team. More specifically, Dr. Compton testified in

pertinent part during Cade's initial state habeas proceeding that:

- The defense team retained nine experts to assist in defending Cade and thoroughly explored Cade's background but were thwarted at some points by the fact (1) one of Cade's brothers (Jerry Scott) was incarcerated and the defense team did not believe having him testify in prison garb would be helpful, (2) some of the people to whom they reached out did not respond back (*e.g.*, Carolyn Singley), (3) when the defense team contacted him, one relative of Cade (*i.e.*, Karl Rogers) appeared to be too impaired to be interviewed reliably; (4) some of Cade's family members people to whom they reached out informed them there were no problems with Cade's childhood (*e.g.*, Mary Rogers); and (5) Cade's ex-wife stated that Cade had sexually assaulted her, making her a problematic potential witness.
- The defense team fully explored the insanity defense.
- As the trial date approached, Cade told other defense experts different information than he told Dr. Compton and his defense attorneys.
- That problem became so acute both Dr. Kessner and she suspected that Cade was attempting to undermine his own defense.
- Cade himself indicated early on that he wanted to go with the insanity defense.
- Asserting an insanity defense allowed the defense to front load mitigating evidence into the guilt-innocence phase of trial.
- Cade's capital offense was so explosively violent it cried out for a mental health defense.
- Asserting an insanity defense allows more in-depth voir dire on venire members' views of mental health evidence.
- The defense team was aware that Cade (1) had dealt drugs; (2) was involved in a shooting of which they thought the prosecution was unaware; and (3) dropped a bowling ball on a cat.
- Cade also told the defense team that there were multiple sexual assaults on Fuller, both while she was dying and after her death, and, at one

- 149 -

point Cade left the crime scene to purchase lubricant, returned to the crime scene, watched pornography, and then sexually assaulted Fuller's corpse.

- The defense team was concerned about and wished to keep from the jury the foregoing additional aggravating evidence.
- When she administered the Minnesota Multiphasic Personality Inventory ("MMPI") to Cade, his score on the Psychopathic Deviate Scale was elevated.
- The defense team did not want to introduce testimony that would open the door to a second, more expansive, mental health evaluation by a prosecution expert because that could result in a diagnosis of Cade as psychopathic.
- The defense team believed introducing Dr. McGarrahan's testimony about future dangerousness based upon her evaluation of Cade might open that door.
- The defense team believed that employing a social historian to testify about Cade's background could also open the door to admission of much of the foregoing, additional, aggravating evidence unknown by the prosecution.
- Cade satisfied the criteria for a diagnosis of antisocial personality disorder ("ASPD").[350]

Cade's lead defense counsel at trial testified during Cade's initial state habeas

proceeding as follows:

- The defense team hired many mental health experts to evaluate Cade and assist in the defense.
- Dr. McGarrahan was retained to help show Cade's relatively low intellectual functioning and help front load other mitigating evidence but her testimony was excluded by the trial court at the guilt-innocence phase of trial.
- While the defense did not call Dr. McGarrahan to testify at the punishment phase of trial, the defense was able to introduce many of her conclusions through cross-examination of prosecution expert Dr. Proctor, who relied on Dr. McGarrahan's report.

---

[350]    Dr. Compton's testimony during Cade's initial state habeas proceeding appears at 2 R.R. Initial State Habeas Hearing [ECF no. 72-2] 19-170.

- Introducing Dr. McGarrahan's testimony at the punishment phase of trial on the issue of future dangerousness would have been problematic because under *Lagrone* it could have opened the door to a more expansive evaluation of Cade by Dr. Proctor and might result in a diagnosis of ASPD.
- The defense's mental health experts believed Cade might qualify for a diagnosis of ASPD.
- There was a recorded telephone conversation between Cade and his ex-wife in which Cade brought up the insanity defense early on and demonstrated that Cade was proactive in asserting such a defense.
- Cade wanted the defense team to assert an insanity defense.
- The defense team presented former TDCJ official Woods to show that TDCJ could control Cade in prison.
- Typically, a social historian will interview a wide range of a defendant's family and friends in the search for mitigating evidence – as a result a social historian often uncovers significant double-edged or overtly harmful evidence.
- The defense team chose not to have a social historian testify at Cade's trial because doing so could open the door to cross-examination revealing the substantial additional aggravating evidence discovered by the defense team of which the prosecution was unaware.
- The defense team managed to keep out substantial additional aggravating evidence detailing Cade's other bad acts.
- The defense was aware Cade had participated in experimental drug trials relating to his chronic back pain, but their investigation revealed no causal relationship between those trials and Cade's capital offense.
- Asserting the insanity defense allowed the defense to obtain a jury more favorably disposed toward mental health evidence.
- The defense chose not to call one of Cade's former high school football coaches to testify because the coach personally knew Desaree and might have offered harmful testimony on cross-examination.
- The defense did not pursue having Cade's daughter Tyra testify at trial because Cade did not want her involved, Cade's ex-wife and Tyra's mother would not permit the defense to contact Tyra, and Cade had made statements known to the prosecution suggesting that, if Tyra had been present at the time of the offense, he likely would have killed her too.
- In a pretrial ruling, the state trial court announced its plan to admit evidence at the guilt-innocence phase of trial showing Cade's status as a

registered sex offender; this necessarily meant the jury would be aware that Cade had a prior conviction for a sex offense.[351]

The foregoing testimony, corroborated by the testimony of Cade's other two trial counsel, fully supported the state habeas trial court's factual findings summarized above.[352]

The TCCA reasonably concluded that the failure of Cade's trial counsel to present a defense (diminished capacity) which was unavailable under Texas law did not cause the performance of his trial counsel to fall below an objective level of reasonableness.  Failure to make a meritless motion or objection cannot be grounds for a finding of deficient performance.[353]

For similar reasons, the TCCA's conclusion that Cade's complaints about his trial counsel's failure to present a diminished capacity defense failed to satisfy the prejudice prong of *Strickland* was eminently reasonable.  Cade was not prejudiced within the meaning of *Strickland* by his trial counsels' failure to raise a factually

---

[351]   The lengthy testimony of attorney Lalon "Clipper" Peale during Cade's initial state habeas proceeding appears at 2 R.R. Initial State Habeas Hearing [ECF no. 72-2] 170-269 and 3 R.R. Initial State Habeas Hearing [ECF no. 72-3] 12-48.

[352]   The testimony of attorney John Tatum during Cade's initial state habeas proceeding appears at 3 R.R. Initial State Habeas Hearing [ECF no. 72-3] 49-94.  The testimony of attorney Richard Franklin appears at 3 R.R. Initial State Habeas Hearing [ECF no. 72-3] 95-132.  Significantly, Franklin testified without contradiction that Cade refused to plead guilty and would not concede his guilt with regard to Desaree's murder.  *Id.* at 127.

[353]   *Clark v. Thaler*, 673 F.3d 410, 429 (5th Cir.), *cert. denied*, 568 U.S. 850, (2012); *Paredes*, 574 F.3d at 291.

meritless, legally unavailable, diminished capacity defense at the guilt-innocence phase of trial.[354]

The TCCA's rejections on the merits during Cade's initial state habeas proceeding of Cade's ineffective assistance claims complaining about his trial counsels' presentation of an insanity defense, failure to present a diminished capacity defense, failure to present the testimony of Dr. McGarrahan at the punishment phase of trial, and failure to present the testimony of a social historian incorporating a more encyclopedic account of Cade's unstable and abusive childhood were neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in Cade's trial, direct appeal, and initial state habeas proceedings.  Under AEDPA, the exhausted portion of Cade's fourth claim does not warrant federal habeas corpus relief.

Cade's fourth claim in his second amended federal habeas petition, as with his fourth claim in his first subsequent (second) state habeas application, includes a more expanded set of legal arguments and is supported by new and additional evidence that was not fairly presented to the state habeas courts during Cade's initial state habeas proceeding.  This court has undertaken *de novo* review of all the legal

_____

[354]     *Garza*, 738 F.3d at 677; *Paredes*, 574 F.3d at 291.

arguments, factual assertions, and new evidence submitted to this court in support of Cade's fourth claim herein.

The failure of Cade's trial team to offer the diminished capacity evidence and defense now proffered by Cade in his fourth claim in his second amended petition did not cause the performance of Cade's trial counsel to fall below an objective level of reasonableness. Cade's legal arguments misconstrue applicable Texas law. There is no diminished capacity defense available under Texas law absent a showing of a serious mental disease or defect which satisfies the statutory definition of insanity in § 8.01(a).[355] Likewise, Cade has alleged no specific facts showing his criminal misconduct was involuntary under Texas law. Cade offers no specific facts, much less any evidence, showing that he was rendered effectively unconscious by somnambulism, a seizure disorder, or some other medical or mental disease, defect, or ailment at the time of his capital offense. Cade's trial counsel diligently and exhaustively investigated Cade's background and retained the services of numerous mental health experts to evaluate Cade (*e.g.*, Dr. McGarrahan, Dr. Fallis, and Dr. Clayton) or to testify about a wide range of mental health issues, including the inheritability of serious mental diseases such as schizophrenia (Dr. Altman), the impact of childhood trauma on emotional stability in adults (Dr. Gottlieb), and abandonment rage (Dr. Kessner).

---

[355]    *Coble*, 496 F.3d at 437-38.

The strategic decision-making detailed above in the uncontroverted testimony of Dr. Compton and Cade's lead trial counsel establishes the objective reasonableness of the decisions made by Cade's defense team at trial with regard to choosing a defensive strategy and presenting available mitigating evidence.  Their testimony also establishes that Cade's defense team took great pains to avoid actions that might open the door to the revelation and admission of evidence showing Cade's additional criminal misconduct and the details of his behavior in the hours immediately following his stabbings of Fuller and Desaree.  In sum, this was reasonable.[356]

Likewise, for the same reasons discussed above, Cade was not prejudiced within the meaning of *Strickland* by his trial counsels' failure to raise a factually meritless, legally unavailable, diminished capacity defense at the guilt-innocence phase of trial.[357]

After *de novo* review of all of the legal and factual arguments contained in Cade's fourth claim for federal habeas relief, this court concludes that Cade's complaints about the performance of his trial counsel in connection with the guilt-innocence phase of trial fail to satisfy either prong of *Strickland*.  The evidence of Cade's guilt was overwhelming.  As Dr. Proctor opined during his trial testimony,

---

[356]   See *Kansas v. Cheever*, 571 U.S. 87, 94 (2013) ("When a defendant presents evidence through a psychological expert who has examined him, the government likewise is permitted to use the only effective means of challenging that evidence:  testimony from an expert who has also examined him.").

[357]   *Garza*, 738 F.3d at 677; *Paredes*, 574 F.3d at 291.

Cade's anger over what Cade perceived as Fuller's "cheating" on him with her ex-husband did not preclude Cade from understanding what he was doing was wrong.[358]  The jury, which was accurately instructed on the insanity defense, agreed with Dr. Proctor when it convicted Cade.  That verdict was fully supported by the evidence presented during the guilt-innocence phase of Cade's capital murder trial. There is no reasonable probability that, but for the failure of Cade's trial counsel to present any or all of the new evidence identified by Cade in support of his fourth claim in his second amended federal habeas petition, the outcome of the guilt-innocence phase of Cade's capital murder trial would have been any different. Even under *de novo* review, Cade's fourth claim in his second amended federal habeas petition satisfies neither prong of *Strickland*.  It does not warrant federal habeas relief.

### 3.  *Eliciting Testimony Showing Cade was a Convicted Felon (Claim 5)*

In his fifth claim in his second amended federal habeas petition, Cade argues that his trial counsel rendered ineffective assistance at the guilt-innocence phase of trial by eliciting testimony showing that Cade was a convicted felon.[359]  Cade

---

[358]    48 R.R. Trial [ECF no. 69-48] 171-77.  As the TCCA explained in its opinion in *Jackson*, "sudden passion" is no longer a defense at the guilt-innocence phase of a Texas murder trial; it is now a sentencing issue under the Texas Penal Code.  *Jackson*, 160 S.W.3d at 573.

[359]    *See* ECF no. 127, 98-101.

presented essentially the same ineffective assistance claim as his eighth claim in his

initial state habeas application.[360]

The state habeas trial court found:

- During a pretrial hearing, the court ruled that the State would be permitted to introduce evidence regarding Cade's status as a sex offender.
- During the guilt-innocence phase of trial, the defense called Cade's half-brother Gregory Scott and elicited testimony that Cade had previously been charged and tried for aggravated sexual assault.
- Cade's trial counsel testified that the defense team decided to introduce evidence of Cade's prior conviction because (1) by the time Gregory Scott testified at the guilt-innocence phase of trial, the jury had already been informed that Cade was a registered sex offender; (2) most people know that if a person is a sex offender, that necessarily means the person was convicted of a sex offense; (3) evidence of Cade's conviction for aggravated sexual assault was likely to be admitted at the punishment phase of trial; and (4) the defense did not want to appear less than transparent in front of the jury.
- Other evidence at the guilt-innocence phase of trial showed that Cade's status as a registered sex offender was part of the reason for his break-up with Fuller, which in turn was one source of Cade's alleged abandonment rage.
- Gregory Scott's testimony merely confirmed what the jury already knew or could have surmised.
- The evidence of Cade's guilt was "overwhelming."
- The decision by Cade's trial counsel to elicit the testimony in question did not cause the performance of said counsel to fall below an objective level of reasonableness and did not prejudice Cade within the meaning of *Thompson v. State*, 9 S.W.3d 808, 812-13 (Tex. Crim. App. 1999) (applying *Strickland*).[361]

---

[360]    Initial State Habeas Application 93-97 [ECF no. 71-4, 96-100].

[361]    FFCL pp. 72-75, ¶¶ 394-414 [ECF no. 71-9, 718-21].

The TCCA expressly adopted all of the foregoing factual findings and conclusions when it denied Cade's initial state habeas application on the merits.[362] Cade has alleged no facts and presented this court with no clear and convincing evidence showing that any of the foregoing factual findings were erroneous.

The uncontroverted testimony of all three of Cade's trial counsel during Cade's initial state habeas proceeding supports all of the state habeas trial court's factual findings adopted by the TCCA.[363]  The TCCA reasonably concluded that Cade's ineffective assistance complaint about his trial counsels' solicitation of the testimony in question at the guilt-innocence phase of trial failed to satisfy either prong of *Strickland*.  Cade's trial counsel had objectively reasonable strategic reasons to elicit testimony from Gregory Scott.  The testimony in question occurred in the course of Gregory Scott's guilt-innocence testimony explaining that Fuller was aware of Cade's status as a registered sex offender when the couple began their romantic relationship because Fuller was physically present during Cade's prosecution for aggravated sexual assault.[364]  The evidence of Cade's guilt was overwhelming.

This court independently concludes there is no reasonable probability that, but for his trial counsel's solicitation of Gregory Scott's testimony, the outcome of the

---

[362]    *Ex parte Cade*, 2017 WL 4803802, at *3.

[363]    3 R.R. Initial State Habeas Hearing [ECF no. 72-3] 29-30, 86-87, 129-30.

[364]    46 R.R. Trial [ECF no. 69-46] at 86-89.

either phase of Cade's capital murder trial would have been any different.  By the time Gregory Scott testified, the jury was already aware that Cade was a registered sex offender.  The jury was also aware from admission of Cade's writings found at the crime scene that his status as a sex offender had been a key factor in the break-up of his romantic relationship with Fuller.  The TCCA reasonably concluded that Cade's complaint about his trial counsels' solicitation of the testimony in question did not satisfy either prong of *Strickland*.[365]

Cade's trial counsel knew evidence of Cade's prior conviction for aggravated sexual assault would be introduced at the punishment phase of trial.  The jury was already aware that Cade was a registered sex offender.  Other evidence already before the jury showed the negative reaction of Fuller's family upon learning that fact had played a role in the dissolution of Cade's romantic relationship with Fuller.  Cade's statements to police and his post-offense writings found at the crime scene attested to same.  The evidence also showed that Fuller had taken care of Cade's daughter Tyra during the time Cade served his term of incarceration.

---

[365]   See *Rhoades v. Davis*, 852 F.3d 422, 433-34 (5th Cir. 2017) (denying a COA on ineffective assistance claim based on trial counsel's failure to object to admission of other bad acts contained in defendant's confession, *i.e.*, multiple burglaries and auto thefts, where the evidence would inevitably be admitted at the punishment phase of trial and defense counsel made a strategic decision to allow admission of same at guilt-innocence phase of trial in an attempt to "de-sensitize" the jury to the bad acts and reduce aggravating impact of it had been sprung on the jury for the first time at the punishment phase), *aff'd*, 914 F.3d 357 (5th Cir.), *cert. denied*, 589 U.S. 956 (2019).

There was, therefore, nothing objectively unreasonable with the decision of Cade's trial counsel to employ evidence of Fuller's long-standing knowledge of Cade's prior criminal conviction as a way of putting their estrangement in proper context. Likewise, Cade was not prejudiced within the meaning of *Strickland* by the admission of Gregory Scott's acknowledgment that Cade had previously been convicted of a felony.

The TCCA's rejection on the merits during Cade's initial state habeas proceeding of Cade's ineffective assistance claim complaining about his trial counsels' solicitation of the testimony in question from Gregory Scott was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in Cade's trial, direct appeal, and initial state habeas proceedings.  Under AEDPA, Cade's fifth claim does not warrant federal habeas corpus relief.

   4.  *Admission of Victim Impact Testimony at Guilt-Innocence Phase (Claim 6)*

In his sixth claim in his second amended federal habeas petition, Cade argues that his trial counsel rendered ineffective assistance by failing to object to victim-impact testimony at the guilt-innocence phase of trial.[366]  Cade presented essentially

---

[366]    ECF no. 127, 102-06.

the same ineffective assistance claim as his tenth claim in his initial state habeas application.[367]

The state habeas trial court made the following findings and conclusions:

- Fuller's mother and Desaree's grandmother, Elena Belcher, testified about Fuller's and Desaree's backgrounds, including the fact that Desaree was scheduled to graduate from high school and planned to join the United States Marine Corps.
- Fuller's sister and Desaree's aunt, Marva Slider, furnished additional background testimony about Fuller, including testifying about Fuller's successful effort to obtain United States citizenship.
- A friend and coworker of Fuller, Sandra Hopkins, testified about her relationship with Fuller and about the emotional reaction of Fuller's son Michael when he learned of the murders of Fuller and Desaree.
- "Victim-impact" evidence concerns "the effect of the victim's death on the victim's family and others."
- "Victim-character" evidence, on the other hand, is evidence showing the victim's good character qualities and that the victim was a unique human being.
- Both victim-impact and victim-character evidence are admissible in rebuttal of the defendant's mitigating evidence.
- Such evidence may be admissible at the guilt-innocence phase of trial to show the framework and context of the offense.
- An objection to most of the testimony in question was that "victim-impact" evidence would have been meritless.
- Much of the testimony in question was simply background information regarding the victims and the circumstances of the offense.
- Cade's trial counsel could have reasonably concluded that objecting to the testimony of the victim's relatives and friend would risk alienating the jury.
- The decision not to object to the testimony in question did not prejudice Cade within the meaning of *Strickland*; evidence of the offense itself was sufficient to engender sympathy for the victims and antagonize the jury against Cade.

---

[367]    Initial State Habeas Application 106-11 [ECF no. 71-4, 109-14].

- The facts of the offense were gruesome, and there was no question as to the identity of the person who killed both victims.
- Cade's complaints about his trial counsels' failure to object to the foregoing testimony as improper victim-impact testimony failed to satisfy either prong of *Strickland*.  *See Thompson*, 9 S.W.3d at 812-13.[368]

The TCCA expressly adopted the foregoing factual findings and legal conclusions when it denied Cade's initial state habeas application on the merits.[369]  Cade has alleged no facts and presented this court with no clear and convincing evidence showing that any of the foregoing factual findings were erroneous.

The TCCA reasonably concluded that the failure of Cade's trial counsel to object to all of the testimony in question as premature victim-impact testimony did not cause the performance of said counsel to fall below an objective level of reasonableness.  In *Payne v. Tennessee*,[370] the Supreme Court recognized that states have "'a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family.'"[371]  The Supreme Court determined that a state may properly conclude that, "for the jury to assess

---

[368]   FFCL pp. 81-86, ¶¶ 445-71 [ECF no. 71-9, 727-32].

[369]   *Ex parte Cade*, 2017 WL 4803802, at *3.

[370]   501 U.S. 808 (1991).

[371]   *Id.* at 825 (quoting *Booth v. Maryland*, 482 U.S. 496, 517 (1987) (White, J., dissenting) (citation omitted)).

meaningfully the defendant's moral culpability and blameworthiness, it should have before it at the sentencing phase evidence of the specific harm caused by the defendant."[372]

Even if some of the testimony in question (specifically, Sandra Hopkins's account of Fuller's son Michael's emotional reaction upon learning of the murders of his mother and sister) did constitute premature victim-impact evidence, Cade's trial counsel could reasonably have believed that objecting to that testimony (and the remaining character testimony in question) risked alienating the jury.[373]  Review of ineffective assistance claims under the AEDPA is doubly deferential.[374]  AEDPA, by setting forth necessary predicates before state-court judgments may be set aside, "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court."[375]

---

[372]   *Id*.; see also *id*. at 827 ("We . . . hold that if the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no *per se* bar.  A State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed.").

[373]   See *Williams v. Beto*, 354 F.2d 698, 703 (5th Cir. 1965) (recognizing that "he who often objects, only to have his objections over-ruled, risks alienating the jury").

[374]   *Harrington*, 562 U.S. at 101.

[375]   *Burt*, 571 U.S. at 19.

The TCCA also reasonably concluded Cade was not prejudiced within the meaning of *Strickland* by his trial counsels' failure to object to testimony regarding the victims' character and backgrounds or by the limited victim-impact testimony about Michael Hoskins.[376]  The evidence of Cade's guilt was overwhelming.  It included many crime scene photographs which corroborated Cade's recorded statements to police, in which he detailed his stabbings of both victims.  Cade's recorded interviews by the police, Cade's writings left at the crime scene, and Cade's admission to Dr. Proctor that he understood what he was doing was wrong at the time of the murders left no doubt as to Cade's awareness of the illegality of his actions, thus effectively negating his insanity defense.  This court independently concludes there is no reasonable probability that, but for the failure of his trial counsel to object to any of the testimony of these witnesses, the outcome of the guilt-innocence phase of Cade's capital murder trial would have been any different.

The TCCA's rejection on the merits of this ineffective assistance claim in the course of Cade's initial state habeas proceeding was neither contrary to, nor involved

---

[376]    See *Busby v. Davis*, 925 F.3d 699, 723-26 (5th Cir. 2019) (no showing of prejudice where it was "highly likely" the same result would have occurred absent trial counsels' allegedly deficient conduct), *cert. denied*, 589 U.S. 1141 (2020); *Thompson v. Davis*, 916 F.3d 444, 460 (5th Cir. 2019) (holding failure to object to the admission of additional bad acts evidence did not prejudice the defendant where there was "no shortage of other evidence" indicating the defendant's violent relationship with the victim, including evidence showing the defendant shot his victim in the face and left her bleeding profusely), *aff'd*, 941 F.3d 813 (5th Cir. 2019), *cert. denied*, __ U.S. __, 141 S. Ct. 977 (2021).

an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in Cade's trial, direct appeal, and initial state habeas proceedings.  Under AEDPA, Cade's sixth claim does not warrant federal habeas corpus relief.

5.  *Failure to Object to Prosecution's Outside-the-Record Jury Argument (Claim 7)*

In his seventh claim in his second amended federal habeas petition, Cade argues that his trial counsel rendered ineffective assistance by failing to object to the prosecution closing guilt-innocence phase jury arguments commenting on (1) the conduct of defense witness Gregory Scott inside the courtroom immediately after Scott left the witness stand and (2) conversations the prosecution had with Cade's relatives.[377]  Cade presented essentially the same ineffective assistance claim as his eleventh claim in his initial state habeas application.[378]

The state habeas trial court made the following findings and conclusions:

- Cade failed to rebut the presumption that his trial counsels' failure to object to the jury arguments in question constituted sound trial strategy.
- Cade's trial counsel failed to object to the prosecution's jury argument on Gregory Scott's allegedly rude comment to a member of the audience after Scott left the witness stand:  "Did you folks see what Gregory Scott did when he was walking out of this courtroom?  How he treated the woman who was in the middle row?  'Get up.'  That's meanness.

---

[377]   ECF no. 127, 106-09.

[378]   Initial State Habeas Application 111-15 [ECF no. 71-4, 114-18].

> That's control.  That's domination.  That's Tyrone Cade." (quoting 48 R.R. Trial [ECF no. 69-48] 227).
> - The prosecution's argument concerning Gregory Scott's behavior was outside the record and objectionable.
> - Cade's trial counsel testified that objecting to an argument may simply draw more attention to the argument that counsel does not want to emphasize.
> - Cade suffered no prejudice with regard to his trial counsels' failure to object to any of the prosecution's jury arguments in question.
> - The evidence of Cade's guilt was overwhelming.
> - The prosecution's arguments in question did little to damage or harm Cade's insanity defense.
> - In finding Cade guilty the jury necessarily rejected Cade's insanity defense.[379]

The TCCA expressly adopted the foregoing factual findings and conclusions when it denied Cade's initial state habeas application on the merits.[380]  Cade has alleged no facts and presented this court with no clear and convincing evidence showing that any of the foregoing factual findings were erroneous.

Cade's lead trial counsel testified during Cade's initial state habeas proceeding that (1) he objects to opposing counsel's jury argument primarily to preserve constitutional claims; (2) if opposing counsel is addressing matters outside the record, sometimes it is better not to object but to then turn the argument against an opponent by suggesting in reply or rebuttal that opposing counsel was attempting to create a smokescreen; and (3) he did not specifically recall the incident involving

---

[379]   FFCL pp. 86, 88-90, ¶¶ 472-75, 480-94 [ECF no. 71-9, 725, 727-29]. The TCCA expressly disavowed FFCL ¶¶ 476-79 when it adopted the state habeas trial court's other findings.

[380]   *Ex parte Cade*, 2017 WL 4803802, at *3.

Gregory Scott after Scott left the stand.[381]  His co-counsel testified that sometimes objecting to an opposing counsel's jury argument draws more attention to an argument that counsel does not want to emphasize.[382]

Cade's lead trial counsel testified that, as a general rule, he only objected to a prosecutor's jury arguments when it was necessary to preserve a constitutional claim.[383]  Improper prosecutorial jury argument constitutes a deprivation of due process only when it renders the entire trial fundamentally unfair, *i.e.*, "'the petitioner must demonstrate either persistent and pronounced misconduct or that the evidence was so insubstantial that (in probability) but for the remarks no conviction would have occurred.'"[384]  Cade's lead trial counsel's strategic approach is objectively reasonable.  Cade's trial counsel reasonably could have concluded the prosecutor's comments on matters outside the record were insufficient to meet this high standard.

Cade's trial counsel also reasonably could have believed that objecting to the prosecution's comments on matters outside the record would have drawn more attention to the comments in question than they deserved and, thereby, distracted the jury and worked against the defense.  The TCCA reasonably concluded that the

---

[381]    3 R.R. Initial State Habeas Hearing [ECF no. 72-3] 28-29.

[382]    *Id*. at 85-86.

[383]    *Id*. at 28.

[384]    *Bridge*, 838 F.2d at 774 (quoting *Felde,* 795 F.2d at 403).

failure of Cade's trial counsel to object to the prosecution's jury arguments on matters outside the record did not overcome the presumption that trial counsels' decision was within the wide range of strategic decisions which are objectively reasonable.[385]

For the same reason discussed above in connection with Cade's complaint about his trial counsels' failure to object to victim-impact testimony, the TCCA reasonably concluded the current ineffective assistance complaint failed to satisfy the prejudice prong of *Strickland*. The evidence of Cade's guilt was overwhelming. Furthermore, the trial court instructed Cade's jury at the guilt-innocence phase of trial as follows:

> You are charged that it is only from the witness stand that
> the jury is permitted to receive evidence regarding the case,
> and no juror is permitted to communicate to any other
> juror anything he may have heard regarding the case from
> any source other than the witness stand.[386]

As previously noted, juries are presumed to follow their instructions.[387] This court independently concludes there is no reasonable probability that, but for the failure of Cade's trial counsel to object to the prosecution's comments on matters

---

[385]   *Harrington*, 562 U.S. at 101 ("A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.").

[386]   ECF no. 68-5, 408-09.

[387]   *Zafiro*, 506 U.S. at 540.

- 168 -

outside-the-record during closing jury argument, the outcome of the guilt-innocence phase of Cade's capital murder trial would have been any different.

The TCCA's rejection on the merits of this ineffective assistance claim in the course of Cade's initial state habeas proceeding was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in Cade's trial, direct appeal, and initial state habeas proceedings.  Under AEDPA, Cade's seventh claim does not warrant federal habeas corpus relief.

6.  *Failure to Challenge Future-Dangerousness-Related Evidence at Punishment Phase (Claim 10)*

In his tenth claim in his second amended federal habeas petition, Cade argues that his trial counsel rendered ineffective assistance by inadequately investigating Cade's background and presenting all available mitigating evidence relating to future dangerousness, including the testimony of Dr. Vigen which had been proffered but partially excluded during the guilt-innocence phase of trial.[388]  Cade did not present this complaint of ineffective assistance to any state court until he included it as the thirteenth claim of his first subsequent (second) state habeas application.[389]  The

---

[388]    ECF no. 127, 119-34.

[389]    First Subsequent (Second) State Habeas Application 153-72 [ECF no. 134-17, 367-405].

TCCA summarily dismissed this claim when it dismissed Cade's first subsequent (second) state habeas application based on state writ-abuse principles.[390]

Because no state court has addressed the merits of this ineffective assistance claim, this court's review of the claim is necessarily *de novo*.[391]  This court has independently reviewed the entire record from Cade's trial, direct appeal, initial, and first subsequent (second) state habeas proceedings, as well as all of the documents accompanying Cade's initial, first amended, and second amended federal habeas petitions filed in this court.  The following discussion and analysis constitute this court's findings of fact and conclusions of law:

In the context of penalty phase mitigation in capital cases, the Supreme Court has held that it is unreasonable not to investigate further when counsel has information that suggests additional mitigating evidence – such as mental illness or a history of childhood abuse – may be available.[392]

---

[390]     *Ex parte Cade*, 2021 WL 1202479, at *1-*2.

[391]     See *Porter*, 558 U.S. at 39; *Rompilla*, 545 U.S. at 390; *Wiggins*, 539 U.S. at 534.

[392]     See, *e.g.*, *Porter*, 558 U.S. at 39-40 (trial counsel failed to interview any witnesses or to request any of the defendant's school, medical, or military records and ignored information in a report on the defendant's competency evaluation suggesting possible mitigating evidence – including evidence of mental illness – could be gleaned from investigation into the defendant's family background and military service); *Wiggins*, 539 U.S. at 524-26 (counsel failed to investigate the defendant's background beyond review of summary records from competency evaluation, presentence report, and records from the state foster care system, failed to compile a social history of the
(continued...)

Cade's trial counsel undertook an extensive investigation into Cade's background, including hiring numerous mental health experts to either evaluate Cade or to testify about the deleterious impact of Cade's unstable and abusive childhood. Cade argues that his trial counsel failed to pursue all available avenues of investigation in a search for evidence of future dangerousness beneficial to the defense.  He also complains that his trial counsel failed to present a portion of Dr. Vigen's testimony proffered during the guilt-innocence phase of trial which the trial court had ruled would be admissible at the punishment phase of trial.

There are several problems with Cade's arguments.  First, Cade mistakenly argues that his defense team was required to exhaustively interview (and present testimony from) more of Cade's acquaintances and family members.  Cade's defense counsel was not obligated to engage in a wide-ranging exploration for every conceivable source of information potentially beneficial to the defense.[393]  Counsel in

---

[392](...continued)
defendant, and presented no mitigating evidence concerning the defendant's background); *Williams*, 529 U.S. at 395-96 (counsel failed to conduct even a cursory investigation into the defendant's background which would have shown the defendant's parents had been imprisoned for the criminal neglect of the defendant and his siblings, the defendant had been severely beaten by his father, and had been returned to his parents' custody after they were released from prison).  Such claims of ineffective assistance of counsel are commonly referred to as *Wiggins* claims.

[393]     See *Thomas v. Lumpkin*, 995 F.3d 432, 456 (5th Cir. 2021) ("[T]he duty to investigate does not force defense lawyers to scour the globe on the off chance something will turn up.") (quoting *Rompilla*, 545 U.S. at 383)), *cert. denied*, __ U.S. __, 143 S. Ct. 4 (2022).

death penalty cases have a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.[394]  "'In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.'"[395]

Cade's mitigation specialist and lead trial counsel testified during Cade's initial state habeas proceeding and detailed the extensive nature of Cade's defense team's deep dive into Cade's lengthy and violent criminal history, as well as Cade's unstable and abusive childhood.  Cade's defense team then presented an extensive case in mitigation.  The defense's case in mitigation was front loaded into both phases of trial and included lay witnesses with personal knowledge of Cade's background – Cade's older half-brother Gregory Scott, a female cousin who grew up with Cade, and, via deposition, Cade's mentally ill father.  Cade's defense team also presented testimony from mental health experts addressing the heritability of schizophrenia, the deleterious impact of Cade's difficult childhood (including his history of repeated childhood sexual abuse by his relatives) on Cade's development, and the implications of the concept of abandonment rage on Cade's capital offense.  One of Cade's experts

---

[394]    *Andrus*, 590 U.S. at 814; *Bobby*, 558 U.S. at 11-12; *Wiggins*, 539 U.S. at 521; *Strickland*, 466 U.S. at 688-91.

[395]    *Andrus*, 590 U.S. at 814 (quoting *Wiggins*, 539 U.S. at 521-22); see also *Strickland*, 466 U.S. at 688-91.

opined that Cade was incapable of rational thought, *i.e.*, legally insane, at the time of his offense, and Cade's sexual assaults on a dying Fuller were "understandable" under the circumstances.[396]

As is readily apparent from the trial testimony of Cade's mental health experts, Cade's defense team managed to obtain a wealth of documentation and other information about Cade's background which they communicated to Cade's mental health experts. Cade's mental health experts, especially Dr. Kessner, Dr. Altman, and Dr. Gottlieb, testified extensively about the factual bases for their opinions. Their trial testimony included many details of Cade's unstable, violent, and abusive childhood. Cade's trial counsel also presented eyewitness testimony from Cade's ill father (via deposition), and Cade's older half-brother Gregory Scott detailing Cade's difficult childhood. In addition, Cade's trial counsel presented the jury with lay testimony from Cade's cousin, a former coworker, and a local attorney who had known Cade during childhood and been Cade's football teammate in high school. These witnesses furnished testimony about Cade's good character.

---

[396]   Dr. Kessner made both of these assertions during her testimony at Cade's trial. *See* 48 R.R. Trial [ECF no. 69-48] 39-47, 55, 61-62, 65-69, 82-83, 87-88, 92-93, 98-99, 101, 104. Dr. Kessner also dismissed the fact Cade told Dr. Proctor that he understood his conduct was wrong at the time he was murdering his victims as a form of "hindsight," which did not alter her diagnosis of abandonment rage. *Id*. at 61-63. She likewise dismissed Cade's writings as reflecting insights acquired or developed after the murders. *Id*. at 71, 81-83, 93, 98-99.

Thus, Cade's trial counsel presented an extensive case in mitigation.  This distinguishes Cade's case from the scenarios the Supreme Court addressed in *Porter*, *Wiggins*, and *Williams*.  Equally significantly, it distinguishes Cade's case from the Supreme Court's recent decision in *Andrus*, in which defense counsel made no effort to investigate or present evidence of the defendant's extremely difficult childhood.  Cade's defense team, in sharp contrast, discovered and presented extensive mitigating evidence showing Cade was the product of a childhood characterized – not only by physical, emotional, and sexual abuse – but also which included Cade witnessing acts of extreme violence between his parents, both of whom were described as alcoholics and drug abusers.

In contrast to the jury in *Andrus*, Cade's capital sentencing jury was well aware of the difficulties Cade faced as a child.  Defense witnesses recounted a knife attack by Cade's mother on his father and a hammer attack by Cade's father on Cade's mother, both of which Cade witnessed.  Cade's father's deposition included an accusation that Cade's mother sexually abused Cade as a child.  Cade's mother was described by defense experts as an unstable alcoholic who often left Cade in the care of his aunts for extended periods.  Cade's father's schizophrenia was also made evident to Cade's jury, both through the testimony of a former caregiver to Cade's father and the deposition of Cade's father.  Through their trial testimony, Dr. Altman, Dr. Gottlieb, and Dr. Kessner explained to the jury how the difficulties

- 174 -

Cade faced as a child detrimentally impacted his conduct as an adult, particularly his inability to handle fear of abandonment and other emotional stressors.

Admittedly, a substantial portion of Cade's case in mitigation was presented through his expert witnesses.  But the decision to present such evidence through expert witnesses rather than a parade of relatives, family friends, and other lay witnesses was objectively reasonable in this case.  The circumstances of Cade's capital offense were horrific.  According to Dr. Compton, when called to testify by the defense, Cade's half-brother Gregory Scott reacted on cross-examination in a manner which shocked the jury.  The transcript from trial confirms that Scott reacted badly when the prosecution confronted him with grisly crime scene and autopsy photographs.

Given the potential for similar reactions on cross-examination from other lay witnesses, it was objectively reasonable for Cade's trial counsel to choose to present a substantial portion of its mitigating evidence regarding Cade's background through experts.  Generally, the decision whether to introduce mitigating evidence through lay witnesses versus expert witnesses lies within the sound discretion of trial counsel.[397]

---

[397]   See *Hummel*, 908 F.3d at 991-92 (recognizing the wide range of discretion counsel generally enjoy regarding how best to present mitigating evidence and holding trial counsel was not ineffective for making reasonable decisions regarding the manner in which mitigating evidence was presented, including the steps taken by defense counsel to avoid opening the door to admission of harmful rebuttal evidence).

- 175 -

In this particular case, Cade's trial counsels' decision to rely primarily upon experts to build its case in mitigation was objectively reasonable. As explained previously, in addition to hopefully avoiding harmful reactions like Gregory Scott's to the graphic crime scene evidence, this also allowed the defense to front load a substantial portion of its case in mitigation (through expert testimony) into the guilt-innocence phase of trial.

Dr. Compton and Cade's lead trial counsel also testified during Cade's initial state habeas proceeding about both (1) the difficulties the defense team encountered in seeking cooperation from Cade's relatives, many of whom insisted Cade's childhood had not been abusive or neglectful, and (2) the practical problems they encountered with Cade's tendency to tell each new defense mental health expert who evaluated him new information that Cade had not previously disclosed to his mitigation specialist or attorneys. The reasonableness of counsel's strategic decisions is substantially influenced by the defendant's own statements.[398]

In addition, Cade's lead counsel and Dr. Compton both testified some of Cade's friends and family interviewed by the defense team's investigators had the potential to offer testimony harmful to the defense, including family members who denied that Cade had been abused as a child and one of Cade's former coaches who

---

[398]    *Strickland*, 466 U.S. at 691; *Carter v. Johnson*, 131 F.3d 452, 465 (5th Cir. 1997) ("The duty of trial counsel to investigate is tempered by the information provided to counsel by the defendant."), *cert. denied*, 523 U.S. 1099 (1998).

knew Desaree.  Cade's trial counsel acted in an objectively reasonable manner in choosing not to call such witnesses out of concern for what might happen on cross-examination.  An informed decision by trial counsel not to proceed with a particular strategy that has the potential for a "double-edged" outcome is objectively reasonable.[399]

Cade has failed to allege any specific facts or furnish any evidence showing his trial counsels' decision to present mitigating evidence in the particular manner and scope they did at Cade's trial was not an informed strategic decision made after (1) numerous and extensive consultations and interviews with Cade, (2) an objectively reasonable investigation into Cade's background, and (3) consultation with multiple

---

[399]    See, *e.g.*, *Mejia v. Davis*, 906 F.3d 307, 316 (5th Cir. 2018) ("This 'double-edged' principle extends to counsel's tactical decision to forego a lesser-included-offense instruction to which his client would otherwise be entitled."), *cert. denied*, 586 U.S. 1170 (2019); *Chanthakoummane v. Stephens*, 816 F.3d 62, 70 (5th Cir.) (informed decision not to present testimony from the defendant's family because of concern that calling family members to testify could invite the prosecution to present evidence of the defendant's gang affiliation and history of violence), *cert. denied*, 580 U.S. 844 (2016); *St. Aubin v. Quarterman*, 470 F.3d 1096, 1103 (5th Cir. 2006) (informed decision not to present evidence that could be construed by jury as both mitigating and aggravating), *cert. denied*, 550 U.S. 921 (2007); *Rector v. Johnson*, 120 F.3d 551, 564 (5th Cir. 1997) (informed decision not to present evidence showing the defendant suffered from child abuse, family instability, a poor educational background, low IQ, gunshot injuries, and the defendant's mother was severely and chronically mentally ill), *cert. denied*, 522 U.S. 1120 (1998); *Mann v. Scott*, 41 F.3d 968, 983-84 (5th Cir. 1994) (informed decision not to present evidence of low intelligence and abusive childhood entitled to "a heavy measure of deference in a subsequent habeas corpus attack") (citations omitted), *cert. denied*, 514 U.S. 1117 (1995).

mental health experts.  The fact that Cade's initial state habeas counsel and federal habeas counsel have identified new experts willing to furnish a slightly different diagnosis of Cade's mental health or propose a different etiology for Cade's condition (*i.e.*, Chronic Traumatic Encephalopathy instead of PTSD or schizoaffective disorder) does not mean there was anything professionally deficient about the extensive investigation undertaken by Cade's trial team.  Cade has alleged no specific facts and presented no evidence showing it was objectively unreasonable for his trial counsel to rely on the information and opinions furnished by the many mental health experts with whom Cade's defense team consulted.

This conclusion is further supported by the evidence presented during Cade's initial state habeas proceeding showing there was substantially more aggravating evidence potentially available to the prosecution which Cade's trial counsel endeavored to conceal from the prosecution.  Dr. Compton and Cade's lead trial counsel both testified Cade had admitted to his defense team that he left the crime scene, purchased lubricant, returned to the scene, watched pornography, and then sexually assaulted Fuller's corpse both vaginally and anally.  Cade's defense team reasonably chose to conceal this information from the jury.

Dr. Compton and Cade's attorney testified that, as trial approached, Cade's statements to defense mental health experts became more erratic.  Cade's defense team was concerned that, by presenting a mental health expert at trial who had

evaluated Cade, the defense might open the door to a new mental health evaluation

by a prosecution expert. The defense feared that such an evaluation could reveal

Cade's admission that he had engaged in other bad acts, all potentially devastating to

the defense because such evidence could form the basis for a diagnosis of antisocial

personality disorder ("ASPD").[400] Cade's lead trial counsel testified, without

---

[400] The Fifth Edition of the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders* ("DSM-5") describes antisocial personality disorder as "a pervasive pattern of disregard for, and violation of, the rights of others that begins in childhood or early adolescence and continues into adulthood." DSM-5 at 659. "[D]eceit and manipulation are central features of antisocial personality disorder[.]" *Id*. The DSM-5 diagnostic criteria for the disorder are as follows:

    A.    A pervasive pattern of disregard for and violation of the rights of others, occurring since age 15 years, as indicated by three (or more) of the following:

        1.    Failure to conform to social norms with respect to lawful behaviors, as indicated by repeatedly performing acts that are grounds for arrest.
        2.    Deceitfulness, as indicated by repeatedly lying, use of aliases, or conning others for personal profit or pleasure.
        3.    Impulsivity or failure to plan ahead.
        4.    Irritability and aggressiveness, as indicated by repeated physical fights or assaults.
        5.    Reckless disregard for safety of self or others.
        6.    Consistent irresponsibility, as indicated by repeated failure to sustain consistent work behavior or honor financial obligations.
        7.    Lack of remorse, as indicated by being indifferent to or rationalizing having hurt, mistreated, or stolen from another.

    B.    The individual is at least age 18 years.
    C.    There is evidence of conduct disorder with onset before age 15 years.
    D.    The occurrence of antisocial behavior is not exclusively during the

(continued...)

contradiction, that the defense's mental health experts were concerned Cade would be diagnosed with ASPD.[401]  The objective reasonableness of Cade's defense team's concern about avoiding a possible ASPD diagnosis is inferentially supported by the fact that, when Cade's initial state habeas counsel retained Dr. Silverman to evaluate Cade, they did not request that Dr. Silverman evaluate Cade for personality disorders on Axis II (where a diagnosis of ASPD could appear).[402]  Cade's trial counsel acted reasonably in choosing not to present testimony from a mental health expert who had evaluated Cade because doing so could have opened the door to evidence of Cade's ASPD.[403]

Cade's trial counsel also acted reasonably when they chose to present evidence of Cade's relatively low intellectual functioning through cross-examination of prosecution witness Dr. Proctor rather than calling Dr. McGarrahan to testify at the punishment phase of trial (after the trial court excluded her testimony at the

---

[400](...continued)
course of schizophrenia or bipolar disorder.

*Id*.

[401]   2 R.R. Initial State Habeas Hearing [ECF no. 72-2] 246-47.

[402]   4 R.R. Initial State Habeas Hearing [ECF no. 72-4] 90.

[403]   See *Smith v. Davis*, 927 F.3d 313, 337 (5th Cir. 2019) (trial counsel acted reasonably in choosing not to present mental health testimony that would have opened the door to evidence the defendant had confessed to other offenses and could be diagnosed as ASPD), *cert. denied*, 589 U.S. 1265 (2020).

guilt-innocence phase).  Calling Dr. McGarrahan (or another mental health expert), who had evaluated Cade, would have potentially opened the door to a new mental health evaluation by Dr. Proctor or another prosecution expert.[404]  While Dr. Proctor did evaluate Cade for insanity, a second evaluation relating to mitigation and future dangerousness could well have revealed evidence of ASPD that Cade's trial counsel reasonably wished to conceal from the prosecution and the jury.[405]

When the defense proffered the testimony of Dr. Sorensen and Dr. Vigen, the trial court excluded Dr. Sorensen's still-in-progress study and Dr. Vigen's opinion on Cade's future dangerousness as unreliable.  Cade now argues his trial counsel should have sought to introduce Dr. Vigen's testimony about TDCJ's effectiveness in controlling its inmates generally.  It was objectively reasonable for Cade's trial counsel to choose a different path, however.

The defense presented testimony about the ability of TDCJ to control inmates generally through a former TDCJ inmate (Johnny Lindsay) and a former TDCJ administrator (S.O. Woods).  It was objectively reasonable for Cade's trial counsel to rely on these witnesses, who possessed personal knowledge of TDCJ facilities and their operations from both sides of the bars, rather than through a mental health expert who was unable to offer an opinion on Cade's future dangerousness because he

---

[404]   *Cheever*, 571 U.S. at 94.

[405]   *Smith*, 927 F.3d at 337.

had not evaluated Cade.  Dr. Vigen had visited TDCJ facilities in his capacity as a

psychologist but possessed no formal education or training in prison administration,

criminal justice, or corrections.  Furthermore, testimony from mental health experts

on the likelihood of future dangerousness is viewed as "rather shaky by in general

because studies have shown that such testimony is wrong more often than it is

right."[406]  Cade's trial counsel reasonably could have concluded the proffered

testimony of Dr. Vigen was of little utility at the punishment phase of Cade's trial

once it was stripped of an opinion on Cade's future dangerousness.

With regard to the prejudice prong of *Strickland*, the Supreme Court held the

petitioners in *Wiggins*, *Porter*, and *Williams* were prejudiced by the failure of their trial

counsel to fully investigate, develop and present available mitigating evidence.  More

specifically, the Supreme Court found in *Wiggins* that his trial counsel failed to

discover, develop, and present available mitigating evidence showing:

> Wiggins experienced severe privation and abuse while in
> the custody of his alcoholic, absentee mother and physical
> torment, sexual molestation, and repeated rape while in
> foster care.  His time spent homeless and his diminished
> mental capacities further augment his mitigation case.  He
> thus has the kind of troubled history relevant to assessing a
> defendant's moral culpability.[407]

---

[406]    See *Harper*, 64 F.4th at 698 (citing *Barefoot v. Estelle*, 463 U.S. 880, 901 (1983)).

[407]    *Wiggins*, 539 U.S. at 512-13 (citation omitted).

In *Porter*, the new mitigating evidence undiscovered and undeveloped by trial counsel included lay and expert testimony showing (1) Porter routinely witnessed his father beat his mother, one time so severely that she had to go to the hospital and lost a child; (2) Porter's father was violent every weekend, and Porter was his father's favorite target, particularly when Porter tried to protect his mother; (3) on one occasion, Porter's father shot at him for coming home late but missed and beat Porter instead; (4) Porter attended classes for slow learners until he left school at age 12 or 13; (5) to escape his horrible family life, Porter enlisted in the United States Army at age 17 and fought in the Korean War; (6) Porter suffered a gunshot wound to the leg yet fought heroically through two battles; (7) after the war, Porter suffered dreadful nightmares and would attempt to climb his bedroom walls at night with knives; (8) Porter developed a serious drinking problem and began drinking so heavily that he would get into fights and not remember them at all; (9) Porter suffered from brain damage that could manifest in impulsive, violent behavior; (10) at the time of the capital offense, Porter was substantially impaired in his ability to conform his conduct to the law and suffered from an extreme mental or emotional disturbance; and (11) Porter had substantial difficulties with reading, writing, and memory.[408]

Prejudice was established in *Williams* through testimony showing trial counsel failed to discover and develop available mitigating evidence showing (1) Williams

---

[408]     See *Porter*, 558 U.S. at 449-51.

experienced a nightmarish childhood; (2) Williams's parents had been imprisoned for criminal neglect of Williams and his siblings; (3) Williams had been severely beaten by his father, committed to the custody of the social services bureau for two years during the incarceration of his parents, and then returned to his parents after they were released from prison; (4) Williams was "'borderline mentally retarded' and did not advance beyond the sixth grade[;]" (5) Williams received commendations for helping to crack a prison drug ring and for returning a guard's missing wallet; (6) Williams was among the inmates least likely to act in a violent, dangerous or provocative way; (7) Williams seemed to thrive in a more regimented and structured environment; and (8) Williams earned a carpentry degree while in prison.[409]

More recently, the Supreme Court held in *Andrus* that a defendant was prejudiced by his trial counsel's failure to undertake any significant investigation into the defendant's background for mitigating evidence beyond communicating with Andrus's parents, neither of whom counsel met in person until they showed up at court to testify.[410] Defense counsel in that case failed to follow up on a mitigation report indicating Andrus had serious mental health issues, including PTSD, depression, mood lability, emotional dysregulation, and a diagnosis of affective

---

[409]   *Williams*, 529 U.S. at 395-96.

[410]   See *Andrus*, 590 U.S. at 814-18.

- 184 -

psychosis.[411]  The Supreme Court explained the failure of Andrus's trial counsel to investigate his client's background resulted in the jury hearing nothing about Andrus's mother's spiraling drug addiction and prostitution; his mother's abandonment of Andrus and his siblings for weeks at a time while she binged drugs; the parade of abusive boyfriends his mother brought into the home; or the fact Andrus became the *de facto* caregiver for his four siblings when he was only twelve years old.[412]  Nor did the jury hear any evidence showing Andrus's difficult experiences as an inmate of the Texas Youth Commission, which included a suicide attempt and medication with psychotropic drugs.[413]  The Supreme Court concluded that Andrus was prejudiced by his trial counsel's unprofessional failure to investigate many avenues for available mitigating evidence, in part, because of what it characterized as likely impact of the "tidal wave" of new mitigating evidence on the jury's appraisal of Andrus's moral culpability.[414]

In making the prejudice determination under *Strickland* in the context of a capital sentencing proceeding, the Supreme Court has instructed federal habeas courts to examine all of the mitigating evidence introduced at trial and all new

---

[411]    *Id*.

[412]    *Id*. at 806-08.

[413]    *Id*. at 809-12.

[414]    *Id*. at 823-24.

mitigating evidence presented in the habeas proceeding "and 'reweig[h] it against the evidence in aggravation.'"[415]  Thus, a federal habeas court must reweigh all the evidence in aggravation against the totality of available mitigating evidence (had the petitioner's trial counsel chosen a different course).[416]  *Strickland* does not require the State to "rule out" or negate a sentence of life in prison to prevail; "[r]ather, *Strickland* places the burden on the defendant, not the State, to show a 'reasonable probability' that the result would have been different."[417]  Within the context of *Strickland* analysis, "prejudice" means a reasonable probability the result of the proceeding would have been different.[418]  To satisfy the prejudice prong, "[t]he likelihood of a different result must be substantial, not just conceivable."[419]

There are several problems with Cade's tenth claim from a prejudice perspective.  First, Cade argues that a more expansive investigation into his background would have disclosed additional evidence showing that Cade's capital offense was "out of character" for him and he was, therefore, likely not to pose a risk

---

[415]    *Id.* at 821-22 (quoting *Williams*, 529 U.S. at 397-98); *Sears v. Upton*, 561 U.S. 945, 956 (2010).

[416]    *Wong v. Belmontes*, 558 U.S. 15, 20 (2009); *Wiggins*, 539 U.S. at 534.

[417]    *Wong*, 558 U.S. at 27.

[418]    *Hinton v. Alabama*, 571 U.S. 263, 275 (2014).

[419]    *Harrington*, 562 U.S. at 112 (quoting *Strickland*, 466 U.S. at 693).

of future violence.[420]  The record from Cade's trial and initial state habeas

proceedings belies that contention.  As the TCCA correctly concluded on direct

appeal, the evidence at trial showed Cade had engaged in an escalating pattern of

violence, particularly toward women, which included juvenile burglaries, a

particularly violent sexual assault, stalking, and making a terroristic threat.  In the

latter instance, Cade threatened to burn down Fuller's house with her inside if she

made him move out of the house.  The record now before this court establishes Cade

was not peaceful or law-abiding prior to his current incarceration.

Likewise, as the TCCA pointed out on direct appeal, the circumstances of

Cade's capital offense were particularly brutal.  They involved dozens of stab wounds

reflecting considerable force being administered, not as a sudden reaction to an

unexpected affront, but hours after Cade placed a recording device under Fuller's side

of their bed and spent hours listening to the recordings of Fuller and her ex-husband

thereon "over and over" in Cade's word.  Cade then obtained a knife and woke a

sleeping Fuller for the express purpose of threatening her.  The crime scene and

autopsy photographs reveal the degree of savagery Cade inflicted on both Fuller and

Desaree.  Cade's admission, known at trial, that he sexually assaulted Fuller as she

bled to death in Desaree's presence evidences a depraved mindset.  Additionally,

there was aggravating evidence before the state habeas court, and now this court,

---

[420]     ECF no. 127, 122.

showing Cade informed his defense team that he left the crime scene, purchased

lubricant, returned to the crime scene, watched pornography for hours, and then

sexually assaulted Fuller's corpse.

Much of Cade's "new" mitigating evidence is, in fact, repetitious or only

slightly more expansive than the extensive case in mitigation presented by his trial

counsel during both phases of trial.  For example, Cade complains that his trial

counsel did not present mitigating evidence showing that Cade performed well in a

highly structured environment or social setting.[421]  But Cade's trial counsel did

present testimony from Dallas County Jail correctional official Austin Jackson

establishing that Cade had not posed any disciplinary problems during his pretrial

detention.  Cade's trial counsel cannot reasonably be faulted for failing to present

mitigating evidence that was largely duplicative of, or only slightly more detailed

than, the extensive mitigating evidence of Cade's background actually presented at

trial.[422]  Evidence of Cade's good behavior during his pretrial detention also must be

viewed in the context of the other evidence presented at trial showing Cade was once

involved in a fight in prison that resulted in his adversary suffering a broken thumb.

---

[421]    *Id.*

[422]    *Howard v. Davis*, 959 F.3d 168, 173 (5th Cir. 2020) (citing *Richards*, 566 F.3d at 568), *cert. denied sub nom.* __ U.S. __, 141 S. Ct. 1085 (2021); *Norman v. Stephens*, 817 F.3d 226, 233 (5th Cir. 2016) (defendant not prejudiced by failure of counsel to present cumulative evidence), *cert. denied*, 580 U.S. 1161 (2017).

Insofar as Cade identifies new witnesses whom he claims his defense team failed to contact or to discover, for the most part, Cade's new witness affidavits fail to establish those witnesses were available and willing to testify at the time of Cade's capital murder trial.  Ordinarily, to prove prejudice under *Strickland* in connection with an ineffective assistance claim premised upon an uncalled witness, a criminal defendant must do more than make naked assertions – the petitioner must (1) name the witness, (2) demonstrate that the witness was available to testify and would have testified, (3) set out the content of the witness's proposed testimony, and (4) show the testimony would have been favorable to a particular defense.[423]

Cade's "new" good character testimony must be viewed in the context of the "good character" testimony Cade's trial counsel presented at the punishment phase of trial from a former coworker, a former childhood friend and high school teammate, and from Cade's cousin Rhea Scott.  New witnesses testifying about Cade's allegedly gentle character (which Cade now urges should have been presented at trial) would likely have confronted the same type of cross-examination which caused defense

---

[423]   See., *e.g.*, *Nelson v. Davis*, 952 F.3d 651, 669 (5th Cir. 2020), *aff'd sub nom*. 72 F.4th 649 (5th Cir. 2023), *cert. denied*, __ U.S. __, 144 S. Ct. 1344 (2024); *King v. Davis*, 883 F.3d 577, 590 (5th Cir.), *cert. denied*, 586 U.S. 965 (2018); *Trevino v. Davis*, 829 F.3d 328, 338 (5th Cir. 2016), *aff'd*, 861 F.3d 545 (5th Cir. 2017), *cert. denied*, 584 U.S. 1019 (2018); *United States v. Fields*, 761 F.3d 443, 461 (5th Cir. 2014), *cert. denied*, 576 U.S. 1004 (2015); *Woodfox v. Cain*, 609 F.3d 774, 808 (5th Cir. 2010); *Gregory v. Thaler*, 601 F.3d 347, 352 (5th Cir.), *cert. denied*, 562 U.S. 911 (2010); *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009) (citation omitted).

witness Gregory Scott to erupt awkwardly.  Moreover, Cade's new lay witnesses offer very little information that was not already before Cade's capital sentencing jury.[424]

At trial, Cade's expert Dr. Kessner opined, without the benefit of having evaluated Cade, that Cade suffered from "confusional arousal" and "abandonment rage" at the time of his capital offense.  In support of this assertion, Dr. Kessner pointed to evidence showing Cade suffered an abusive and neglected childhood; was the victim of childhood sexual abuse perpetrated by his mother and two cousins; Cade's father suffered from schizophrenia; and Cade suffered from symptoms of PTSD resulting from the fact, as a child, he witnessed acts of extreme violence inflicted by his parents on each other, including a knife attack by his mother on his father, and his father striking his mother in the head with a hammer.[425]  To the foregoing, Cade now adds allegations that he has a history of multiple concussions and head injuries arising from a lengthy career playing football and automobile accidents as an adult which results in him suffering from Chronic Traumatic Encephalopathy ("CTE"), symptoms of which include Myoclonic Movement Disorder and sleep disorders.

---

[424]    See *United States v. Bernard*, 762 F.3d 467, 475 (5th Cir. 2014) (cumulative positive character evidence could not form the basis for an ineffective assistance claim), *cert. denied*, 577 U.S. 1101 (2016).

[425]    48 R.R. Trial [ECF no. 69-48] 36-105.

The "new" medical or mental health evidence Cade proffered in his initial and second state habeas proceedings and which Cade presents to this court is, for the most part, double-edged in nature.  For instance, Dr. Silverman testified during Cade's initial state habeas proceeding that:

- Cade suffers from frontal lobe impairment (disinhibition) as a result of recurring head trauma.
- This condition results in cognitive impairment.
- Cade also suffers from traits of schizophrenia (hearing voice) and symptoms of PTSD.
- Cade's brain damage renders him susceptible to wide ranges of extreme emotions which Dr. Silverman described as "off the charts."
- Cade experienced childhood trauma as a result of rampant drug use in his family and frequent instances in which Cade was abandoned by his mother by being left with an aunt.
- Cade's mother frequently beat him.
- Cade's mother was a heavy drinker.
- Cade's cognitive disorder includes indications of paranoia.
- Individuals such as Cade are easily overwhelmed, often give illogical responses, display confusion, and have a hard time interpreting the world.
- Cade experienced many risk factors in childhood, including in utero alcohol exposure; a need to receive oxygen immediately after birth; physical, emotional, and sexual abuse; deprivation; a lack of parenting; inconsistent nutrition; frequent head injuries; and exposure to a violent drug-laden environment.
- The type of abuse Cade experienced as a child often leads to an individual being impulsive, rebellious, and emotionally labile, *i.e.*, subject to swift and dramatic mood swings not necessarily in response to stimuli.[426]

---

[426]    3 R.R. Initial State Habeas Hearing [ECF no. 72-3] 6-42, 55-90; 4 R.R. Initial State Habeas Hearing [ECF no. 72-4] 7-90.

Dr. Silverman's description of Cade is an example of what the Fifth Circuit has termed "double-edged" mitigation evidence.[427]  The Fifth Circuit has identified several other forms of double-edged evidence.[428]

Dr. Silverman diagnosed Cade as suffering from frontal lobe damage which he attributed to a long history of multiple head injuries.  He also explained that Cade's frontal lobe brain damage meant Cade experienced cognitive difficulties and was inherently unable to control his emotions (emotional lability).  Other, undisputed, evidence in the record shows Cade functions intellectually in the low-average-to-borderline range.  This supports the first of Dr. Silverman's observations.  The undisputed facts of Cade's capital offense support the latter.  In the eyes of some jurors, such evidence might tend to reduce Cade's moral culpability.  But it most assuredly would have been viewed by all rational jurors as supporting an

---

[427]     See *Brown v. Thaler*, 684 F.3d 482, 499 (5th Cir. 2012) (explaining that mitigating evidence is "double-edged" when it "'might permit an inference that [the defendant] is not as morally culpable for his behavior [but], it also might suggest [that he], as the product of his environment, is likely to continue to be dangerous in the future") (quoting *Ladd v. Cockrell*, 311 F.3d 349, 360 (5th Cir. 2002)), *cert. denied*, 568 U.S. 1164 (2013).

[428]     See, *e.g.*, *Broadnax v. Lumpkin*, 987 F.3d 400, 413 (5th Cir. 2021) (evidence of intoxication and defendant's troubled upbringing), *cert. denied*, __ U.S. __, 142 S. Ct. 859 (2022); *Howard*, 959 F.3d at 173 (evidence of head injury); *Smith*, 927 F.3d at 337 (evidence of mental illness); *Fields*, 761 F.3d at 459 (evidence of mental illness); *Johnson v. Cockrell*, 306 F.3d 249, 253 (5th Cir. 2002) (evidence of alleged brain injury), *cert. denied*, 538 U.S. 926 (2003); *Kitchens v. Johnson*, 190 F.3d 698, 703 (5th Cir. 1999) (evidence of substance abuse).

affirmative finding on the future dangerousness special issue.  It is clearly doubled-edged in nature.

The problem with Dr. Silverman's diagnosis (and with Cade's current assertion that he suffers from CTE) is the absence of any evidence in the record now before this court showing that Cade actually sustained any of the concussions or head injuries that are the foundation of this diagnosis.  The record includes no medical records or other evidence showing Cade has ever been diagnosed or treated for a concussion.  The only source of information relating to Cade's two alleged automobile accidents is Cade himself.  No other witness identified in the record claims to have personal knowledge of same.[429]  The same is true for Cade's assertions of multiple head injuries while playing football.[430]  Cade presents no evidence he sustained any injury playing football until his junior year in high school when he experienced an episode of temporary paralysis during a game and was diagnosed with

---

[429]   Cade offers no police reports or insurance records memorializing the fact that he was involved in any automobile accident.  Nor does he offer any medical records confirming that he was ever examined or treated for any injury, much less a concussion, as a result of any automotive accident.  Likewise, Cade offers no affidavit from any witness corroborating his involvement in an automotive accident and any injuries Cade allegedly sustained therein.

[430]   As noted by Dr. Price in his testimony during Cade's initial state habeas proceeding, Cade's statements to Dr. Silverman that he experienced numerous "stingers" throughout his football career is hardly surprising given his congenital spinal condition.  *See* 6 R.R. Initial State Habeas Hearing [ECF no. 72-6] 162-64 (explaining that the term "stinger," used by Cade to describe his football injuries, is commonly associated with a temporary numbness or paralysis, usually of an extremity, not a concussion).

a congenital narrowing of the spinal column which effectively ended his football career.  Had Cade's former high school coaches testified at trial as Cade now suggests they would – *i.e.*, that they routinely forced their players to continue to play through injuries – they undoubtedly would have been met with cross-examination focused on how they could have ignored a serious medical injury like a concussion.  Such an admission may have been construed by Cade's jury as an admission of unprofessional conduct and, therefore, constituted impeachment evidence.

An informed decision by Cade's trial counsel not to introduce double-edged mental health testimony, such as evidence of mental illness and substance abuse, will not support an ineffective assistance claim.[431]  Cade's trial counsel presented extensive mental health testimony at trial, including testimony showing (1) Cade operates intellectually in the low-average to borderline range (Dr. Proctor's trial testimony based on Dr. McGarrahan's testing and report); (2) there was a risk Cade could inherit his father's schizophrenia (Dr. Altman's trial testimony); (3) as a victim of childhood sexual abuse, Cade was likely to experience serious emotional disturbances, difficulty in long-term intimate relationships, and feelings of shame and low-self-confidence (multiple witnesses); (4) Cade was also likely to experience long-term emotional disorders such as chronic PTSD and emotional disorders

---

[431]  *Ayestas v. Davis*, 933 F.3d 384, 392 (5th Cir. 2019), *cert. denied*, 589 U.S. 1203 (2020).

(multiple witnesses); (5) Cade was also potentially a candidate for long-term depression, bipolar disorder, psychosis, and mental illness (Dr. Gottlieb's trial testimony); and (6) as a result of autonomic arousal attributable to his history of abandonment as a child, at the time of his capital offense, Cade was experiencing limited cognition, loss of volitional control, and extreme emotions – *i.e.*, abandonment rage (Dr. Kessner's trial testimony).  While suggesting a slightly different etiology or causal origin from Dr. Gottlieb for Cade's emotional lability and cognitive difficulties, Dr. Silverman's testimony offered little that was genuinely new in terms of mitigating evidence.

Cade's trial counsel made an informed decision not to present any testimony from a mental health expert who had evaluated Cade.  They did so out of reasonable concern that doing so would open the door to a new evaluation by a prosecution expert which could result in a diagnosis of ASPD.  Cade has alleged no specific facts and presented no evidence showing it was objectively unreasonable for Cade's defense team to circumscribe the defense's case in mitigation in the manner they did. Introducing at trial the type of expert testimony offered during Cade's initial state habeas proceeding by Dr. Silverman, *i.e.*, the product of an evaluation, could have opened the door to the prosecution discovering some very harmful information. Moreover, it would have offered little that was genuinely new in terms of mitigation. Both Dr. Kessner and Dr. Silverman agreed that Cade displayed cognitive difficulties

and emotional lability.  They merely disagreed as to the cause.  Cade's latest allegation of CTE likewise offers little that is truly new.  Cade has not alleged any specific facts or presented any evidence showing the strategic decision by his trial counsel to limit its mental health evidence to only experts who had not evaluated Cade was objectively unreasonable.

Nor has Cade alleged any specific facts or furnished any evidence showing there is a reasonable probability that, but for the failure of his trial counsel to present testimony like Dr. Silverman's (or any of the other new medical or mental health evidence now before the court), the outcome of the punishment phase of Cade's trial would have been any different.  On the contrary, there is reason to believe that presenting a testifying mental health expert for the defense who, like Dr. Silverman, had evaluated Cade could have turned the already disturbing nature of Cade's capital offense into something even worse.  Cade's trial counsel had compelling reasons to avoid the course Cade now argues they should have followed:  it could have resulted in disclosure of Cade's other depraved acts.  In all reasonable probability, such evidence would have increased the likelihood the jury would render an affirmative answer to the future dangerousness special issue and a negative answer to the mitigation special issue.

Cade's complaint about his trial counsels' failure to present additional evidence addressing the future dangerousness special issue, including testimony from

an evaluating mental health expert and the proffered testimony of Dr. Vigen that had

been excluded from the guilt-innocence phase of trial, satisfies neither prong of

*Strickland*.[432]  Cade's tenth claim does not warrant federal habeas relief.

7.  *Failure to Adequately Investigate and Present All Available Mitigation (Claim 15)*

In his fifteenth claim in his second amended federal habeas petition, Cade

argues that his trial counsel failed to adequately investigate Cade's background and to

present all available mitigating evidence.[433]  Cade presented a somewhat streamlined

version of his current *Wiggins* claim in his second, third, and fifth claims in his initial

state habeas application, wherein he argued his trial counsel were ineffective for

failing to investigate and present mitigating evidence (Claim 2); failing to present a

social historian to explain the impact of Cade's social history (Claim 3); and failing to

present Dr. McGarrahan's testimony (Claim 5), all at the punishment phase of

trial.[434]

In connection with Cade's *Wiggins* claim (Claim 2), the state habeas trial court

found and concluded, in pertinent part, as follows:

- Cade failed to demonstrate by a preponderance of the evidence any
  deficiency in his trial counsels' investigation and presentation of
  mitigating evidence.

---

[432]    See, *e.g, id*.

[433]    ECF no. 127, 151-232.

[434]    Initial State Habeas Application 44-76, 82-85 [ECF no. 71-4, 47-79, 85-88].

- Cade also failed to demonstrate any resulting prejudice arising from his trial counsels' investigation for, and presentation of, mitigating evidence.
- Cade's trial counsel reasonably chose not to call Cade's daughter Tyra to testify at trial because at the time of Cade's trial, Tyra was only eleven or twelve years old; Cade had indicated he did not want her to testify; Tyra's mother would not allow the defense team to interview Tyra; and Cade's trial counsel feared that if called to testify, Tyra might learn on cross-examination that Cade had made statements following his arrest in which he stated that he would have also killed Tyra if she had been present at the time of the murders.
- Testimony from Tyra to Cade's qualities as a good father was irrelevant to Cade's moral blameworthiness for the murders of Fuller and Desaree.
- Testimony about Tyra's love for her father and desire to see him live would have been inadmissible as irrelevant to Cade's own personal moral culpability.
- Counsel was not deficient for not offering inadmissible evidence, and trial counsels' decision not to present Tyra's testimony constituted sound trial strategy.
- Evidence consisting of expressions of mere sympathy or emotional responses may not be considered by a capital sentencing jury.
- Cade's half-brother Gregory Scott testified Cade always had a job because Cade wanted to provide for Tyra.
- Cade's friend and former coworker James Kemp testified Cade appeared to be a good father.
- Cade's cousin Rhea Scott also testified Cade was a good father to Tyra and good with her children.
- Additional details from Tyra regarding her relationship with Cade would have been of little benefit to Cade, in part because there was no dispute as to the positive nature of Cade's relationship with Tyra.
- Cade's trial counsels' investigation into Cade's background was not deficient.
- The defense team made reasonable efforts to contact potential witnesses Karl Rogers, Debora Tennell, and Carolyn Singley.
- The day Dr. Compton attempted to interview Karl Rogers, Rogers appeared to be intoxicated and the decision was made not to pursue Rogers as a witness because of concerns, based on his substance abuse, about his overall ability to be a good witness.
- The defense team attempted without success to contact Debora Tennell.

- A defense investigator attempted to reach Carolyn Singley and contacted a relative who stated that Singley was still alive; the relative agreed to give Singley Dr. Compton's office number, but the defense never heard from Singley.
- The defense made a strategic decision not to contact Cade's half-brother Jerry Scott because Scott was incarcerated, and the defense team reasonably did not believe Scott's testimony would benefit Cade.
- The defense team interviewed Mary Rogers and made a reasonable decision not to call her to testify because she denied there was anything really difficult about Cade's childhood or that Cade's mother was physically or emotionally abusive.
- The defense called Rhea Scott to testify but reasonably limited the scope of her testimony in an effort to avoid disclosing that Cade once had been a drug dealer.
- Additional evidence showing substance abuse by family members other than Cade's parents would have only minimal benefit to Cade.
- Calling Jerry Scott to testify would have been problematic because he may have reacted to learning the shocking details of Cade's capital offense in the same way Gregory Scott had.
- Most of the evidence Cade alleged the foregoing witnesses could have furnished was already before the jury.
- There was no evidence suggesting Cade had witnessed heavy drug or alcohol abuse by anyone in his family other than his parents.
- The defense team contacted Cade's former high school coach Jim Bennett but reasonably chose not to call Bennett to testify because (1) Bennett knew both Fuller and her daughter and thought highly of them, which may have been used by the prosecution on cross-examination, and (2) Bennett's testimony that Cade experienced a difficult home life and experienced depression after being forced to give up football would have had only meager value because it was cumulative of other evidence the defense did present through other witnesses.
- Defense witness James Kemp appeared upset when, on cross-examination, he learned for the first time of the gruesome nature of Cade's offense.
- Cade's trial counsel reasonably chose not to cross-examine prosecution witness Justus Rogers, Cade's second cousin and Desaree's friend, because such cross-examination would have produced little benefit to the defense, could have revealed that Desaree did not like Cade, and thus might rebut Cade's contention that he was seeking to improve his relationship with her.

- The defense did not call Cade's chiropractor Dr. Marcum because, despite the fact Cade communicated with Dr. Marcum on the phone from jail, Cade never informed his defense team of Dr. Marcum.
- The defense did not need testimony from Dr. Marcum or Karl Rogers about Cade's back injury and Cade's chronic pain; such evidence was available from other sources and was introduced at trial; thus, further testimony on those subjects from Dr. Marcum and Rogers would have been cumulative.
- Dr. Kessner testified Dr. Proctor's report (which was admitted into evidence) established Cade experienced many stressors in his life, including back injury and chronic back pain.
- The prosecution's evidence supporting the death sentence was overwhelming: the undisputed facts of the crime demonstrated Cade was capable of extreme and gruesome violence and his capital offense was simply the latest in a line of increasingly violent behavior.[435]

In connection with Cade's complaint about his trial counsels' failure to present testimony of the social historian (Claim 3), the state habeas trial court found and concluded in pertinent part as follows:

- Cade failed to show the decision by his trial counsel not to call a social historian to testify at trial was objectively unreasonable.
- Cade was not prejudiced by the absence of a social historian as defense trial witness.
- The ABA Guidelines do not require that evidence of a defendant's social history be presented through expert testimony.
- Through lay and expert testimony, Cade's trial counsel introduced testimony showing that Cade's offense was the culmination of a violent and deprived childhood, loss of opportunity and adult support in high school, and the stress of physical injury, loss of income, and rejection by Fuller.
- Cade's trial counsel reasonably chose not to present testimony through a social historian because using a social historian as a trial witness posed the potential to disclose additional bad acts evidence theretofore unknown to the prosecution, such as the fact Cade had once been a

---

[435]    FFCL pp. 27-42, ¶¶ 116-219 [ECF no. 71-9, 673-88].

drug dealer, had intentionally dropped a bowling ball on a cat's head, and the details of his sexual assault of Fuller's corpse.

- Presenting testimony such as that offered during the initial state habeas proceeding by criminal justice professor Dr. Scott Bowman would have been of little utility to the defense, in part, because Dr. Bowman based his conclusion that Cade would not pose a risk of future violence on a general theory of crime associating low self-control with crime/delinquency and which describes most crime as unplanned and opportunistic.

- Dr. Bowman's characterization of Cade's offense as lacking in planning was belied by the evidence at trial, which showed considerable forethought including planting a recording device and getting a knife before Cade confronted Fuller.

- Cade's aggravated sexual assault on Charity Trice likewise demonstrated considerable forethought and discipline on Cade's part.

- The evidence at trial contradicted Dr. Bowman's characterization of Cade as lacking self-control; Cade was described by his former coaches and an adult acquaintance as being very much under control during his years in high school.

- Social worker Laura Sovine's testimony during Cade's initial state habeas proceeding consisted of descriptions of Cade's deprived childhood that were cumulative of other evidence admitted at trial and would have been of little utility at trial because Sovine's biopsychosocial history of Cade concluded at the point Cade was eighteen years of age; another social worker who did testify at trial, prosecution witness Al Merchant, accurately predicted Cade would reoffend after Cade was convicted of aggravated sexual assault.[436]

In connection with Cade's complaint about his trial counsels' decision not to present Dr. McGarrahan's testimony at the punishment phase of trial (Claim 5), the state habeas trial court found and concluded in pertinent part as follows:

- Dr. McGarrahan opined that Cade exhibited symptoms of PTSD, including depression and scored in the low average to borderline range of intellectual functioning.

---

[436]   *Id*. at pp. 43-51, ¶¶ 220-70 [ECF no. 71-9, 689-97].

- Cade's trial counsel attempted to introduce Dr. McGarrahan's testimony at the guilt-innocence phase of trial, but the trial court excluded it.
- Cade's trial counsel made a reasonable strategic decision not to present Dr. McGarrahan's testimony at the punishment phase of trial because she had evaluated Cade and introducing her testimony would have opened the door to a new evaluation by a prosecution mental health expert.
- Evidence of Cade's low intellectual functioning was introduced through cross-examination of Dr. Proctor.
- On inquiry in open court, the prosecution advised the court it would seek a new mental health evaluation of Cade by a prosecution expert if the defense chose to introduce testimony from an evaluating mental health expert.
- The risk of the prosecution discovering additional aggravating evidence had Dr. McGarrahan testified at the punishment phase of trial was real: at trial the prosecution was unaware that Cade had admitted he sexually assaulted Fuller's corpse several times, including after he left the scene, purchased lubricant, returned to the scene, and then watched pornography for several hours to get aroused.
- Dr. McGarrahan's diagnosis of Cade was cumulative of other evidence showing Cade was depressed, was at risk for PTSD, and functioned in the low average to borderline range of intellectual functioning.
- Despite not calling Dr. McGarrahan to testify at the punishment phase, Cade's trial counsel were able to argue plausibly that Cade was remorseful; Cade was depressed at the time of his offense; and Cade's low IQ prevented him from planning his offense.[437]

The TCCA expressly adopted all of the foregoing factual findings and conclusions when it denied Cade's initial state habeas application on the merits.[438] Cade has alleged no facts and presented this court with no clear and convincing evidence showing that any of the foregoing factual findings were erroneous.

---

[437]   *Id*. at pp. 61-66, ¶¶ 321-50 [ECF no. 71-9, 707-12].

[438]   *Ex parte Cade*, 2017 WL 4803802, at *3.

The TCCA reasonably concluded that Cade's complaints about his trial counsels' investigation into Cade's background for mitigating evidence and presentation of mitigating evidence at trial fail to satisfy either prong of *Strickland*. Cade's trial counsel conducted an objectively reasonable investigation into Cade's background and made informed, strategically reasonable, decisions with regard to the mitigating evidence they chose to present at trial and how to present same. The TCCA's factual findings and legal conclusions on Cade's *Wiggins* claims summarized above are fully supported by the evidence that was before the state habeas court during Cade's initial state habeas proceeding.

The TCCA's rejections on the merits during Cade's initial state habeas proceeding of Cade's ineffective assistance claims complaining about his trial counsels' failures to investigate and present mitigating evidence (Claim 2), present the testimony from a social historian to explain the impact of Cade's social history (Claim 3), and present Dr. McGarrahan's testimony (Claim 5) were neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in Cade's trial, direct appeal, and initial state habeas proceedings. Under AEDPA, Cade's fifteenth claim does not warrant federal habeas corpus relief.

Alternatively, even when reviewed under a *de novo* standard (including review of all new factual allegations and new evidence presented by Cade in conjunction with his federal habeas pleadings in this cause), Cade's ineffective assistance complaints in his fifteenth claim in his second amended petition fail to satisfy either prong of *Strickland*.  Cade's fifteenth claim does not warrant federal habeas relief under a *de novo* standard of review.

## L.  CUMULATIVE ERROR CLAIM

In his twelfth claim in his second amended federal habeas petition, Cade argues his constitutional rights were violated by the cumulative effect of various adverse trial court rulings and the ineffective assistance of his trial counsel.[439]  Cade did not present his cumulative error claim to any state court until he included it as his seventeenth claim in his first subsequent (second) state habeas application.[440] The TCCA summarily dismissed this claim when it dismissed Cade's first subsequent (second) state habeas application based on state writ-abuse principles.[441]

---

[439]    ECF no. 127, 144-46.

[440]    First Subsequent (Second) State Habeas Application 189-91 [ECF no. 134-17, 439-43].

[441]    *Ex parte Cade*, 2021 WL 1202479, at *1-*2.

- 204 -

The cumulative error doctrine requires a showing that constitutional error occurred during the defendant's state court trial.[442]  For the reasons discussed, all of Cade's complaints about the performance of his trial counsel fail to satisfy either prong of *Strickland*.  Further, for the reasons discussed, all of Cade's remaining claims are without arguable merit.  His challenges to the constitutionality of the Texas capital sentencing scheme are foreclosed by Fifth Circuit or Supreme Court authority and are legally meritless.  Thus, under the cumulative error doctrine recognized in the Fifth Circuit, there is nothing for this court to cumulate.  Cade's cumulative error claim is without arguable merit and does not warrant federal habeas relief even under a *de novo* standard of review.

---

[442]    See *Young v. Stephens*, 795 F.3d 484, 494 (5th Cir. 2015) (noting petitioner's failure to demonstrate any constitutional error committed during his trial, as required to satisfy the cumulative error doctrine) (citation omitted), *cert. denied*, 577 U.S. 1220 (2016); *Coble*, 496 F.3d at 440 ("Federal habeas relief is only available for cumulative errors that are of a constitutional dimension.") (citations omitted); *Miller v. Johnson*, 200 F.3d 274, 286 n.6 (5th Cir.) (absent constitutional error, there is nothing to cumulate), *cert. denied*, 531 U.S. 849 (2000); *Jackson v. Johnson*, 194 F.3d 641, 655 n.59 (5th Cir. 1999) ("The cumulative error doctrine provides relief only when the constitutional errors committed in the state court trial so fatally infected the trial that they violated the trial's fundamental fairness.") (citing *Spence v. Johnson*, 80 F.3d 989, 1000 (5th Cir.), *cert. denied*, 519 U.S. 1012 (1996)), *cert. denied*, 529 U.S. 1027 (2000); *Derden v. McNeel*, 978 F.2d 1453, 1454 (5th Cir. 1992) ("[F]ederal habeas corpus relief may only be granted for cumulative errors in the conduct of a state trial where (1) the individual errors involved matters of constitutional dimension rather than mere violations of state law; (2) the errors were not procedurally defaulted for habeas purposes; and (3) the errors 'so infected the entire trial that the resulting conviction violates due process.'") (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)), *cert. denied*, 508 U.S. 960 (1993).

IV.  MOTIONS ATTACKING THE CONSTITUTIONALITY OF AEDPA

On July 23, 2025, Cade filed a motion requesting leave to file a pair of motions attacking the constitutionality of AEDPA.[443]  In one of his proposed motions, Cade argues his constitutional rights would be violated by application of AEDPA to his federal habeas petition.[444]  In his other proposed motion, Cade argues Congress lacked the constitutional authority to enact AEDPA and that, for a plethora of policy considerations, the restrictions AEDPA imposes on federal habeas review of petitions filed by state prisoners are unwise and inconsistent with history.[445]  Because both of Cade's proposed motions lack any arguable merit, his motion for leave to file will be granted, and his substantive motions will be denied.

Cade's arguments that the Supreme Court's recent decision in *Loper Bright Enterprises v. Raimondo*[446] renders unconstitutional AEDPA ignore the history of the writ of habeas corpus in the federal courts of this nation, ignore clearly established federal law as pronounced by the Supreme Court, and are without arguable merit.

The only reason this court has any authority to entertain Cade's federal habeas corpus petition is that Congress has enacted statutes, currently codified at Title 28,

---

[443]    *See* docket entry 152.

[444]    *See* docket entry 150.

[445]    *See* docket entry 151.

[446]    603 U.S. 369 (2024) ("*Loper Bright*").

United States Code, Subsections 2241(a) and 2254(a), which authorize federal district courts to grant the writ of habeas corpus to prisoners held in custody by the states. The circumstances under which this court, or any federal district court, may grant federal habeas corpus relief are likewise established by statute, specifically Title 28, United States Code, Sections 2241-55. This is because the Constitution, in Article I, Section 8, Clause 9, vests the authority to create federal district courts, in fact all federal courts other than the United States Supreme Court, in the United States Congress.[447]

Federal district courts are courts of limited jurisdiction.[448] As an inferior federal court, this court's authority to entertain actions filed by state prisoners seeking federal habeas relief is dependent upon congressional authorization. Federal district courts have not always been authorized to grant habeas corpus relief to state prisoners. In fact, as explained below, Congress did not grant federal district courts the authority to issue writs of habeas corpus to state prisoners under any circumstances until 1867.

---

[447] *See* U.S. CONST. art. I § 8, cl. 9 ("The Congress shall have Power . . . To constitute Tribunals inferior to the supreme Court[.]").

[448] *Smith v. Spizzirri*, 601 U.S. 472, 476 n.2 (2024) (citing *Exxon Mobil Corporation v. Allapattah Services, Inc.*, 545 U.S. 546, 552 (2005) (observing that "'[t]he district courts of the United States . . . are 'courts of limited jurisdiction'" and "'possess only that power authorized by Constitution and statute'")); *Badgerow v. Walters*, 596 U.S. 1, 7 (2022) ("The district courts of the United States are courts of limited jurisdiction, defined (within constitutional bounds) by federal statute.").

The jurisprudence of the Supreme Court confirms the limited historical scope of federal habeas review which the inferior federal courts may exercise.  The Supreme Court has explained this principle in *Shinn v. Ramirez* as follows:

> A state prisoner may request that a federal court order his release by petitioning for a writ of habeas corpus.  See 28 U.S.C. § 2254.  The writ may issue "only on the ground that [the prisoner] is in custody in violation of the Constitution or laws or treaties of the United States." § 2254(a).  To respect our system of dual sovereignty, see *Printz v. United States*, 521 U.S. 898, 918 [] (1997), the availability of habeas relief is narrowly circumscribed, see *Brown v. Davenport*, []596 U.S. [] (2022).  Among other restrictions, only rarely may a federal habeas court hear a claim or consider evidence that a prisoner did not previously present to the state courts in compliance with state procedural rules.[449]

The Supreme Court's earlier decision the same term in *Brown v. Davenport,*[450] cited with approval in *Shinn*, is informative with regard to the scope of a federal district court's authority to issue a writ of habeas corpus.  In *Brown*, the Supreme Court held that a federal district court may not issue a writ of habeas corpus to a state prisoner unless the prisoner satisfies both the harmless error test adopted by the Supreme Court in *Brecht v. Abrahamson*,[451] and the test set forth by Congress in

---

[449]    *Shinn*, 596 U.S. at 375-76.

[450]    596 U.S. 118 (2022).

[451]    507 U.S. 619 (1993).

AEDPA.[452]  The Supreme Court emphasized the authority to grant federal habeas

relief is proscribed by federal statute:

> When Congress supplies a constitutionally valid rule of
> decision, federal courts must follow it.  In AEDPA,
> Congress announced such a rule.  It instructed that a
> federal court "*shall not . . . gran[t]*" relief with respect to a
> claim that has been adjudicated on the merits in state
> court "*unless*" the state court's decision was (1) "contrary
> to" or an "unreasonable application of " clearly established
> federal law, as determined by the decisions of this Court,
> or (2) based on an "unreasonable determination of the
> facts" presented in the state-court proceeding. § 2254(d)
> (emphasis added).[453]

Justice Gorsuch's opinion for the Court in *Brown* discussed the history of the

writ of habeas corpus in the federal courts of this nation:

> Some background helps explain this arrangement.  From
> the founding, Congress authorized federal courts to issue
> habeas writs to federal custodians.  § 14, 1 Stat. 81-82.
> After the Civil War, Congress extended this authority,
> allowing federal courts to issue habeas writs to state
> custodians as well.  See Act of Feb. 5, 1867, ch. 28, § 1, 14
> Stat. 385.  But these statutes used permissive rather than
> mandatory language; federal courts had the "power to"
> grant writs of habeas corpus in certain circumstances.  That
> same structure lives on in contemporary statutes, which
> provide that federal courts "may" grant habeas relief "as
> law and justice require."  28 U.S.C. §§ 2241, 2243; *Wright
> v. West*, 505 U.S. 277, 285 [](1992) (plurality opinion).[454]

---

[452]   *Brown*, 596 U.S. at 122.

[453]   *Id*. at 127 (emphasis in the original).

[454]   *Id*. at 127-28.

Following a brief discussion of the history of the writ of habeas corpus in both England and this nation, Justice Gorsuch discussed the Court's holding in *Brown v. Allen*.[455]  Significantly, he noted that the 1953 decision in *Brown* marked a significant shift in the nature of habeas corpus jurisprudence in this nation:  "The traditional distinction between jurisdictional defects and mere errors in adjudication no longer restrained federal habeas courts.  Full-blown constitutional error correction became the order of the day."[456]  This shift effectively granted to federal habeas courts the authority to review the validity of criminal judgments and to grant relief not just for jurisdictional error but for any violation of a defendant's federal constitutional rights which might have taken place at or before trial.[457]

Justice Gorsuch's opinion for the majority in *Brown v. Davenport* noted the sweeping change in federal habeas practice resulting from the Court's 1953 *Brown v. Allen* decision led to the federal courts being inundated with petitions for federal habeas relief filed by state prisoners.[458]  Justice Gorsuch explained that the Court began adopting procedural devices in an attempt to ameliorate the flood of federal habeas petitions with which the federal courts were battling, specifically citing the

---

[455]    344 U.S. 443, 458 (1953).

[456]    *Brown*, 596 U.S. at 130.

[457]    *Id*.

[458]    *Id.* at 130-31.

Court's adoption of rules of procedural default and the harmless error announced in

*Brecht*.[459]  In his opinion for the Court, Justice Gorsuch also explained these

procedural rules were aimed at restoring the writ of habeas corpus to its status prior

to 1953, by re-emphasizing both (1) the powerful and legitimate interest states

possess in "punishing the guilty[,]"[460] and (2) the reality that the "[g]ranting of

[federal] habeas relief to a state prisoner 'intrudes on state sovereignty to a degree

matched by few exercises of federal judicial authority.'"[461]  It was with those

considerations in mind, Justice Gorsuch declared, the Court adopted its harmless

error rule in *Brecht* in 1993.[462]

Within that context, Justice Gorsuch recognized that Congressional enactment

of AEDPA in 1996 "represented a sea change in federal habeas law."[463]  The Court

then declared (1) the equitable principles the Supreme Court adopted prior to

passage of AEDPA continued to apply, and (2) state prisoners seeking federal habeas

---

[459]     *Id*. at 132-33.

[460]     *Id*. at 132 (quoting *Calderon v. Thompson*, 523 U.S. 538, 556 (1998)).

[461]     *Id*. (quoting *Harrington*, 562 U.S. at 103) (internal quotation marks omitted)).

[462]     *Id*. at 133.

[463]     *Id*. at 134.

relief remained obligated to satisfy not just AEDPA's test but also the harmless error rule in *Brecht* before a federal court could issue a writ of habeas corpus.[464]

The Supreme Court's prior decisions construing and applying AEDPA likewise offered no clue that it viewed AEDPA as in any manner unconstitutional.  For instance, in *Felker v. Turpin*,[465] the Supreme Court held AEDPA provision (28 U.S.C. § 2244(d)) mandating advance Circuit Court approval for the filing of a second or successive federal habeas petition in a federal district court (1) did not violate Article I, Section 9, of the Constitution (which bars suspension of the writ of habeas corpus) and (2) did not impinge upon the Supreme Court's original habeas corpus jurisdiction.[466]  In the course of its opinion in *Felker*, the Court recognized that, originally, federal habeas jurisdiction applied only to individuals held in federal, as opposed to state, custody:  "the first Congress made the writ of habeas corpus available only to prisoners confined under the authority of the United States, not under state authority."[467]  The Court's *Felker* opinion expressed the same historical view of the evolution of federal habeas authority as Justice Gorsuch would recite a quarter century later in *Brown v. Davenport*:

---

[464]     *Id*.

[465]     518 U.S. 651 (1996).

[466]     *Id.* at 662-65.

[467]     *Id*. at 663 (citation omitted).

> It was not until 1867 that Congress made the writ generally available in "all cases where any person may be restrained of his or her liberty in violation of the constitution, or of any treaty or law of the United States." . . . And it was not until well into this century that this Court interpreted that provision to allow a final judgment of conviction in a state court to be collaterally attacked on habeas.[468]

Nothing in *Felker* suggested or implied that congressional limitation on access to federal habeas corpus remedies in the federal district courts violated constitutional principle.

Writing for the Court in *Williams v. Taylor*,[469] Justice O'Connor explained that AEDPA effectively altered the standard of federal habeas review of claims fully adjudicated in the state courts:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied – the state-court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case

---

[468]   *Id*.

[469]   529 U.S. 362 (2000).

> differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.[470]

There was no issue regarding the constitutionality of AEDPA presented in *Williams*. That case dealt with a pure question of statutory interpretation. Still, *Williams* recognized the Court's view that AEDPA had dramatically altered the nature of federal habeas review in the federal district courts.[471]

With the foregoing historical context clear, this court now turns to Cade's contention that the Supreme Court's recent holding in *Loper Bright*, as well as a concurring opinion by Justice Gorsuch in that case, somehow rent asunder everything Justice Gorsuch so meticulously explained in his opinion for the Court in *Brown v. Davenport*.

In *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,[472] the Supreme Court confronted neither a state prisoner seeking vindication of his constitutional rights nor the constitutionality of a federal statute. Rather, the issue before the Court in *Chevron* was the propriety under the Clean Air Act of a regulation promulgated by the Environmental Protection Agency in furtherance of its duty to

---

[470]   *Id.* at 412-13.

[471]   *Id.*

[472]   467 U.S. 837 (1984).

- 214 -

enforce that statute.  In the course of addressing that administrative law issue, the

Court explained the question before it as follows:

> When a court reviews an agency's construction of the
> statute which it administers, it is confronted with two
> questions.  First, always, is the question whether Congress
> has directly spoken to the precise question at issue.  If the
> intent of Congress is clear, that is the end of the matter;
> for the court, as well as the agency, must give effect to the
> unambiguously expressed intent of Congress.  If, however,
> the court determines Congress has not directly addressed
> the precise question at issue, the court does not simply
> impose its own construction on the statute, as would be
> necessary in the absence of an administrative
> interpretation.  Rather, if the statute is silent or ambiguous
> with respect to the specific issue, the question for the court
> is whether the agency's answer is based on a permissible
> construction of the statute.[473]

The *Chevron* Court acknowledged that the power of administrative agencies to

administer congressionally created programs necessarily requires the formulation of

policies and the making of rules to fill in the gaps, explicit or implicit, in the

congressional enactment.[474]  The Court explained that when Congress explicitly left a

gap for the agency to fill, the agency's regulations addressing that gap were "given

controlling weight unless they are arbitrary, capricious, or manifestly contrary to the

statute."[475]  In cases in which a congressional delegation of authority to an agency

---

[473]   *Id*. at 842-43 (footnotes omitted).

[474]   *Id*. at 843.

[475]   *Id*. at 843-44.

was implicit, the Court held "a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency."[476]  "We have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer, and the principle of deference to administrative interpretations."[477]  The Court explained that such deference should be applied when "the meaning or reach of a statute has involved reconciling conflicting policies, and a full understanding of the force of the statutory policy in the given situation has depended upon more than ordinary knowledge respecting the matters subjected to agency regulations."[478]  The foregoing judicially crafted legal doctrine eventually became known colloquially as "the *Chevron* doctrine" or "*Chevron* deference[.]"

In *Loper Bright*,[479] the Supreme Court once again confronted neither a request by a state prisoner for federal habeas relief nor a constitutional challenge to a federal statute.  Instead, two groups of fishermen challenged a rule adopted by a federal agency (the National Marine Fisheries Service) as part of its duties to enforce a federal statute addressing maritime fishing in U.S. waters (the Magnuson-Stevens

---

[476]      *Id*. at 844.

[477]      *Id*. (citations omitted).

[478]      *Id*.

[479]      603 U.S. 369 (2024).

Fishery Conservation and Management Act), which required operators of fishing vessels in U.S. waters to pay for third-party observers on their vessels when a government observer was unavailable. Chief Justice Roberts began his opinion for the Court majority by announcing the Court was using the case to overrule the judicially created doctrine of deference to agency rule-making it had recognized in *Chevron*.[480] The Court then explained the operative facts and procedural history of the cases before it.[481] Chief Justice Roberts proceeded to describe the principles of judicial review and judicial independence which ascribed to the Constitution's Framers as they adopted Article III of the Constitution and what he viewed to be the proper role of the federal courts in performing their duty to determine the cases and controversies brought before them.[482]

The *Loper Bright* majority's opinion continued with a discussion of the development of the Court's administrative law jurisprudence from the New Deal forward, arguing that the fundamental distinction between judicial review of factual determinations made by executive branch agencies and determinations of law.[483] More specifically, the Court majority explained what it viewed as the long-standing

---

[480]   *Id*. at 377-80.

[481]   *Id*. at 380-84.

[482]   *Id*. at 384-87.

[483]   *Id*. at 387-90.

- 217 -

tradition of judicial deference to agency fact-finding and expertise did not extend to agency determinations of purely legal matters.[484]  Next, the Court explained that Congress enacted the federal Administrative Procedure Act ("APA") in 1946 "'as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices.'"[485]

The Court then carefully analyzed the history and text of the APA and concluded that the congressional enactment requires federal courts construing statutes to exercise their independent judgment when addressing questions of law: "The APA, in short, incorporates the traditional understanding of the judicial function, under which courts must exercise independent judgment in determining the meaning of statutory provisions.  In exercising such judgment, though, courts may – as they have from the start – seek aid from the interpretations of those responsible for implementing particular statutes."[486]  The Court concluded that the deference required by *Chevron* was inconsistent with the foregoing principles within the APA.[487]

---

[484]    *Id.*

[485]    *Id*. at 391 (quoting *United States v. Morton Salt Co.*, 338 U.S. 632, 644 (1950)).

[486]    *Id*. at 394.

[487]    *Id*. at 396 ("The deference that *Chevron* requires of courts reviewing agency action cannot be squared with the APA.").

The Supreme Court then launched into a lengthy discussion of the reasons why it believed *Chevron* deference could not be reconciled with the APA and such deference had become unworkable as a practical matter.[488]  Chief Justice Roberts emphasized the nature of the beast the Court was slaying:  "*Chevron* was a *judicial invention* that required judges to disregard their statutory duties."[489]  The Court overruled *Chevron* and declared a new responsibility for federal courts consistent with the APA:  "Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires."[490]  Because both of the Circuit Courts which had addressed the propriety of the agency rule in question had expressly relied upon *Chevron* to uphold the rule and grant summary judgment against the fishermen, the Court reversed and remanded for reconsideration of the issue absent the influence of *Chevron*.[491]

In a separate opinion, Justice Gorsuch, who joined the Court's majority, expressed his own views of the three "lessons" he drew from history which counseled in favor of the majority's decision to abandon the *Chevron* doctrine:

> Lesson 1, because *Chevron* deference contravenes the law Congress prescribed in the Administrative Procedure Act.

---

[488]    *Id*. at 397-413.

[489]    *Id*. at 411 (emphasis added).

[490]    *Id*. at 412.

[491]    *Id*. at 413.

- 219 -

Lesson 2, because *Chevron* deference runs against mainstream currents in our law regarding the separation of powers, due process, and centuries-old interpretive rules that fortify those constitutional commitments. And Lesson 3, because to hold otherwise would effectively require us to endow stray statements in *Chevron* with the authority of statutory language, all while ignoring more considered language in that same decision and the teachings of experience.[492]

Justice Gorsuch then explained that he fully concurred with Chief Justice Roberts's views on the primacy of the role courts play in the interpretation of the law and the incompatibility of that principle with the *Chevron* doctrine:

From the Nation's founding, they considered "[t]he interpretation of the laws" in cases and controversies "the proper and peculiar province of the courts." The Federalist No. 78, p. 467 (C. Rossiter ed. 1961) (A. Hamilton). Perhaps the Court's most famous early decision reflected exactly that view. There, Chief Justice Marshall declared it "emphatically the province and duty of the judicial department to say what the law is." *Marbury*, 1 Cranch at 177. For judges "have neither FORCE nor WILL but merely judgment" – and an obligation to exercise that judgment independently. The Federalist No. 78, at 465. No matter how "disagreeable that duty may be," this Court has said, a judge "is not at liberty to surrender, or to waive it." *United States v. Dickson*, 15 Pet. 141, 162, 10 L. Ed. 689 (1841) (Story, J.). This duty of independent judgment is perhaps "the defining characteristi[c] of Article III judges." *Stern v. Marshall*, 564 U.S. 462, 483 [] (2011).[493]

---

[492]   *Id*. at 427 (Gorsuch concurring).

[493]   *Id*. at 429-30.

As was true for Chief Justice Roberts's majority opinion, despite the length and breadth of Justice Gorsuch's concurring opinion in *Loper Bright*,[494] at no point did Justice Gorsuch suggest he was attempting to determine the constitutionality of a federal statute on either a facial or as-applied basis.  Instead, what is clearly evident from both the majority and Justice Gorsuch's concurring opinions in *Loper Bright* is that the author's focus in each opinion was on whether the judicially created *Chevron* doctrine warranted continued adherence by federal courts given (1) the requirements of the APA and (2) the traditional role of federal courts as arbiters of the law when confronting the interpretation of federal statutes.  Their common conclusion that continued application of *Chevron* deference could not be reconciled with either the APA or historical tradition bears no rational relationship to the constitutionality of AEDPA.

Moreover, given the majority's express reliance in *Loper Bright* on the language of the APA (a congressional enactment) as determinative on the issue before it, its discussion of the historical tradition of the primacy of judicial review on issues of law, as opposed to fact, is rendered little more than *obiter dictum*, that is, "something said in passing" or which refers to a point of law not directly relevant to the case and, thus, not forming a binding precedent.[495]

---

[494]    See *Loper Bright*, 603 U.S. at 416-48.

[495]    See *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 66-67 (1996) ("We
(continued...)

- 221 -

Cade relies heavily on the discussions by Chief Justice Roberts and Justice Gorsuch of the primacy of judicial review of questions of law, as opposed to fact, to support his attacks on the constitutionality of AEDPA.  For the reasons discussed at length above, their discussions of that subject in *Loper Bright* are little more than *dicta*.  Thus, Cade erroneously relies upon Chief Justice Roberts's and Justice Gorsuch's ruminations in *Loper Bright* on the historical tradition of the primacy of judicial review on issues of law, as opposed to fact, as the basis for his constitutional challenges to AEDPA's restriction (in Subsections 2254(d) & (e)) on federal habeas review of claims that were litigated and resolved on the merits in the state courts.

As Justice O'Connor explained for the Court in *Williams*, in AEDPA Congress placed a new restriction on the power of federal courts to grant writs of habeas corpus to state prisoners.[496]

---

[495](...continued)
adhere in this case, however, not to mere *obiter dicta*, but rather to the well-established rationale upon which the Court based the results of its earlier decisions.  When an opinion issues for the Court, it is not only the result but also those portions of the opinion necessary to that result by which we are bound."); *Bennis v. Michigan*, 516 U.S. 442, 450 (1996) ("'[I]t is to the holdings of our cases, rather than their dicta, that we must attend.'") (quoting *Kokkonen v. Guardian Life Insurance Company of America*, 511 U.S. 375, 379 (1994)); *Williams v. United States*, 289 U.S. 553, 568 (1933) ("None of these cases involved the question now under consideration, and the expressions referred to were clearly obiter dicta, which, as said by Chief Justice Marshall in Cohens v. Virginia, 6 Wheat. 264, 399, 5 L. Ed. 257, 'may be respected, but ought not to control the judgment in a subsequent suit, when the very point is presented for decision.'").

[496]      *Williams*, 529 U.S. at 399.

As explained above, the legislative history of AEDPA indicates it was intended as a limitation upon the scope of federal habeas review, not as an enactment intended to broaden the scope of federal habeas review or to reconfigure federal habeas courts as super state appellate courts.

Insofar as Cade relies upon *obiter dictum* in the majority opinion in *Loper Bright* and Justice Gorsuch's concurring opinion in the same case, his arguments are unpersuasive. Nothing in *Loper Bright* purported to address the constitutionality of a federal statute, such as AEDPA. On the contrary, in that case the Supreme Court relied upon a federal statute, the APA, as the legal basis for rejecting a judicial creation – the *Chevron* doctrine. Nor do Cade's citations to *Loper Bright* cast any doubt on the continuing efficacy of the many Supreme Court decisions since the enactment of AEDPA discussed above which recognized the limitations Congress placed on federal habeas review by the federal district courts. Cade cites no decision by the Supreme Court or any other federal court in which a petition for federal habeas corpus relief was denied on the basis of *Chevron* deference. Accordingly, his arguments premised on *Loper Bright* bear no rational relationship to the issue of AEDPA constitutionality.

Cade's reliance on Chief Justice Roberts's and Justice Gorsuch's discussions of the Supreme Court's decision in *Marbury v. Madison*,[497] is likewise misplaced. *Marbury* addressed the propriety of a Congressional enactment which purported to add to the Supreme Court's original jurisdiction.  Chief Justice Marshall reasoned for the Court that Congress lacked the constitutional authority to add or detract from the authority expressly granted to the Supreme Court in Article III of the Constitution.  In *Felker*, the Supreme Court held AEDPA did not purport to impose any restriction on the Supreme Court's *original* habeas corpus jurisdiction, only on its *appellate* jurisdiction, a matter expressly reserved to Congress under Article III, Section 2.[498]  Cade fails to recognize that the Supreme Court of the United States has consistently held federal district courts may exercise only the federal habeas authority granted to them by Congress pursuant to Article I, Section 8, of the Constitution. Even the Supreme Court's 1953 decision in *Brown v. Allen* recognized as much: "Jurisdiction over applications for federal habeas corpus is controlled by statute."[499]

Likewise, Cade's historical references to federal habeas cases decided prior to 1867 have no relevance to AEDPA constitutionality.  As discussed above, and the Supreme Court has explained multiple times, because of a lack of statutory

---

[497]    5 U.S. (1 Cranch) 137, 177, 2 L. Ed. 60 (1803).

[498]    *Felker*, 518 U.S. at 661.

[499]    *Brown*, 344 U.S. at 460 (citing Section 2241(a)).

authorization, federal district courts exercised no habeas corpus authority prior to 1867 over *state* prisoners.

Finally, in *Cobb v. Thaler*,[500] the Fifth Circuit expressly rejected arguments that Section 2254(d)(1) unconstitutionally impinges upon the decisional independence of the federal courts – the same basic argument presented by Cade in his motions challenging AEDPA constitutionality.[501]  More specifically, in *Cobb*, the Fifth Circuit expressly rejected arguments that (1) § 2254(d)(1) (which limits federal habeas relief to detentions pursuant to state court violations of "clearly established Federal law, as determined by the Supreme Court") unconstitutionally dictates how federal courts adjudicate habeas cases by restricting them to considering only certain legal authorities and (2) § 2254(d)(1)'s "unreasonable application" standard instructs federal courts to defer to state court interpretations of federal law.

With regard to Cobb's former argument, the Fifth Circuit held Section 2254(d)(1) "does not intrude on the independent adjudicative authority of the federal courts."[502]  The Fifth Circuit reasoned that "[r]egulating relief is a far cry from limiting the interpretive power of the courts . . . and Congress has ample power to adjust the circumstances under which the remedy of the writ of habeas corpus is

---

[500]    682 F.3d 364 (5th Cir. 2012), *cert. denied*, 568 U.S. 1126 (2013).

[501]    *Id*. at 273-77.

[502]    *Id*. at 374.

deployed."[503]  The Fifth Circuit concluded Cobb's Article III arguments could not withstand scrutiny:

> Most fundamentally, Cobb's Article III challenge is untenable because it depends on an assumption that contradicts nearly two centuries of Supreme Court precedent.  Cobb assumes that if Congress gives federal courts habeas jurisdiction to consider collateral attacks on state convictions it must give them plenary authority to consider afresh any and every error of federal law made by the state court.  The Supreme Court, however, has long permitted Congress to extend habeas jurisdiction to federal courts without authorizing them to reconsider the legal determinations of criminal courts.  Indeed, the common law understanding of the writ forbade reexamination of the judgments of criminal courts of competent jurisdiction.[504]

With regard to Cobb's latter argument, after examining the history of federal habeas practiced in this nation, the Fifth Circuit held that "Congress may constitutionally grant federal courts habeas jurisdiction over collateral challenges to state convictions and yet limit the availability of the remedy to exceptional circumstances."[505]  The Fifth Circuit noted that, in rejecting a Suspension Clause challenge to a different provision of AEDPA, the Supreme Court in *Felker* emphasized that "judgments about the proper scope of the writ are 'normally for Congress to

---

[503]    *Id*. at 374-75 (quoting *Lindh v. Murphy*, 96 F.3d 856, 872 (7th Cir. 1996), *overruled on other grounds*, 521 U.S. 320 (1997)).

[504]    *Id*. at 375.

[505]    *Id*. at 376-77.

make.'"[506] The Fifth Circuit's holding in *Cobb* forecloses the arguments Cade makes in his motions and pleadings attacking the constitutionality of AEDPA. This court lacks the authority to either disregard or overrule the Fifth Circuit's holding in *Cobb* which, unlike the language in *Loper Bright* on which Cade relies, is not *obiter dictum*.[507]

Cade argues in a conclusory manner that the Supreme Court's majority opinion and Justice Gorsuch's concurring opinion in *Loper Bright* warrant "reconsideration" of the holding in *Cobb* as well as all of the many Supreme Court authorities discussed above. What Cade does not offer is a rational explanation for why such "reconsideration" is necessary at this juncture. Neither the history of federal habeas practice in this nation, as documented by the Supreme Court in its opinions discussed above, nor the plain language of the Constitution support Cade's constitutional challenge to AEDPA. As explained above, *Loper Bright* had absolutely nothing to do with either federal habeas practice or the constitutionality of a federal statute such as AEDPA.

Cade's arguments that Congress lacked the constitutional authority to restrict federal habeas review of petitions filed by state prisoners are at least inferentially

---

[506]   *Id*. at 377 (quoting *Felker*, 518 U.S. at 664) (in turn quoting *Lonchar v. Thomas*, 517 U.S. 314, 323 (1996)).

[507]   *In re Bonvillian Marine Service, Incorporated*, 19 F.4th 787, 789 (5th Cir. 2021) (holding a district court lacks the freedom to overturn a Fifth Circuit ruling even in light of subsequent Supreme Court precedent overruling the Fifth Circuit's holding).

rebutted by the Supreme Court's decisions in *Brown v. Allen* and *Brown v. Davenport*, decided almost seventy years apart; both of which recognize Congress possesses the authority to determine the scope of federal habeas relief.  The Fifth Circuit's decision in *Cobb*, which remains the law in this Circuit, refutes his remaining arguments challenging the constitutionality of AEDPA.  Every federal court identified by either party as having addressed the same issues has ruled against Cade's *Loper Bright*-based challenges to the constitutionality of AEDPA.[508]  Thus, Cade's constitutional challenges to AEDPA lack any arguable merit.

Respondent furnishes compelling arguments that Cade's constitutional arguments challenging AEDPA are (1) dilatory in nature; (2) foreclosed by this court's scheduling orders directing Cade to include all legal and factual arguments supporting his federal habeas claims in his pleadings; and (3) wholly untimely because they are premised on legal arguments readily available at the time Cade filed his second amended petition (ECF no. 159).  Nonetheless, this court will GRANT Cade leave to file his two motions attacking the constitutionality of AEDPA but, for

---

[508]    See *Bates v. Secretary, Florida Department of Corrections*, No. 25-12588, 2025 WL 2305211, at *1 (11th Cir. Aug. 1, 2025), *cert. denied sub nom*. __ U.S. __, 146 S. Ct. 65 (2025); *Miles v. Floyd*, No. 24-1096, 2025 WL 902800, at *3 (6th Cir. Mar. 25, 2025); *Suniga v. Guerrero*, No. 5:22-CV-0124-H, 2025 WL 2533209, at *22 (N.D. Tex. July 22, 2025) (Hendrix, J.); *Joubert v. Lumpkin*, No. 13-CV-3002, 2024 WL 4281444, at *9 n.4 (S.D. Tex. Sept. 24, 2024), *COA denied sub nom*. No. 24-70007, 2025 WL 2643182 (5th Cir. Sept. 15, 2025), *pet. for cert. docketed* (Feb. 3, 2026) (No. 25-6707).

the reasons set forth in Section IV of this Memorandum Opinion and Order, this court will simultaneously DENY both of those motions on the merits.  Thus, Cade's requests that he be granted leave to file his pair of motions attacking the constitutionality of AEDPA (ECF nos. 152, 158) are GRANTED.  For the reasons set forth above in Section IV of this Memorandum Opinion and Order, all relief requested in either of Cade's motions attacking the constitutionality of AEDPA (ECF nos. 150, 151) is DENIED.  Cade is also DENIED a Certificate of Appealability on all claims and issues presented in either of his motions attacking the constitutionality of AEDPA.  For the reasons set forth at length above, reasonable jurists could not disagree with this court's rejection on the merits of all of Cade's attacks on the constitutionality of AEDPA.

## V.  EVIDENTIARY HEARING REQUEST

Cade requests an evidentiary hearing in this court.[509]  Insofar as Cade's claims in this federal habeas corpus proceeding were disposed of on the merits during the course of his direct appeal or initial state habeas corpus proceedings, he is not entitled to a federal evidentiary hearing to develop new evidence attacking the state appellate or state habeas court's resolution of his claims unless he can satisfy 28 U.S.C. § 2254(e)(2).[510]  Likewise, a federal habeas petitioner is not entitled to an

---

[509]   ECF no. 127 at 250.

[510]   *Shinn*, 596 U.S. at 371 (in all but the extraordinary situations listed in
(continued...)

- 229 -

evidentiary hearing for the purpose of showing that his failure to develop facts in the

state court was the result of the ineffective assistance of his state habeas counsel.[511]

Under AEDPA, the proper place for development of the facts supporting a

federal habeas claim is the state court.[512]  Where a petitioner's claims have been

rejected on the merits, further factual development in federal court is effectively

precluded by virtue of the Supreme Court's holding in *Cullen v. Pinholster*:

> We now hold that review under § 2254(d)(1) is limited to
> the record that was before the state court that adjudicated
> the claim on the merits.  Section 2254(d)(1) refers, in the
> past tense, to a state-court adjudication that "resulted in" a
> decision that was contrary to, or "involved" an
> unreasonable application of, established law.  This
> backward-looking language requires an examination of the
> state-court decision at the time it was made.  It follows
> that the record under review is limited to the record in
> existence at that same time *i.e.*, the record before the state
> court.[513]

---

[510](...continued)
§ 2254(e)(2), a federal habeas petitioner who failed to develop facts in state court
supporting his claim is not entitled to an evidentiary hearing in federal court).

[511]    *Id*. at 383-91.

[512]    See *Harrington*, 562 U.S. at 103 ("Section 2254(d) thus complements
the exhaustion requirement and the doctrine of procedural bar to ensure that state
proceedings are the central process, not just a preliminary step for a later federal
habeas proceeding[.]"); *Hernandez*, 108 F.3d at 558 n.4 (holding AEDPA clearly
places the burden on a federal habeas petitioner to raise and litigate as fully as
possible his federal claims in state court).

[513]    *Cullen*, 563 U.S. at 181-82.

Thus, Cade is not entitled to a federal evidentiary hearing on any of his claims which were rejected on the merits by the state courts, either on direct appeal or during his initial state habeas corpus proceedings.[514]  Furthermore, factual development of a claim in federal court is permissible only when the federal habeas court first determines the new evidence to be developed could properly be considered in light of the restrictions on evidentiary development imposed by AEDPA.[515]

This court is entitled to rely upon the facts alleged by Cade in his second amended federal habeas petition.[516]  Conclusory allegations will not support a claim of ineffective assistance of counsel.[517]  Further, "complaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified are largely

---

[514]    *Shinn*, 596 U.S. at 371; *Halprin v. Davis*, 911 F.3d 247, 255 (5th Cir. 2018) (per curiam) ("'If a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court.'") (quoting *Cullen*, 563 U.S. at 185), *cert. denied*, 589 U.S. 959 (2019).

[515]    *Shoop*, 596 U.S. at 819-21 (where a petitioner failed to develop the factual bases for his claims in state court, he is entitled to present new evidence in support of his claims before the federal habeas court only in the two limited circumstances outlined in § 2254(e)(2)).

[516]    *See* Rule 2(c)(2) of the Rules Governing Section 2254 Cases in the United States District Courts; see also *Mayle*, 545 U.S. at 655.

[517]    See *Harper*, 64 F.4th at 691-92; *Collier v. Cockrell*, 300 F.3d 577, 587 (5th Cir.), *cert. denied*, 537 U.S. 1084 (2002); *Barnard v. Collins*, 958 F.2d 634, 642 n.11 (5th Cir.), *rehearing denied*, 964 F.2d 1145 (1992), *cert. denied*, 506 U.S. 1057 (1993).

speculative."[518]  To prevail on an ineffective assistance claim based upon uncalled

witnesses, an applicant "'must name the witness, demonstrate that the witness was

available to testify and would have done so, set out the content of the witness's

proposed testimony, and show that the testimony would have been favorable to a

particular defense.'"[519]  "An applicant 'who alleges a failure to investigate on the part

of his counsel must allege with specificity what the investigation would have revealed

and how it would have altered the outcome of the trial.'"[520]

With regard to any new factual allegations, new evidence, or new legal

arguments Cade presents in support of any of the claims for which this court has

undertaken *de novo* review, he is likewise not entitled to an evidentiary hearing.  In

the course of conducting a *de novo* review of Cade's claims that were summarily

dismissed by the TCCA when it dismissed Cade's first subsequent (second) state

habeas application, except for those assertions that are refuted by the state courts

records now before this court, this court has assumed the factual accuracy of (1) all

---

[518]    *Buckelew v. United States*, 575 F.2d 515, 521 (5th Cir. 1978); see also
*Nelson*, 952 F.3d at 669; *Fields*, 761 F.3d at 461; *Coleman v. Thaler*, 716 F.3d 895, 906
(5th Cir. 2013), *cert. denied*, 571 U.S. 1214 (2014); *Woodfox*, 609 F.3d at 808; *Coble*,
496 F.3d at 436; *Graves v. Cockrell*, 351 F.3d 143, 156 (5th Cir. 2003).

[519]    *Nelson*, 952 F.3d at 669 (quoting *Day*, 566 F.3d at 538); *Gray v. Epps*,
616 F.3d 436, 443 (5th Cir. 2010), *cert. denied*, 563 U.S. 905 (2011); *Woodfox*, 609
F.3d at 808; *Gregory*, 601 F.3d at 352.

[520]    *Gregory*, 601 F.3d at 352 (quoting *United States v. Green*, 882 F.2d 999,
1003 (5th Cir. 1989)).

the specific facts alleged by Cade in support of his claims for relief and (2) any

documents he has presented in support of those claims.  Even when the truth of all of

Cade's new specific factual allegations supporting those claims is assumed, his claims

do not warrant federal habeas relief.[521]  Thus, Cade is not entitled to an evidentiary

hearing in this court with regard to any of his claims for which this court has

undertaken *de novo* review.[522]  The pleadings and this court's review of the state court

records establish that Cade is precluded from obtaining federal habeas relief.  He is

not entitled to an evidentiary hearing in this court.

## VI.  CERTIFICATE OF APPEALABILITY

Under AEDPA, before a petitioner may appeal the denial of a habeas corpus

petition filed under § 2254, the petitioner must obtain a COA.[523]  Likewise, under

AEDPA, appellate review of a habeas petition is limited to the issues on which a COA

---

[521]     See *Schriro*, 550 U.S. at 474 ("In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief.").

[522]     *Richards*, 566 F.3d at 563 (if the district court's review of the petition, answer, transcripts, and record from the state court proceedings refutes the petitioner's factual allegations or otherwise precludes habeas relief, the district court is not required to hold an evidentiary hearing).

[523]     *Miller-El I*, 537 U.S. at 335-36; 28 U.S.C. § 2253(c)(2).

is granted.[524]  In other words, a court grants or denies a COA on an issue-by-issue

basis, thereby limiting appellate review to those issues on which a COA is granted.[525]

A court will not grant a COA unless a petitioner makes a substantial showing

of the denial of a constitutional right.[526]  To make such a showing, the petitioner

need not show he will prevail on the merits but, rather, must demonstrate that

reasonable jurists could debate whether (or, for that matter, agree) the petition

should have been resolved in a different manner or that the issues presented are

adequate to deserve encouragement to proceed further.[527]  This court is required to

issue or deny a COA when it enters a final order such as this one adverse to a federal

habeas petitioner.[528]

The showing necessary to obtain a COA on a particular claim depends on the

manner in which the District Court has disposed of a claim.  "[W]here a district

court has rejected the constitutional claims on the merits, the showing required to

---

[524]    See *Crutcher v. Cockrell*, 301 F.3d 656, 658 (5th Cir. 2002) (per curiam).

[525]    *Lackey v. Johnson*, 116 F.3d 149, 151 (5th Cir. 1997) ("A plain reading of the AEDPA compels the conclusion that COAs are granted on an issue-by-issue basis, thereby limiting appellate review to those issues alone."); 28 U.S.C. § 2253(c)(3).

[526]    *Tennard*, 542 U.S. at 282; *Miller-El I*, 537 U.S. at 336; *Slack v. McDaniel*, 529 U.S. 473, 483 (2000); *Barefoot*, 463 U.S. at 893.

[527]    *Tennard*, 542 U.S. at 282; *Miller-El I*, 537 U.S. at 336.

[528]    Rule 11(a), Rules Governing Section 2254 Cases in the United States District Courts.

satisfy § 2253(c) is straightforward:  The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."[529]  In a case in which the petitioner wishes to challenge on appeal this court's dismissal of a claim for a reason not of constitutional dimension, such as procedural default, limitations, or lack of exhaustion, the petitioner must show reasonable jurists would find it debatable whether the petition states a valid claim of the denial of a constitutional right *and* whether this court was correct in its procedural ruling.[530]  This court did not dispose of any of Cade's federal habeas corpus claims on procedural grounds.  Rather, this court addressed the merits of all of Cade's federal constitutional claims, including those of his federal habeas claims which the TCCA summarily dismissed in the course of Cade's second state habeas proceeding.

Reasonable minds could not disagree with this court's conclusions that (1) all of Cade's substantive federal constitutional claims, including his complaints about state trial and appellate court rulings on challenges for cause, evidentiary sufficiency, the absence of a lesser-included offense instruction, the exclusion of expert testimony,

---

[529]     *Miller-El I*, 537 U.S. at 338 (quoting *Slack*, 529 U.S. at 484).

[530]     See *Slack*, 529 U.S. at 484 (holding when a district court denies a habeas claim on procedural grounds, without reaching the underlying constitutional claim, a COA may issue only when the petitioner shows that reasonable jurists would find it debatable whether (1) the claim is a valid assertion of the denial of a constitutional right and (2) the district court's procedural ruling was correct).

allegedly improper prosecutorial jury argument, Cade's alleged intellectual disability, constitutional defects in the Texas capital sentencing special issues, an alleged fair cross-section violation, and his *Batson* claim are without arguable merit; (2) all of Cade's complaints of ineffective assistance by his trial counsel fail to satisfy the prejudice prong of *Strickland*; and (3) Cade's cumulative error claim is legally frivolous. There are no constitutional errors to cumulate in this case. Cade is not entitled to a COA from this court.

## VII.  CONCLUSION

For these reasons, (1) the referral of this cause to the United States Magistrate Judge is **WITHDRAWN**; (2) all relief requested in Cade's second amended federal habeas petition (ECF no. 127), as supplemented by Cade's reply brief (ECF no. 146), is **DENIED** on the merits; (3) Cade's requests for leave to file motions attacking the constitutionality of AEDPA (ECF nos. 152, 158) are **GRANTED**; (4) all relief requested in either of Cade's motions attacking the constitutionality of AEDPA (ECF nos. 150, 151) is **DENIED**; (5) Cade's request for an evidentiary hearing is **DENIED**; and (6) Cade is **DENIED** a Certificate of Appealability on all of his claims for relief in this action and his motions asserting constitutional challenges to AEDPA.

**SO ORDERED**.

March 31, 2026.

_____

**A. JOE FISH**
**Senior United States District Judge**

- 236 -